AFFIDAVIT

I, Benjamin Wallace, Special Agent, Federal Bureau of Investigation ("FBI"), being sworn, state as follows:

1. I have been employed as a Special Agent with the FBI since 2009. I am currently assigned to the FBI's Boston Field Office's Organized Crime Task Force (the "FBI Task Force"). Before joining the FBI, I was a Special Agent with the United States Secret Service for approximately four years. Before that, I worked as a police officer with the City of Atlanta, Georgia Police Department for approximately five years.

2. The mission of the FBI Task Force is to identify, investigate, disrupt and dismantle sophisticated criminal organizations operating in Massachusetts, with a particular focus on those groups connected to national or transnational criminal networks that pose the greatest threat to the national and economic security of the United States. The FBI Task Force uses a broad array of techniques to conduct these investigations, including utilizing information received from confidential human sources; examining and exploiting telephone, social media, and financial records; and embedding undercover agents in dangerous, difficult-to-penetrate groups.

3. I submit this affidavit in support of an application for a criminal complaint charging that, from in or about January 2022 to at least October 2022, QING HUA SUN, a/k/a "Ben" (hereinafter, "SUN") conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

4. During this investigation, the FBI Task Force used cooperating witnesses ("CWs") and undercover agents ("UCs") to infiltrate a criminal organization led by JIN HUA ZHANG. This organization (hereinafter, the "ZHANG Organization") laundered large sums of money for

1

various criminal groups.[1]  Agents on the FBI Task Force first detected the network in greater Boston but also identified leaders and members of the group throughout the United States and overseas.  Over the past year, agents determined that the ZHANG Organization laundered at least $25 million worth of proceeds from the sale of controlled substances, fraud schemes, and profits from other illegal businesses.  To date, agents have traced funds from the ZHANG Organization to Hong Kong and elsewhere in China, India, Cambodia, and Brazil, among other locations.  The investigation also revealed that the ZHANG Organization distributed kilogram-sized quantities of cocaine, a Schedule II controlled substance, and MDMA, or ecstasy, a Schedule I controlled substance, to FBI CWs and UCs.

5.      This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it describes only those facts necessary to establish probable cause to believe that the SUN committed the violation set forth in the accompanying criminal complaint.

6.      <u>The Money Laundering Conspiracy</u>.  Agents first became aware of the ZHANG Organization in May 2021, when a Boston-area member of the ZHANG Organization, LICHENG HUANG,[2] began to have a series of discussions with a cooperating witness (CW-1).[3]  In these

---

[1] ZHANG has been charged with conspiracy to commit money laundering, in violation 18 U.S.C. § 1956(h), and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, in *United States v. Zhang, et al.*, Case No. 22-cr-10279-AK.

[2] HUANG has been charged with conspiracy to commit money laundering, in violation 18 U.S.C. § 1956(h), in *United States v. Zhang, et al.*, Case No. 22-cr-10279-AK.

[3] CW-1 began providing information to agents when it was unable to pay debts it incurred to an extortionate lender.  In exchange for information, agents paid CW-1, who used the funds to help resolve its debt.  Since then, CW-1 has been paid for its work in this and other investigations.  CW-1 has been advised that agents will take steps to ensure CW-1's safety and the safety of CW-1's family.  CW-1's information has been corroborated by agents and by the investigation generally.  For that reason, I believe CW-1 is reliable.

exchanges, which agents recorded or preserved, HUANG asked CW-1 on behalf of his "boss" (later identified as ZHANG) if CW-1 knew anyone who could launder the proceeds of drug sales by converting United States currency into Chinese renminbi (RMB) and then having those funds deposited in Chinese bank accounts.[4]

7. Based on this information, the FBI Task Force designed an undercover operation to identify the network of money launderers working with HUANG's group (which ultimately led to ZHANG) and to identify the sources of the illicit funds that the group sought to launder. Agents directed CW-1 to make HUANG a counterproposal: CW-1 would agree to introduce HUANG to other criminals (in reality, FBI undercover agents) who could help HUANG and his group convert drug funds into cryptocurrency. Based on my training and experience, I know that cryptocurrency is a decentralized, peer-to peer, computer network-based medium of exchange that may be used as a substitute for government-issued currency. Cryptocurrencies have legitimate uses but are also used for criminal purposes such as money laundering and are an often used means of payment for illegal goods and services. Cryptocurrency is stored in a virtual account called a wallet. Those who use cryptocurrency for illicit purposes often maintain multiple wallets in an effort to thwart law enforcement's ability to track purchases or transfers. I also know that Tether (sometimes referred to as "USDT" or "U") is a cryptocurrency.

8. Over a series of phone calls and meetings in June and July 2021, CW-1 introduced HUANG to two undercover agents, UC-1 and UC-2 (collectively, the "UCs"). UC-1 spoke Mandarin and posed as a West Coast-based criminal. UC-2 posed as UC-1's partner and a money launderer based in Boston. UC-1 explained to HUANG that he used Boston-based UC-2 to launder

---

[4] CW-1 communicated with HUANG on a cellular telephone registered to him at his home address. CW-1 also identified HUANG from a Registry of Motor Vehicles (RMV) photograph.

money, including drug proceeds, by converting the funds to cryptocurrency, which could then be transmitted to China or elsewhere without being detected by law enforcement. UC-1 and UC-2 explained to HUANG that UC-2 charged a fee for this service, and that the fee varied based on the level of danger involved (for instance, the fee charged for laundering funds derived from low-risk internet-based scams was smaller than the fee charged for funds derived from drug trafficking).

9. On July 28, 2021, agents recorded a meeting between CW-1, the UCs, and HUANG in Newport, Rhode Island. During this meeting, HUANG explained to the UCs that his "boss" needed to launder large amounts of proceeds from marijuana trafficking. The UCs, in turn, explained to HUANG how the group's drug proceeds would be converted into cryptocurrency: once HUANG contacted CW-1 to report he would have cash to convert, CW-1 would direct HUANG to a meeting location (often a public area, like the parking lot of a bank or grocery store or coffee shop). CW-1 and HUANG would meet at the predetermined location. Once there, a courier would bring a bag containing a bulk cash delivery. CW-1 would confirm that the correct amount of money had been delivered. CW-1 would then contact UC-2 by phone. After UC-2 received confirmation that the funds to be laundered had arrived, UC-2 would send an equivalent amount of cryptocurrency, minus a service fee, to a digital wallet that a ZHANG Organization member would identify. The UCs explained that the person in control of the digital wallet (later identified as ZHANG) would be able to confirm that the transfer had occurred within seconds.

10. During the meeting on July 28, 2021, UC-2 made a small cryptocurrency transfer to a digital wallet that HUANG identified as belonging to his "boss." When HUANG called his "boss," UC-1 observed that the contact name on HUANG's telephone was "Hua." Agents reviewed toll records from HUANG's phone and determined that during the meeting HUANG

called telephone number (917) 916-3567, which, according to a law enforcement database, was a telephone number associated with ZHANG.

11. ZHANG Identified Other Sources of Funds To Be Laundered. On January 10, 2022, ZHANG arrived at the One Hotel in Brooklyn, New York with an associate, who agents later identified as SUN.[5] In a lengthy video-recorded meeting involving UC-1, UC-2, CW-1, and another UC in a minor supporting role, ZHANG and SUN discussed expanding their money laundering business. During this meeting, UC-1 told ZHANG and SUN that his business is mostly from Latin America, that he usually charged a 7 percent fee for "powder" (cocaine) money, that this money would be laundered through enough layers that it would appear to be clean. As a result, UC-1 told ZHANG and SUN, both UC-1 and his customers are protected. In response, ZHANG explained that they had money from similar sources (drug money) but all those funds were in cash and were either from "leaf" (marijuana) or "white" from Latin America (cocaine).

12. ZHANG then asked the UCs if they have dealt with what he called "T5" money. In response, the UCs told ZHANG and SUN that the money they launder comes from many different sources. ZHANG explained what he meant by "T5" money. According to ZHANG, these funds come from victims of fraud schemes. These funds are transferred from business or personal accounts when a victim is convinced under false pretenses to transfer money to a fraudster's account. ZHANG provided the UCs with the following example of a T5 scheme: a scammer uses social media, such as Instagram or Facebook, to lure a victim to "invest in" cryptocurrency. The victim is led to believe that he or she is making money, so the victim invests

---

[5] New York-based agents on surveillance advised that they believed that the person accompanying ZHANG was SUN. I obtained a driver's license photograph of SUN and showed that image to CW-1, who identified SUN as ZHANG's associate. I also reviewed the video recording, which is well over an hour, and identified SUN with ZHANG in the video recording.

5

more. However, eventually, the scammer takes the victim's money. ZHANG indicated that if the loss amount is small, neither the police nor the bank would investigate. But if the loss is large enough, ZHANG said the FBI could get involved. Normally, by the time the victims realize that they are being scammed and report the fraud to the bank or police, the proceeds have been transferred out of the fraudster-controlled bank account that was receiving the victim's money. However, once the fraud is detected, the bank or law enforcement would know that the receiving account was involved with an online fraud. Therefore, the accounts are often closed. ZHANG's description of the fraud schemes highlighted a problem that ZHANG and his associates discussed regularly with the UCs and CWs during this investigation and worked to overcome, namely, finding ways to extract funds from the accounts to which fraud victims send money without leaving a trail of accounts that could be traced to the fraudsters who were responsible for tricking the victims into parting with their money.

13. SUN told the UCs that the volume of deposits into the receiving accounts was hard to control. SUN stated that his cousin told him that $10,000 or $20,000 would be wired to SUN's account per day. However, $180,000 was transferred one day in November and SUN lost it all (agents later learned that the loss was the result of the account being frozen). SUN also raised another concern, namely there were times when a victim's bank would call the victim to confirm a wire transfer, which could delay the release of funds and jeopardize the scheme. SUN told the UCs that he wanted to disclose to them all the risk ahead of time before they became more involved in the money laundering operation.

14. <u>ZHANG's January 27, 2022, Pick Up of $190,000 At Frank Pepe's Pizza in New Haven, Connecticut</u>. Beginning on January 25, 2022, ZHANG and UC-2 began to plan for a $200,000 money bulk cash pick up. At about 8:27 p.m., UC-2 sent ZHANG a message over

Telegram: "Cash pick up about noon?"  ZHANG responded, "Will know by 11 pm after my guy pick the find [sic] funds."

15. On January 26, 2022, UC-2 texted ZHANG, "How's it looking bro?"  ZHANG responded, "Still Waiting for answers since morning."  At 2:22 p.m., ZHANG sent a message, "I thnk [sic] need to be rescheduled."  UC-2 replied, "OK, let m[e] know" and told him he was holding Tether for him.  At 8:29 p.m., ZHANG called UC-2 and they arranged to conduct a $190,000 bulk cash pick up the next day.  UC-2 sent ZHANG the address: "Frank Pepe Pizzeria Napoletana, 14 Wooster Street, New Haven, CT."  UC-2 told ZHANG that he and CW-2 would meet him there.  UC-2 told ZHANG, "I'll buy you lunch if you come" and ZHANG replied "hahaha thanks."

16. On January 27, 2022, a surveillance team accompanied UC-2, CW-2, and another undercover agent in a limited role posing as an employee of UC-2, to Frank Pepe's restaurant.  At 12:48 p.m., UC-2 sent a message to ZHANG over Telegram: "We are here having lunch."[6]  ZHANG responded, "Enjoy will be there 26 minutes."  At 1:13 p.m., ZHANG texted UC-2, "I'm here."  UC-2 replied, "You wanna come in or you want Linda to come out?"  ZHANG told UC-2, "Just send her out."  UC-2 responded, "OK she's coming."  Three minutes later, ZHANG texted UC-2, "190k only" and "Not 200k."  UC-2 responded, "Ok take fee of [sic] the top?"  ZHANG responded, "Yes you can."  UC-2 did the math, "Ok I will send 186200," then asked ZHANG "same wallet as before?"  ZHANG forwarded UC-2 the address for the digital wallet.

17. Agents saw CW-2 and UC walk out of the restaurant and enter a white Toyota sedan.  Agents saw two men in the car.  CW-2 entered the Toyota alone.  ZHANG was in the front

---

[6] Telegram is cloud-based, encrypted messaging service.  During this investigation, ZHANG and UC-2 often used Telegram to communicate regarding the ZHANG Organization's money laundering operation.

passenger seat and an Asian male was in the driver's seat. ZHANG told CW-2 that it was risky to bring the money inside the pizzeria and that he felt more comfortable in the car. ZHANG told CW-2 that he needed UC-2 to launder larger amounts of money because the current volume was too small. ZHANG also asked CW-2 if CW-2 had heard about the fact that one of his money couriers had stolen $200,000 from him the previous week. ZHANG handed CW-2 a bag of money. CW-2 contacted UC-2, who wired Tether to ZHANG's digital wallet. Once UC-2 confirmed that the deal was done (he texted a screen shot of the Tether exchange to ZHANG over Telegram), CW-2 and the undercover agent walked back into the restaurant carrying the bag of cash and the Toyota drove away. The bag that ZHANG delivered contained $190,000 in cash.

18. On January 30, 2022, ZHANG and UC-2 used Telegram to communicate about a $25,000 wire transfer. ZHANG confirmed the account number with UC-2 and UC-2 asked whether the exchange would take place that day. ZHANG replied, "tomorrow." On January 31, 2022, at 11:36 a.m., ZHANG used Telegram to send UC-2 an image of a Bank of America receipt showing a $25,000 wire transfer to an FBI undercover account, along with the text, "T5." At 11:52 a.m., ZHANG texted UC-2, "please check." At 1:35 p.m., UC-2 responded "OK," "It's processing, should clear in an hour and I will send 24250," and "Same wallet?" ZHANG responded, "yes."

19. After the foregoing exchange, ZHANG sent UC-2 a fifteen second audio message about a deal in a few days (after the Chinese New Year). ZHANG explained the source of these funds: "it's like gambling money . . . its's not, umm, it's not, umm, scam money . . . it's gambling money, right now I'm testing, they are sending the money to my account first, if it's ok, I'm thinking of sending some of the money to your account. Is that ok?"

8

20.     ZHANG and SUN's Meeting With Undercover Agents Regarding Laundering Funds Derived from a Cambodia-Based Fraud Scheme. On April 4, 2022, ZHANG and SUN met with UC-1 and UC-2 at the One Hotel in Brooklyn and then later at a restaurant in Queens. During this meeting, the group discussed ZHANG and SUN's continued efforts to obtain cryptocurrency from the Boston-based UC-2 in exchanged for illicit funds. At the meeting, ZHANG told the UCs that he was "in it with them for the long haul." In addition, ZHANG indicated that he had new clients based in Cambodia who were the source of to-be-laundered funds and that SUN was the person who established the connection with the Cambodian clients.

21.     U.S. Customs and Border Protection ("CBP") records confirm that SUN and ZHANG traveled to Cambodia approximately one month before the April 4, 2022 meeting. On or about March 4, 2022, ZHANG arrived at John F. Kennedy International Airport on an in-bound flight from Seoul, South Korea. ZHANG's flight had originated in Phnom Penh, Cambodia. Upon his arrival, ZHANG told a CBP official that he was returning from a thirteen-day trip to Cambodia and indicated that he had been traveling with SUN. ZHANG told the CBP official that SUN would be returning to the United States on March 6, 2022 (records later confirmed that SUN returned to New York on March 7, 2022).

22.     Based on my training and experience in this investigation, I know that certain international fraud operations are based in Cambodia. I know from my training and experience, as well as open-source media reports, that some Cambodia-based fraudsters operate from compounds where they direct, and in some cases compel, individuals to use the internet and social media to contact and subsequently defraud victims by offering fictitious investment opportunities. Based on my training and experience, ZHANG's previous description of his organization's money laundering operation (including his description of the origin of T5 money), and the April 4, 2022

9

discussion involving ZHANG and SUN's activities, all establish that ZHANG and SUN agreed and intended to exchange proceeds derived from a Cambodia-based fraud operation for cryptocurrency that the Boston-based UC-2 would provide. Based on my training and experience, this would enable the principals of the Cambodia-based fraud operation to obtain the fraud victims' money while avoiding detection by law enforcement.

23. On June 4, 2022, ZHANG and SUN traveled to the Seaport District in Boston to meet with UC-2. During that meeting, ZHANG, SUN, and UC-2 continued to discuss their money laundering operation. During their conversation, they discussed concerns about bank accounts that ZHANG and the UCs had used to receive wire transfers that had been audited or reviewed by bank fraud examiners. ZHANG, SUN, and UC-2 also placed a call to UC-1. During that recorded call, ZHANG and SUN discussed the need to hire someone to collect an overdue debt from an associate in California. ZHANG also asked if UC-2 could identity additional fraud victims for the ZHANG Organization to target.

24. In summary, over the course of several lengthy meetings, ZHANG, SUN, UC-1, UC-2, and CW-1 discussed how the UCs would aid the ZHANG organization's efforts to launder funds from drug trafficking and other frauds by converting the funds to cryptocurrency for a fee. ZHANG and SUN's laundering operation included funds derived from fraud operations based in Cambodia, which SUN was responsible for cultivating. Accordingly, the ZHANG Organization's cash deliveries, wire transfers, and check deposits were proceeds derived in violation of 21 U.S.C. § 846, and 18 U.S.C. §§ 1343 (wire fraud) and 1349 (wire fraud conspiracy). And SUN, ZHANG, and others' agreement to convert these funds to cryptocurrency constitutes a violation of 18 U.S.C. §§ 1956(h) (money laundering conspiracy).

25. <u>Conclusion</u>. Based on the information set forth above, I submit that there is probable cause to believe that QING HUA SUN conspired with JIN HUA ZHANG and others to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

I, Benjamin Wallace, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

*Benjamin Wallace*
Benjamin Wallace
Special Agent
Federal Bureau of Investigation

~~Signed electronically~~ and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this 14th day of April 2023.        4:42 p.m.

*David H. Hennessy*
The Honorable David H. Hennessy
United States Magistrate Judge