1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4    UNITED STATES OF AMERICA,          )
                                        )
5           Plaintiff,                  )
                                        )  Criminal Action
6    v.                                 )  No. 1:22-cr-10279-AK-3
                                        )  Pages 1 to 23
7    FENG CHEN,                         )
                                        )
8           Defendant.                  )
                                        )
9

10

11            BEFORE THE HONORABLE ANGEL KELLEY
                 UNITED STATES DISTRICT JUDGE
12

13            EXCERPT TO JURY TRIAL - Day 2
                   OPENING STATEMENTS
14

15                    August 5, 2025

16

17         John J. Moakley United States Courthouse
                   Courtroom No. 8
18                 One Courthouse Way
              Boston, Massachusetts 02210
19

20

21

22            Linda Walsh, RPR, CRR
                Official Court Reporter
23    John J. Moakley United States Courthouse
                   One Courthouse Way
24            Boston, Massachusetts 02210
                 lwalshsteno@gmail.com
25

 1   APPEARANCES:

 2   On Behalf of the Government:

 3        UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Christopher J. Pohl
 4            AUSA Meghan Chambers Cleary
          1 Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          617-748-3196
 6        christopher.pohl@usdoj.gov

 7   On Behalf of the Defendant:

 8        SHEEHAN PHINNEY BASS & GREEN, PA
          By: Patrick J. Queenan, Esq.
 9            Jennifer Tamkin, Esq.
          1000 Elm Street, 17th Floor
10        Manchester, New Hampshire 03101
          603-627-8335
11        pqueenan@sheehan.com
          jtamkin@sheehan.com
12
          SHEEHAN PHINNEY BASS & GREEN, PA
13        By: David M. Losier, Esq.
          28 State Street, 22nd Floor
14        Boston, Massachusetts 02109
          617-897-5604
15        dlosier@sheehan.com

16

17   ALSO PRESENT: Simon Chan, Interpreter
                   Stephanie Liu, Interpreter
18

19

20

21

22                 Proceedings reported and produced
                    by computer-aided stenography.
23

24

25

                    P R O C E E D I N G S

                         * * * * *

(EXCERPT BEGINS.)

                GOVERNMENT OPENING STATEMENT

BY MS. CLEARY:

        On a dreary Valentine's day in 2022, the defendant,
Feng Chen, pulled into the parking lot of a Best Western Motel
in Quincy.  He was there to make an important delivery, not
flowers or chocolate, but $250,000, a quarter of a million
dollars in cash.  He had it in the back seat of his black
pickup truck, loose stacks of cash in a Walmart box.

        You'll get to see exactly what happened that day
because the FBI recorded the whole thing.  You'll see someone
who was working undercover for the FBI get out of their car at
that motel parking lot, walk across the lot to defendant
Cheng's black pickup truck, and you'll see inside the car that
he picks up a blue and white patterned bag and unties it.

        Inside the bag you'll see an open Walmart box filled
with cash.  You'll see that person start to remove the cash,
large stacks, and counted 1, 2, 3, 4, all the way to 25.  And
you'll see the stacks, big fat stacks that you can barely hold
in one hand, piled up in the Walmart box.

        And you'll see that as the money is counted, defendant
Cheng sits right there in the driver's seat of his black pickup
truck.  You'll get to watch this recording later in this trial,

1  and you'll have transcripts translating the Mandarin

2  conversation to English so that you can understand exactly

3  what's being said.

4       But you won't need a transcript to know what's going

10:07  5  on here.  The evidence will show that defendant Chen was

6  delivering money that came from illegal activity, and everyone

7  knew it.

8       This trial is about defendant Chen and seven

9  deliveries of cash and checks that he made around Boston

10:08  10  between August 2021 and August 2022.

11       As you know already, my name is Meghan Cleary, and I'm

12  an Assistant United States Attorney.  Together with my

13  colleague, Christopher Pohl, I represent the United States in

14  this case.  Isabella McIntyre is a paralegal with our office

10:08  15  and also part of our team.

16       Our job is to prove to you beyond a reasonable doubt

17  that defendant Chen committed the crimes that he is charged

18  with, which are money laundering conspiracy and conducting or

19  aiding and abetting the operation of an unlicensed money

10:08  20  transmitting business.

21       The evidence will show that over a period of

22  approximately one year, defendant Chen agreed to deliver well

23  over half a million dollars in cash and checks in seven

24  different deliveries.  You will see that he agreed five times

10:09  25  to deliver bags of cash to various parking lots and streets

around Boston.  You'll hear that most of this money was drug

money from the sale of cocaine or marijuana.  And you'll see

that defendant Chen agreed two other times at two different

restaurants to deliver bank checks, including one check for

10:09 over $162,000.  Most of this money was scam money from romance

scams and other investment scams.

You'll see a lot of evidence at this trial about

Chen's seven different money deliveries and the over $600,000

that he delivered.  We won't go into detail today about all of

10:09 those transactions, but you'll see that defendant Chen

delivered bags of money all over Boston and you'll see that the

pattern was generally the same each time.

For example, on August 6th, 2021, defendant Chen

delivered over $30,000 in the parking lot of a TD Bank.  He

10:10 delivered loose cash inside a plastic bag from a grocery store.

On February 7th, 2022, he delivered $100,000 at the

Encore Casino in a large black duffel bag.  And you'll see that

he sat there while the money was converted to cryptocurrency.

We've talked already about February 14th, 2022, when

10:10 defendant Chen delivered $250,000 in a Walmart box at a Best

Western Motel parking lot.

And on July 7th, 2022, he delivered $50,000 out the

window of his black pickup truck in the middle of the street in

Quincy.

10:11 You will learn that defendant Chen's deliveries looked

1    suspicious because they were.  The evidence will show that

2    defendant Chen made his seven deliveries on behalf of his

3    longtime friend and sometime business partner Jin Hua Zhang.

4         Zhang was in the business of exchanging cash that came

10:11 5    from drug trafficking and Internet fraud, and on seven

6    different occasions defendant Chen agreed to help him.  Zhang's

7    business was mostly based in New York, not Boston, but Zhang

8    had clients with cash in Boston and he needed someone here who

9    he could trust to receive that cash that came from crime, hold

10:11 10    on to it, and then deliver it.  And you will hear that

11    defendant Chen was that person.

12         And on seven different occasions he received money

13    from Zhang's clients.  And on seven different occasions he held

14    on to it until Zhang gave him the green light to deliver the

10:12 15    money.  And on seven different occasions he made those

16    deliveries for Zhang.

17         It doesn't matter why defendant Chen did what he did,

18    but the evidence that you'll see will tell you why.  He did it

19    because Zhang was his friend and Zhang needed his help.  The

10:12 20    evidence will show that they did favors for each other.  They

21    loaned each other money, and Zhang brought defendant Chen

22    investment opportunities.  But most importantly, they trusted

23    each other, and for Zhang, in this illegal business, trust is

24    everything.

10:12 25         I mentioned already, and the Judge told you, that

1  defendant Chen is charged with money laundering conspiracy.

2  The phrase "money laundering" sounds complicated, but the

3  concept really is simple.  People who commit certain types of

4  crimes, like selling drugs or stealing cash through scams on

10:13 5  the Internet, make money from committing those crimes.  But

6  those proceeds from crime are difficult for them to use.

7        You can't just deposit thousands and thousands of

8  dollars in cash into bank accounts without any explanation of

9  where that cash comes from.  People will get suspicious, banks

10:13 10  will ask questions, and when your business is criminal, that is

11  the last thing that you want.  So before you can put your

12  criminal profits into a bank account, you have to launder the

13  money, which just means adding a step between those profits and

14  their illegal source.  The added step is designed to make the

10:13 15  cash look more legitimate, and then the cleaner-looking cash

16  can go back to the criminals who need it to buy more drugs and

17  commit more crimes in the ongoing loop that you see there.

18  That's exactly the service that Zhang and defendant Chen

19  provided.

10:14 20        You will hear that in schemes like this, different

21  people can play different roles, and that's what happened here.

22  Zhang and defendant Chen did not do exactly the same thing, and

23  you're not going to hear that defendant Chen ever sold drugs or

24  converted money to cryptocurrency himself.  That was not his

10:14 25  job.  His job was to receive bags of cash and bank checks from

1    Zhang's customers, to hold on to them and keep them safe, and
2    then to deliver them to Zhang and people who worked for Zhang
3    so that the money could be converted to cryptocurrency.

4         You will hear from witnesses in this case, like FBI
10:14 5  Intelligence Analyst Brandon Tetro, who will explain to you
6    what cryptocurrency is and describe certain features that it
7    has that can make it attractive to criminals.  One thing that
8    you'll hear is that many cryptocurrency exchanges allow you to
9    move money outside the supervision of the traditional banking
10:15 10 system.  To access and store cryptocurrency, you don't have to
11   show your ID like you do to open a bank account.  You don't
12   have to explain it to anyone, where all of your cash is coming
13   from.  And suspicious transactions are not reported to
14   authorities like they would be by a bank.

10:15 15       You'll also hear from Mr. Ted Vlahakis, who works for
16   the Bureau of the United States Department of Treasury that's
17   responsible for protecting our financial system from illegal
18   activity, like money laundering.  He will tell you that the law
19   requires that banks report suspicious transactions and large
10:15 20 cash transactions to the government, and those reports are then
21   provided to law enforcement to help prevent crime.  That's
22   exactly why people are not going to use a bank when they want
23   to fly under the radar.  Instead, they will use someone like
24   Zhang and defendant Chen who will take their cash from crime
10:16 25 and convert it to cryptocurrency without reporting a thing.

1          Mr. Vlahakis also will tell you that people in

2   businesses that exchange cash for cryptocurrency are required

3   to register with the government.  And the evidence will show

4   here that neither Zhang nor defendant Chen ever registered

10:16  5   their business with the government, and they certainly never

6   filed any reports about their suspicious and large cash

7   transactions.  That's called conducting an unlicensed money

8   transmitting business.

9          In addition to Intelligence Analyst Tetro and

10:16 10   Mr. Vlahakis, you will get to hear testimony from Zhang

11  directly, and he will tell you exactly what money transmitting

12  services he provided and who it was for, drug traffickers and

13  online scammers.  Zhang has already pled guilty for his

14  conduct, and you will learn that he has agreed with the

10:17 15   government to testify because he hopes the government will

16  recommend a reduced jail sentence, although ultimately his

17  sentence will be up for Judge Kelley to decide.

18          For this reason, I anticipate that Judge Kelley will

19  instruct you at the end of the trial that you should consider

10:17 20   his testimony carefully.  But you won't just have to take

21  Zhang's word for it.  You'll get to see text messages showing

22  you exactly the amount of money that Zhang exchanged and when.

23  You'll hear some of Zhang's recorded calls with defendant Chen

24  where defendant Chen reports to Zhang that he's delivered the

10:17 25   cash and it's ready to be exchanged.  And you'll hear from

1    Intelligence Analyst Tetro that he traced Zhang's

2    cryptocurrency transactions on the blockchain, which he'll tell

3    you is a publicly available digital record of every

4    cryptocurrency transaction that's ever taken place.

10:18  5        All of this evidence will show you that the cash that

6    defendant Chen delivered was converted to cryptocurrency, sent

7    back to Zhang, and then sent to Zhang's clients, drug dealers

8    and online scammers.  This business was not registered, and

9    nothing was reported to the government.

10:18 10       Over the course of a year, defendant Chen had seven

11   different opportunities to walk away.  He never did.  And he

12   chose instead to deliver over half a million dollars all around

13   Boston.  For defendant Chen's conduct, his multiple deliveries

14   of drug money, hundreds of thousands of dollars in cash at

10:19 15  parking lots, a casino, and streets around Boston, and for his

16   two deliveries of bank checks, including $162,000 of fraud

17   money, defendant Chen is charged in the indictment with two

18   crimes that Judge Kelley described to you earlier, money

19   laundering conspiracy and conducting or aiding and abetting an

10:19 20  unlicensed money transmitting business.

21       The Judge will instruct you again about the elements

22   of these crimes at the end of trial.  And the evidence in this

23   case will prove that defendant Chen agreed to deliver money

24   that he knew came from illegal sources.  He knew that his

10:19 25  deliveries were designed to conceal those sources of the money.

1    And the evidence will show that those sources were drug

2    trafficking and Internet scams, like romance scams and

3    investment scams.  The evidence also will show that defendant

4    Chen conducted or aided and abetted the operation of a business

10:20  5    that was transmitting money across state lines and

6    internationally.

7         As I mentioned already, you will hear that businesses

8    like Chen's and Zhang's that exchange and transmit money have

9    to be licensed, and they have to report any cash transactions

10:20  10    over $10,000.  But you will see that defendant Chen and Zhang

11    didn't have a license for their money transmitting, and they

12    definitely never reported any of defendant Chen's five large

13    cash transactions to the government.

14         After you've seen and heard all the evidence, the

10:21  15    government will have the opportunity to speak with you again.

16    And when we do, we will ask you to return the only verdict

17    that's consistent with the charges and with all of the evidence

18    in this case, that beyond a reasonable doubt defendant Chen is

19    guilty.

10:21  20         Thank you.

21         THE COURT:  Thank you, Counsel.

22         Will there be an opening?

23         MR. QUEENAN:  Yes, Your Honor.

24         Could we have just one moment?

10:21  25         THE COURT:  Yes.

1           (Pause.)

2           MR. QUEENAN:  Your Honor, may I proceed?

3           THE COURT:  You may.

4           MR. QUEENAN:  Thank you.

10:23    5                 DEFENDANT OPENING STATEMENT

6    BY MR. QUEENAN:

7           Mr. Chen did not commit a crime.  He had no knowledge

8    of any unlawful activity.  He was not involved in any way in

9    any of the underlying crimes of wire fraud or drug

10:23   10   distribution.  He delivered money for a friend.  He did not get

11   paid.  He had no motive and no reason to be involved in

12   anything illegal.  Mr. Chen did not commit a crime.

13          I'm going to discuss essentially two things with you

14   during my opening statement.

10:24   15          The first is I want to introduce you to Mr. Chen, and

16   I want to walk you through what the evidence will show and

17   importantly what the evidence will not show.

18          And second, I want to discuss the law that applies to

19   this case, the government's burden of proof, the charges, the

10:24   20   requirement that the government prove each element beyond a

21   reasonable doubt.  Essentially, I want to give you a sneak peek

22   into which of the elements for you to be focused in on during

23   the trial.

24          Because you will see over the course of this trial

10:24   25   that the government cannot meet its extraordinary burden of

1    proving these elements beyond a reasonable doubt.  Mr. Chen,

2    who goes by Leo, is a United States citizen.  He immigrated

3    here from China approximately 18 years ago.  He lives in Canton

4    with his wife and two children.

10:25    5    Up until he was charged in this case, Leo was living

6    out the promise of the American dream.  He came here from China

7    with nothing.  He worked hard.  He started and still runs real

8    legitimate businesses.  And by hard work, day and night, he has

9    enjoyed professional and personal success.  He has done things

10:25   10    the right way.

11    You will hear that for the past nine years he has

12    owned and operated a successful and reputable kitchen design

13    and cabinet business located here in Dorchester with a

14    warehouse in Stoughton.  He is both an owner of this small

10:26   15    business as well as a skilled cabinet and countertop installer.

16    He is also on the ground managing these installs.  And like

17    many small business owners, he does everything, and it is an

18    around-the-clock job.

19    And on top of that, he also owns a restaurant with his

10:26   20    sister and his family called the Wei Shu Wu Hot Pot in Quincy.

21    And during times relevant to this case, in the summer of 2022,

22    Leo and his sister had the grand opening of their restaurant.

23    So while running In House Kitchen and Design by day, Leo worked

24    at night to prepare the restaurant for opening.  Most days he

10:27   25    did not return until 2:00 or 3:00 in the morning, only to turn

1   around and do it all again the next day.

2           So how is it that Leo, a successful small business

3   owner, who was not involved in any criminal activity, how is it

4   that he is now sitting here today in front of you charged with

10:27  5   financial crimes?

6           Jin Hua Zhang, this is someone who Leo trusted,

7   someone who Leo thought was a legitimate businessman, someone

8   who Leo thought was his friend, but Zhang betrayed Leo in the

9   worst way.  He deceived him.  He only showed Leo one side of

10:28 10  him.  He hid from Leo that he, Zhang, was a criminal.  He used

11  Leo so that he, Zhang, could make money.  And that's why Leo is

12  sitting here today.  Because he delivered money for someone who

13  he thought was his friend.

14          So let me tell you the background about Leo and

10:28 15  Mr. Zhang's friendship.  Around 2008 Leo immigrated to the

16  United States and settled in New Orleans.  And you will hear

17  that Leo came from the Fujian province of China, which is

18  roughly the size of California.  It has about 40 million

19  people.

10:29 20          While in New Orleans, Leo started working as a cabinet

21  installer, and while he was there, around 2012 or 2013, he met

22  Mr. Zhang and the two became friends.  Although they did not

23  know each other in China, they learned they came from that same

24  region.  Eventually, Leo moved here to Boston and Mr. Zhang

10:29 25  lived in New York City.  And over the years the two men

1    remained friends.

2          Leo became a U.S. citizen, he started a family, and he

3    opened his businesses.  And in 2017, you'll hear Mr. Zhang

4    actually moved to the Boston area to work with Leo at In House

10:29 5  Kitchen and Design.  Mr. Zhang saw how successful Leo was and

6    wanted to learn the business.  So Mr. Zhang spent about six

7    months with Leo learning, acting as an apprentice, but it's

8    hard work.  And Zhang decided to return to New York, and he

9    started his own businesses, nail salons, a car auction

10:30 10 business, a Western Union business.

11          And despite living in different cities, Leo and

12    Mr. Zhang stayed in contact.  When Leo was in New York for

13    business -- there's a distributor down there for his cabinet

14    business -- the two men would have dinner or lunch together,

10:30 15 and the same is true when Mr. Zhang visited the Boston area.

16    They also frequented the Encore Casino in Everett to gamble,

17    and you will hear that gambling is popular in the Chinese

18    culture.

19          All along Leo only knew one side of Mr. Zhang, a

10:31 20 legitimate business person, hardworking, entrepreneurial.  But

21    you will learn from the FBI's investigation that starting in

22    2021, unbeknownst to Leo, Mr. Zhang started transferring and

23    exchanging and converting money related to illegal activity,

24    and this is where this case starts.

10:31 25          Now, you heard a summary of the government's

1          investigation in their opening statement.  And the FBI

2          conducted an extensive investigation discovering that Mr. Zhang

3          was moving and exchanging money for both legitimate business

4          and unlawful activity.  Yet the government failed to mention

10:31  5          that, that Mr. Zhang also moved money for legitimate

6          businesses, and you'll hear that during the time of this case

7          Mr. Zhang also transferred and exchanged legitimate money,

8          money from foreign exchange students, restaurants, nail salons,

9          gambling winnings, and anyone who wanted to send money to

10:32 10          family back in China.

11                In fact, as I mentioned, you will hear that Zhang

12          owned a Western Union store in New York.  But as for Zhang's

13          other side, his involvement in unlawful activity, the evidence

14          will show that Leo was never made aware of that side of

10:32 15          Mr. Zhang.  The evidence will show -- instead, you will hear

16          and see that the opposite is true, that Leo was only led to

17          believe that Mr. Zhang was a legitimate business person.

18                And as you heard from the government, Leo delivered

19          money or checks seven times over a 13-month period, from August

10:33 20          2021 to August 2022.  None of that is in dispute.  Recordings

21          and photographs and cash bags, Leo was there seven times over

22          the course of 13 months.  And you're going to learn that each

23          one of these transactions was set up by FBI Boston.  So even

24          though Zhang was in New York, which is his home base for his

10:33 25          criminal activity, FBI Boston wanted to conduct undercover

1    operations into Zhang involving transactions here in this area,

2    in their jurisdiction.  And you will hear and see how the FBI

3    communicated with Zhang to schedule these transactions, and how

4    the FBI insisted on certain locations and created the

10:34 5    circumstances surrounding these transactions.

6         And as the government informed you in their opening,

7    they will play recordings and show you transcripts of these

8    transactions involving Leo.  In fact, we anticipate you'll see

9    and hear them today.  And when you review the recordings and

10:34 10    the transcripts, you will learn two things.

11        One, that Leo is unquestionably merely delivering

12    money or a check on behalf of Mr. Zhang.

13        And, two, during each one of these transactions when

14    Leo was present, no one discussed or even mentioned anything

10:34 15    about illegal activity, drugs, romance scams, investment scams,

16    not once.

17        Now, let's talk about the money.  Some of these

18    transactions involve large amounts of cash.  In fact, the

19    government's going to focus on that, and there's no dispute,

10:35 20    large amounts of cash.  It's not a crime to transact in cash or

21    to deliver cash.  We all know that.  It's important that you

22    will hear that it's very common in Chinese culture, especially

23    for recently immigrated Chinese, to conduct business in cash.

24    So although it may be unusual and rare for many of us to

10:35 25    conduct in cash, it is not unusual or rare for Chinese business

1    people to do so.

2         And as jurors, certainly you will be asked to apply

3    your common sense and your life experience when you're

4    reviewing the evidence, but you will also be asked to keep an

10:36 5    open mind and to consider that Leo is from a different culture.

6    He has different life experiences, and those cultural

7    differences and those differences in life experiences should be

8    considered when evaluating the evidence in this case.

9         And you were selected as jurors yesterday because you

10:36 10    are fair minded, because you promised to follow the Judge's

11    instructions, you promised to keep an open mind, and we've all

12    promised to ensure that Leo, like all of those that walk into

13    this courtroom and this courthouse, that they receive a fair

14    trial.

10:36 15         So we are going to ask you, keep an open mind

16    throughout the trial, and when considering the relevance or the

17    weight of the evidence presented to you, remember throughout

18    this trial, Leo is on trial, not Mr. Zhang.

19         The government will introduce evidence during the

10:37 20    trial of meetings and calls and text messages and Telegram

21    messages and that they discuss illegality, and the government

22    may even introduce evidence of a cocaine sale in New Jersey, of

23    a trip to Cambodia.  But you will see Leo is involved in none

24    of this.  He's not involved, and he's never made aware of any

10:37 25    of it.

1          Don't let the government distract you or confuse you.

2     Follow the evidence closely.  It will certainly incriminate

3     Mr. Zhang, but it's not evidence of Leo's guilt.  It is

4     important that you focus on the evidence that the government

10:38  5     introduces related to Leo and Leo only.

6          And during this trial you will hear from government

7     witnesses, many of them from the FBI, but not a single witness

8     is going to walk up here and take that stand and present

9     evidence demonstrating that Leo was aware that Mr. Zhang was

10:38 10     involved in criminal activity, and further, there will be no

11     evidence, none, that Leo himself was involved in any underlying

12     activities, none.

13          All right.  We're at the second part where I said I'm

14     going to walk you through some of the elements of the crime --

10:38 15     the charges as a way to help guide you during this trial.

16     We'll ask you to take note of the elements because, as the

17     evidence will show, the government will not establish these

18     elements beyond a reasonable doubt.

19          As jurors you're not being asked to consider simply

10:39 20     whether the government proved Leo did it or didn't do it.

21     Instead, determining guilt and innocence, it involves looking

22     at each and every element of the charged offenses, and one by

23     one determining if the government has proven each beyond a

24     reasonable doubt.  That means to do so, you collectively, the

10:39 25     jury, have to have confidence that the government has met the

1   highest burden in our legal system, proof beyond a reasonable

2   doubt.  And along the way, if you find one element is not met,

3   you stop, and you must acquit on the charge, and you'll be

4   instructed on that by the Judge.

10:40  5        So what are those elements that I want to sneak peek

6   for you?

7        With regard to the money laundering conspiracy, I want

8   to bring your attention to three elements to pay attention to

9   throughout this trial.

10:40 10        One is the knowledge element.  Will they prove to you

11  that Leo knew that the money involved in the transactions

12  derived from unlawful activities?

13        The second is the proceeds element.  Will they prove

14  to you that the money involved in the transactions actually

10:40 15  derived from what's called specified unlawful activity, wire

16  fraud or drug distribution, or did it come from some other

17  source?  Because if it's from another source, it's not

18  proceeds.

19        The third is the agreement element.  Will the

10:40 20  government prove that Leo willfully entered into an agreement

21  to commit money laundering, meaning that he agreed with someone

22  else to commit a crime, not that he committed to deliver money

23  but that he agreed to commit a crime.

24        And as to the other count, operating an unlicensed

10:41 25  money transmitting business, we're going to ask you to focus on

1    two elements throughout this trial.

2          And the first is the ownership element, whether Leo

3    himself owned or controlled or managed a money transmitting

4    business.  You will find that he did not.

10:41  5          And the second is the advance knowledge element.  As

6    Leo is alleged to have aided and abetted the operation of an

7    unlicensed money transmitting business, the government must

8    prove that Leo intended to help commit a crime.  That is, that

9    he had advance knowledge that Mr. Zhang was operating an

10:41  10   unlicensed money business, and the evidence will show he had no

11   knowledge, let alone advance knowledge, of Mr. Zhang's criminal

12   conduct.

13         During its opening statement, the government

14   referenced and showed photos of some co-conspirators in this

10:42  15   case.  They referenced Jin Hua Zhang and you might hear about

16   another man named Licheng Huang and may hear about others.  And

17   you will see a stark difference between these men and Leo.

18   Each of these other men had explicit knowledge of the

19   underlying criminal conduct.  Leo had no knowledge of

10:42  20   Mr. Zhang's criminal conduct.

21         Each of these other men were involved in the

22   underlying criminal conduct.  Leo was not involved in any of

23   the underlying criminal conduct.  Each of these criminals got

24   paid for what they did.  Leo got nothing.  He didn't get paid a

10:43  25   cent.  And that is the difference between being guilty of

1    committing a crime and being not guilty of committing a crime.

2            Leo is innocent.  And as the Court told you and as

3    you'll learn through the instructions and as we know, that the

4    Constitution affords Leo, like all of us in this country, the

10:43  5    presumption of innocence.  So he sits here right now innocent,

6    and the government has to prove each and every element of the

7    crimes charged beyond a reasonable doubt.

8            And at the end of this trial, I'm going to come back

9    up here.  By that point the evidence will show that the

10:43 10    government cannot meet its burden, that Leo remains innocent,

11    and that we will ask you to hold the government to that burden

12    and find that Leo is not guilty of the two offenses.

13            Thank you.

14            THE COURT:  Thank you, Counsel.

10:44 15            It's 10:45.  Do we need a break?

16    (END OF EXCERPT.)

17                            *  *  *  *  *

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 7th day of August, 2025.


/s/ Linda Walsh
Linda Walsh, RPR, CRR
Official Court Reporter