UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action |
| v. | ) | No. 1:22-cr-10279-AK-3 |
| | ) | Pages 5-1 to 5-102 |
| FENG CHEN, | ) | |
| Defendant. | ) | |

BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE

JURY TRIAL
Day 5

August 8, 2025
8:59 a.m.

John J. Moakley United States Courthouse
Courtroom No. 8
One Courthouse Way
Boston, Massachusetts 02210

Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
By: AUSA Christopher J. Pohl
AUSA Meghan Chambers Cleary
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3196
christopher.pohl@usdoj.gov
meghan.cleary@usdoj.gov

On Behalf of the Defendant:

SHEEHAN PHINNEY BASS & GREEN, PA
By: Patrick J. Queenan, Esq.
Jennifer Tamkin, Esq.
1000 Elm Street, 17th Floor
Manchester, New Hampshire 03101
603-627-8335
pqueenan@sheehan.com
jtamkin@sheehan.com

SHEEHAN PHINNEY BASS & GREEN, PA
By: David M. Losier, Esq.
28 State Street, 22nd Floor
Boston, Massachusetts 02109
617-897-5604
dlosier@sheehan.com

Proceedings reported and produced by computer-aided stenography.

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| JIN HUA ZHANG, Continued | | | | |
| By Mr. Pohl | 5-6 | | 5-94 | |
| By Mr. Queenan | | 5-84 | | |

E X H I B I T S

| | DESCRIPTION | RECEIVED |
| --- | --- | --- |
| GOVERNMENT EXHIBITS | | |
| 71 | Photo of Great Wall in Cambodia................ | 5-20 |
| 72 | Bank of America records....................... | 5-31 |
| 73 | Chen-Zhang WeChat Messages.................... | 5-53 |
| 74 | Chen-Zhang WeChat Transcript.................. | 5-54 |

P R O C E E D I N G S

(The jury is not present.)

THE CLERK: Simon, Stephanie, we'll swear you in. Please raise your right hand.

(Interpreters sworn.)

INTERPRETER LIU: Yes, I do.

INTERPRETER CHAN: Yes, I do.

MS. CLEARY: Your Honor, I just want to make you aware that the parties entered into a stipulation this morning that 08:59 we'll read into the record today. I don't know if you would like to look at it.

THE COURT: That looks longer than what I have.

MS. CLEARY: That's not the instruction, Your Honor. It's just a stipulation.

THE COURT: Okay. Thank you. You can give that back.

MS. CLEARY: Thank you.

THE COURT: And you're intending to read the instruction when you get to that point?

MS. CLEARY: I think Attorney Pohl will indicate the 09:01 appropriate time.

MR. POHL: Your Honor, just one thing. I emailed this to Mr. Lara this morning, so maybe this is duplicate effort, but there is a transcript that was not in the binders that we're going to be using today, and so I just wanted to make sure -- I think we have those for Mr. Lara, and Mr. Lara will

distribute them at the appropriate time. I just wanted to make sure you knew that.

THE COURT: Yes.

MR. POHL: Yes. Thank you.

THE COURT: Before we conclude today, if you'd give me an idea of what next week looks like so I can advise the jury.

(The Jury is present.)

THE CLERK: All rise for the jury.

Thank you.

09:05 Please be seated.

Court calls Criminal Action 22-10279. The United States versus Feng Chen will now be heard before this Court.

THE COURT: Good morning to you all. Thank you for returning. And we are ready to begin, but before we can do that, I need to ask you my three questions.

Has any member of the jury had any difficulty following my instructions not to discuss this case with anyone either in person, electronically or otherwise?

No affirmative responses.

09:06 Has any member of the jury read, seen, heard or overheard anything from any source about any aspect of this case outside of this courtroom since we were last together?

No affirmative responses.

And is there any serious matter or concern bearing on your service as a juror that a juror needs to bring to my

attention at this time?

All right. Thank you.

No affirmative responses.

And with that, we can begin. And let's remind the witness he's still under oath.

THE CLERK: Sir, I remind you that you are still under oath.

THE WITNESS: I know. Thank you.

MR. POHL: Thank you.

09:06 Your Honor, if I could ask for the jurors to pull out the transcript binders for Exhibit 18, which is the recording of February 7th, 2022. Thank you.

JIN HUA ZHANG, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION, Continued

BY MR. POHL:

Q. Good morning, Mr. Zhang.

A. Good morning, sir.

Q. When we left off yesterday, we were discussing a meeting
09:07 at the Encore Hotel and Casino on February 7th, 2022; do you remember that?

A. Correct.

Q. So I'm going to read certain portions of a transcript related to that day beginning at page 1.

"Hey, hello, Chief Ma. I'm Linda. Yeah. Which room

is it?

"I have arrived. I'm...I'm down here...Yeah, sure. Give me one minute. No rush. I'll come up in a little bit...Sure.

"I've been here before."

So who is this, Mr. Zhang, who is speaking here?

INTERPRETER CHAN: Counsel, can you allow me to translate what you just read?

MR. POHL: Of course. Thank you.

09:08 BY MR. POHL:

Q. So who is that speaking to you?

A. Linda.

Q. And at the time of this meeting, who did you think Linda was?

A. Linda was working with J.

Q. Okay. And you now know she worked for the FBI?

A. At the time I did not know.

Q. Right. All right. And do you remember where you were when you were speaking to her?

09:09 A. I should be in my room.

Q. Okay.

CW-2, "I've been here before. Is it here?"

Zhang, "You came by yourself?"

CW-2, "Uh-huh...

"On the 8th floor?"

Zhang, "Yes."

CW-2, "How long are you staying here, Chief Ma?"

Zhang, "I arrived last night. I probably will leave tonight."

CW-2, "Oh. What about unintelligible?"

Zhang, "Unintelligible, said he/she is not available today. He/she is supposed to book today...he said he's not available. So forget it. I'll go back first."

A. Correct.

09:11 Q. All right.

CW-2, "Can't go up?"

Zhang, "How are you doing lately? Are you still traveling everywhere?"

CW-2, "Yes. The same old..."

Zhang, "When will you go to New York?"

CW-2, "I'll listen to...the boss...Boss says 'go,' we go."

Zhang, "Yeah. I'm...getting a headache...you guys..."

09:11 CW-2, "Yes...what happened?

Zhang, "Running around."

INTERPRETER CHAN: Counsel, can you flip back to Page 1. There were three or four sentences left on page 1. Thank you.

Now page 2. Thank you.

A. Correct.
Q. All right.
Zhang, "You see...leaving the thing down here; give or take, from last Sunday to this Saturday, it has been left there for a whole week now."
When you said "leaving the thing down here from last Sunday to this Saturday, it's been left there for a whole week," what were you talking about?
A. I think it was referring to the cash.
09:13 Q. And where was the cash for that week before February 7th?
A. I was asking Feng Chen to do me a favor, to hold the money for a few days.
Q. Okay. We can skip ahead to the third page of the transcript.
Zhang, "Hello?"
[Pause]
Zhang, "Uh...You...just leave it in the truck [sic], in the truck and don't..."
[Pause]
09:14 Zhang, "Leave it in the back seat...oh, you, are you driving a pickup truck? Is there a problem? Is it serious?"
"[Pause]"
Zhang, "This...it is the not a problem! What is the problem? He called the police, no problem. At most, the police will tell him to unintelligible. Where are you? Where

are you?"

Zhang, "Okay, okay. Should I drive over there?"

Zhang, "Oh, you and...you unintelligible? You're at unintelligible and are bringing Yi Bing down here?"

"[Pause] [background noise.]"

"Okay, now I... I will wait for you, wait for you. Sure."

"No problem. Bye!"

A. Correct.

09:16 Q. All right. Do you remember -- do you remember that phone call?

A. Yeah, I have an impression.

Q. And do you remember who you were on that phone call with?

A. Feng Chen.

Q. Okay. And what are you and Feng Chen discussing on this phone call?

A. He told me that he's just ran into a small accident.

Q. Do you remember anything else that he said?

A. Yeah, I can't remember all.

09:17 Q. Okay. And you said you would wait for him?

A. Correct.

Q. All right. All right. So Mr. Zhang, I'm not going to read the next -- pages 3 through 12 of the transcript, but I'm going to -- but I'm going to just start at page 4, in the middle of that page. Do you see where you begin a phone call?

A. Yeah, it should be me who said making the phone call.
Q. Okay. And that phone call continues on to the next page, on to page 5, correct?
A. Well, at this time I was talking to another person.
Q. No, I understand. I understand. Do you remember what it was about?
A. It should be concerning something in New York. About some cashier's checks.
Q. Okay. And when you say cashier's checks, what is it exactly that you mean?
09:18
A. When some Chinese people, when they try to buy a house, they need to get some cash, and one of the ways to get the cash is that they will get some money from their community, a money club, but those money club are handled by pure cash. And once they got a stack of cash and while trying to buy a house, they need to convert stack of cash into bank checks.
Q. Okay. And you had people with bank accounts who could accept those checks, correct?
A. We were helping other people to open the account.
09:20
INTERPRETER CHAN: No. Strike that. The witness just changed the version, saying that --
A. We are helping other people for the issuance of checks.
Q. All right. At the end of that phone call, you have another phone call that begins in the middle of page 5, correct? And that goes all the way over until page 7.

A. Is this my phone call that I was making?
Q. Yes. Let me ask you this: You had a number of phone calls that day, correct?
A. Correct.
Q. Right. One began with -- one was with Feng Chen, right? One began at page 4.
The middle of page 5, it says, "[Phone rings. Zhang answers another call?]"
At the bottom of page 7, "[Phone rings. Zhang answers another call,]" and that goes on for several pages, correct?
A. Correct.
Q. All right. Let's go to page 12.
CW-2, "Is he almost here? Is he arriving soon?"
Zhang, "Unintelligible."
CW-2, "[chuckles]"
"[Zhang gets on the phone]"
Zhang, "Hello."
Chen, "Hello."
Zhang, "Huh?"
Chen, "Hello?"
Zhang, "Are you downstairs?"
"[Phone ringing]"
"Hello?"
"Oh...unintelligible."

All right. What happens then, Mr. Zhang? Who are you on the phone with there?

INTERPRETER CHAN: Let me read the conversation to the witness first.

A. This is I was making a phone call with Feng Chen.

Q. And after you made that phone call -- well, what does Feng Chen tell you in that phone call, if you remember?

Well, not long after that phone call do you see Feng Chen?

09:23 A. Inside the room.

Q. Okay. Mr. Chen comes to your room?

A. It appear to be.

Q. And what was Mr. Chen carrying when he got to your room?

A. He was carrying the cash there he was holding for me.

Q. Okay. Finish page 12.

Zhang, "You can count it."

Chen, "I did not count it. I did not count it... unintelligible, said it's $600 short."

MR. POHL: Can we have Exhibit 70, Ms. McIntyre. And 09:25 flip through it.

BY MR. POHL:

Q. Who's that?

A. Feng Chen.

Q. Who's that?

A. Feng Chen.

THE COURT: Didn't we cover this yesterday?

MR. POHL: We did, Your Honor. I'm just moving ahead. Thank you.

BY MR. POHL:

Q. All right. I have one last question about this particular meeting. So you -- Feng Chen brought the money to the room, and what happened to the money after Feng Chen brought it to the room?

A. And then Linda said the money was short, and I did not know the precise figure.

09:26

Q. Okay. But at some point Linda took the cash out of the room, correct?

And before she did, what did you receive?

Before she left, did you have a conversation with J?

A. I told J that I have received the currency in the crypto Tether.

Q. And once that happened, Linda took the money and left the room?

A. Then Linda left.

09:27

Q. Okay. So I just want to read one last section of the transcript. Before Linda left and while Chen is still there, you had another phone call, correct?

And we're at the bottom of page 17. All right. Two thirds of the way down the page.

"[Phone ringing]"

Zhang, "Hello? You are going to collect it now?" He said, "That...he...didn't you say it has to be two o'clock?"

Zhang, "Uh...you already collected over 20. Ah-Bing is also on Eighth Avenue today. You...uh, the Flushing one... to drive to Flushing...let me see, maybe to pick up three pieces or five pieces...Can he make it back in time? You already have more than 20. Uh...initially it was 15, now it's changed to 18, right?"

Zhang, "Eighteen thousand? Eighteen thousand was
09:28 collected?"

I can pause here for you, Mr. Chan, to translate.

A. Correct.

Q. Okay. Do you remember who you were talking to at this time?

A. Yeah, I remember I talked to a guy in New York. I don't remember whom exactly I was talking to.

Q. What were you talking about?

A. I was helping my clients to purchase cashier's checks.

Q. Okay. So your clients are customers, right?

09:30 A. Correct.

Q. And when you say clients, you mean people that have cash, correct?

MR. QUEENAN: Objection, leading the witness.

MR. POHL: Let me ask a better question, Judge. Thank you.

THE COURT: Thank you.
BY MR. POHL:
Q. All right. You've talked about several different types of -- you discussed a moment ago about how people have cash, correct?
And that you -- what do you -- in this -- in the context of this conversation, what do you do in New York with that cash?
A. We will pass the cash to the people who will purchase a 09:31 cashier's check and then go to the bank to get the cashier's check.
Q. Right. And what do you get for performing that service?
A. I will collect 1 to 1.5 percent commission.
Q. Right. And why don't the people with the cash just go to the bank themselves?
MR. QUEENAN: Objection, speculation.
THE COURT: Rephrase, please. Sustained.
BY MR. POHL:
Q. The money that -- the cash that is brought to you.
09:32 A. Correct.
Q. You speak to the people who have that cash, correct?
A. Correct.
Q. And based on those conversations, do you know where that money comes from?
A. Yeah, I can think about some of them.

Q. Okay. Where does that money come from?
A. Well, they, you know, they borrow the money from a money club.
Q. All right. Thank you. All right.
Let's move ahead to Exhibit number 23, which is February 14th, 2022.
Do you remember another time after the Encore Casino where you -- Mr. Zhang, I'm not asking you to read the transcript yet.
09:34 Do you remember another time after February 7th, 2022, where you asked Feng Chen for help with cash?
A. Is this time frame happening after the $100,000 incident?
Q. Yes.
A. Yes, I did ask him for another round of favor.
Q. All right. And what do you remember about that?
A. That was one thing that I did talk to him. I told him that this -- the cash this time is the same source of from my friend of the $100,000 last time.
Q. And do you remember -- what do you remember about that
09:35 meeting?
A. Well, I wasn't in Boston. There was no meeting.
Q. Were you on the phone with Feng Chen that day?
A. Yeah, I did telephone him to ask whether he can do me that favor.
Q. And what did he say?

A. Well, I did not remember everything he said, but I just want to emphasize that I told him that the money was coming from the same source of my friend of the last time.
Q. Okay. And do you remember speaking to Brian that day?
A. Yeah, I should have called both J and Brian, but I cannot remember all the details.
Q. Do you remember -- what did you receive that day from J?
A. You mean on that day?
Q. Yes.
09:37 A. I receive, you know, the Tether money that J transfer to me.
Q. And after you received the Tether, what did you tell Feng Chen to do?
A. Hand over the money to him on my behalf.
Q. All right. Thank you.
MR. POHL: You can take that down.
Can I have -- actually, we don't need the transcript back up. Could I have Exhibit 49, please.
BY MR. POHL:
09:38 Q. Do you know this person?
A. Roger.
Q. And we talked about him yesterday, but after Roger stole the money from you, what did you do to find the money?
A. After Roger ran away with my money, you know, after that incident, I ask Feng Chen to help me.

Q. How did you ask him to help you?
A. That was the first time that -- the incident of $100,000, I just told him that, you know, I have that kind of trouble. Can you hold the money for me for a couple of days, maybe two days. And then I went to Boston myself.
Q. And that's the meeting that took place at Encore, correct?
A. Correct.
Q. Did you go looking for Roger?
A. Yeah, I asked J to help me to search for Roger.
09:40 Q. All right. All right. After these two February meetings, the one at the Encore and the one that you've just talked about, did you -- did you take a trip?
A. It appeared I might have gone to Southeast Asia in March.
Q. Do you remember who you went on the trip with?
A. Sun Qing.
Q. Is that the person that came to the meeting in New York at the hotel with you?
A. Correct.
Q. All right. Where did you go?
09:41 A. Cambodia.
MR. POHL: For the witness, Mr. Lara, can I have Exhibit MMM-1.
Q. Do you recognize this place, Mr. Zhang?
A. Yes. This is like -- in Chinese it's called the Great Wall International Hotel.

Q. Okay. And where is this located?
A. This is in Sihanoukville, Sihanoukville, the city of this place.
Q. But the country that it's located in is what?
A. Cambodia.
Q. All right. And did you stay at this location on your trip to Cambodia?
A. Yes.
MR. POHL: We would offer this.
09:42 MR. QUEENAN: Your Honor, objection for the record.
THE COURT: Okay. Thank you. Received in evidence.
THE CLERK: 71.
(Government Exhibit 71 received in evidence.)
BY MR. POHL:
Q. All right. Mr. Zhang, why did you go to this hotel?
A. Because I know a friend that is inside this hotel.
Q. And is there anything next to or nearby this hotel that you visited?
A. I'm nearby this hotel there was another, you know, another
09:43 hotel with, you know, a restaurant, you know -- it was, you know, another smaller hotel or motel setup with restaurant.
Q. And what else was in that building?
A. You mean inside the smaller compound or this compound?
Q. In the smaller compound.
A. There are a lot of, you know, employees who are working

there and a lot of computers.
Q. Okay. And the employees that are working there and the computers that they're using, you saw that?
A. Well, I did see, you know, the computers, but I did not look at what they are doing.
Q. But who brought you to that room, or who brought you to that space?
A. It's one of the friend -- one of my friends inside the hotel.
09:45 Q. And the friend that you met, why did you meet with that person in Cambodia?
A. Well, we're trying to explore whatever we can find, any more resources, resources.
Q. Resources for what?
A. Just the, you know, T-5 fundings.
THE COURT: Can I see counsel at sidebar. If you need to take a note of where you left off.
MR. POHL: I did. Thank you. Thank you for that.
(At sidebar.)
09:46 THE COURT: Do the parties have a limiting instruction with regards to his testimony?
MR. QUEENAN: We haven't, Your Honor.
THE COURT: Do you want a limiting instruction?
MR. QUEENAN: We would, Your Honor, based on our basis for our motion in limine to exclude this evidence and exclude

all this evidence of Cambodia.

THE COURT: So what do you propose?

MR. QUEENAN: Do you want -- I mean, do we propose something after the break, and Mr. Zhang will still be on the stand, if Your Honor finds an agreement put that on the record after his direct testimony?

THE COURT: What do you want to say?

MR. POHL: I'm happy to hear whatever counsel says, but I'm not sure what we're limiting. This was essentially a trip to solidify their ability to get scam money from these foreign Internet farms into the U.S. And those monies were collected in bank accounts that were controlled by Zhang, and the testimony I expect will be that some of those monies were converted for reasons of the checks and that Chen delivered the checks. So there is a -- I mean, there is a direct line between this trip and actions that happened afterwards and the checks that went to Chen.

THE COURT: The jury doesn't know what to do with all this information. So you're talking about things that Zhang has been involved in, and so in order to help focus your attention into receiving the evidence, then it's appropriate to tell them what it pertains to and whether you believe he was directly involved in it or not versus waiting for cross-examination after, you know, a day, two days' worth of testimony to try to, you know, figure out, oh, that's what

they're talking about now. So I think it's more important to --

MR. POHL: This relates to the wire fraud SUA allegation in the indictment, you mean something like that?

THE COURT: Why don't I -- why don't you have a seat there and work out something, and I'll let the jury stretch.

(End of sidebar.)

THE COURT: You can continue to stand, stretch, whatever. The attorneys are going to conference, and then I'm 09:48 going to speak with them, unless you feel like you need to step out. But I don't expect it to be long, maybe five minutes.

You're good there?

THE JUROR: I'm good.

(At sidebar.)

MR. QUEENAN: Your Honor, we certainly appreciate this opportunity. We think, though, at this point that a special instruction would draw some sort of specialized attention to this in which obviously our position is this has no probative value in determining --

09:51 THE COURT: So you'll deal with it on cross-examination.

MR. QUEENAN: Yes. Thank you, Judge.

THE COURT: All right.

(End of sidebar.)

BY MR. POHL:

Q. All right. So I think where we left off --

MR. POHL: And we can put back up 71. Thank you, Ms. McIntyre.

Q. You said that you wanted to develop relationships regarding T-5, correct?

A. Yeah, I wanted to handle more of the T-5 money.

Q. And were the people that were committing T-5 in Cambodia?

A. Well, I mean, they handle a lot of transaction with Mainland China, and they also do some operation concerning Europe and the United States.

09:52 Q. And when you said the United States, that includes T-5, correct?

A. Correct.

Q. And when you saw this room with the computers, did you discuss with your friend what was happening in that room?

A. Well, yeah. We did some chatting, and they said those were concerning China activities.

Q. And while you were in Cambodia, did you talk about other US-based T-5?

A. Well, I did ask them whether they can refer me to some of

09:53 the T-5 fundings.

Q. Did that happen while you were in Cambodia?

A. Yeah, he did refer, but he did not refer that quantity.

Q. Okay. Did you discuss how you would -- what you would receive from these contacts in Cambodia when you went back to the United States?

A. Not with that particular personnel, but I did talk about those things with other personnel inside the restaurant -- oh, I did talk about those things in Telegrams.
Q. Okay. And what did you talk about?
MR. QUEENAN: Your Honor, we just would like to object for the record.
THE COURT: Thank you. You may proceed. It's noted.
MR. POHL: Thank you.
A. We were discussing about our commissions.
09:55 Q. Okay. What did you discuss about your commissions?
MR. QUEENAN: And, Your Honor, to object for the record, and ask the Court for permission to not continue to interrupt this series of questions and have it be for the entire series?
THE COURT: Yes, understood.
MR. QUEENAN: Thank you.
THE COURT: Ladies and gentlemen, let me just explain. So what counsel is asking me is just to take note of his objection so that he doesn't have to keep standing up for this 09:56 line of inquiry. I've made a ruling, and so it's coming in. But his objection is preserved for the record.
MR. QUEENAN: Thank you, Judge.
A. So we talk about, you know, the rates of commission, and we also talk about the timeline of sending money back to them.
Q. Okay. So when you said the rates of commission, okay, and

that -- let's start with the rates of commission. What did you talk about with respect to rates of commission?
A. We talk about T-5.
Q. Right. But when you said rates of commission, that means who's making what, right?
A. Correct.
Q. Okay. So the people that you met in Cambodia when you were talking about rates of commission, what did the people in Cambodia say that they would do?
09:57 A. Well, after the guy who refer us, he said after the referral he would take 3 percent.
Q. Okay. And what would they be sending you to the United States?
A. They would send a wire transfer to the bank account that I set up in America.
Q. Okay. And did you talk about what was in the wire -- like, what the source of the funds was in the wire transfers?
MR. QUEENAN: I'm going to object just for clarification. They said did you discuss. I want to make sure
09:59 we're not talking about Feng Chen.
THE COURT: Very good. Rephrase.
BY MR. POHL:
Q. You're in Cambodia, right?
A. Correct.
Q. Is Feng Chen in Cambodia with you?

A. No.
Q. So we're not talking about Feng Chen, right?
You were talking to the people in Cambodia, correct?
A. Correct.
Q. That ran these compounds, correct?
INTERPRETER CHAN: Excuse me?
Q. Ran compounds?
A. When we were talking about the T-5, we were not in this compound.
09:59 Q. I understand. I understand. But what you talked about was -- and just to get back to where we were a moment ago, they talked to you about sending wire transfers, correct?
A. Correct.
Q. Okay. Into bank accounts in the United States, correct?
A. Correct.
Q. That you set up, correct?
A. Yeah, it was open by my co-defendant.
Q. Okay. But you -- in partnership with you, correct?
A. Correct.
10:00 Q. And those wire transfers, correct, those -- what are the -- what is -- based on your conversations with the people that you met in Cambodia, where does the money that is in those wire transfers, where does that come from?
A. These are the money from, you know, investment money, you know, offered by the victims.

Q. Okay. All right. This is T-5 money?
A. Correct.
Q. Does the phrase "T-5," does that have a translation in Chinese -- Mandarin, I should say?
A. Well, it actually is called essential chanting [sic].
Q. Essential chatting?
A. Yes, in Chinese we call it essential chatting.
Q. Thank you. All right. You talked about the conversations that you had with the people in Cambodia, you talked about what 10:02 they sent you, you talked about what got paid.

You also mentioned a moment ago something about a time limit or time frame. Do you remember that?
A. Yeah, we were talking about, you know, the time frame should be 48 hours.
Q. When you say the time frame should be 48 hours, like what are we talking about?
A. Well, you know, after the money, you know, has backed to our place, then it would be wired out in 48 hours.
Q. What rate did you charge for receiving this type of wire 10:03 transfer from the compound in Cambodia?
A. We would charge them 11 to 12 percent.
Q. Okay. Is that more or less than you would charge for converting drug money?
A. More.
Q. Why more?

A. Because we have to split it, the money, up with many people.
Q. All right. When you returned -- how long did you stay overseas in Cambodia?
A. I really don't remember precisely how long, but it was about two weeks.
Q. Okay.
A. Two to three weeks.
Q. All right. And before you went back you said that you -- you discussed how much you charged and why that was. You said you had to return the money in -- what was the time frame that you had to return the money that you received from the compounds?
A. Yeah, we were basically saying that, you know, after we receive the money, we'll wire back to them within 48 hours, and then we'll send them back about 80-something percent of the funds.
Q. Of the funds, okay.
And what way -- what form of payment did you use when you -- the wire transfer came to you, you took your percentage, within 48 hours you sent that money back, correct?
A. Correct.
Q. And what form of payment did you use when you sent the proceeds back?
A. We use cryptocurrency.

Q. Okay. Who -- who -- whose idea was it to use the cryptocurrency to send it back?
A. They requested that.
Q. Did they say why they requested it?
A. No.
Q. Okay. All right. Thank you.
MR. POHL: You can take that down, Mr. McIntyre. And Mr. Lara, for the witness can I have Exhibit XX-1.
BY MR. POHL:
10:07 Q. Mr. Zhang, do you recognize this document?
A. Yes, I do.
Q. How do you recognize it?
A. JK.
Q. When you say -- well, besides from the name, what do you recognize this document as being?
A. This is a piece of paper, a document from Bank of America.
Q. And do you know what this piece of paper from the Bank of America -- it has a title on the top. Can you read that?
MR. QUEENAN: Your Honor, if it helps, there will be
10:08 no objection.
MR. POHL: We have no objection to this coming in, all right.
A. Yes, I can see it. Yes, I can.
MR. POHL: Okay. And I think it will be 72, Mr. Lara; is that right?

THE COURT: We are going to move it into evidence.

THE CLERK: Yes. It will be 72. Is there a copy for the Court?

MR. POHL: It should be in the binders, XX-1. Sorry, two Xs.

THE CLERK: XX-1 to be marked as 72.

(Government Exhibit 72 received in evidence.)

MR. POHL: Thank you. All right. Ms. McIntyre, can I have you blow up the top that has the name of this.

10:09 BY MR. POHL:

Q. Do you see this, Mr. Zhang?

A. Yes, I can.

Q. And the document says the name of the business is JK Electronic World, Inc., correct?

A. Yes, I see that.

Q. And the reason or the purpose of the document is to the right, opening and maintaining banking relationship; do you see that?

A. Yes.

10:09 Q. Okay.

THE COURT: Counsel, just one second.

Members of the jury, any time you see a blocked out portion, it's intentional. The attorneys know to -- we call it redacting personal information.

THE COURT REPORTER: I'm sorry. I can hear both of

you at the same time.

INTERPRETER CHAN: Your Honor, I would suggest when there is a conversation not concerning the witness, I will whisper to the defendant the translated, so that there will be no microphone, no voice colliding for Ms. Stenographer.

THE COURT: I appreciate everyone's willingness to cooperate and help facilitate these logistical challenges that we have. But Ms. Walsh, what I was saying to the jury is that any time there is a blocked portion on an exhibit that's 10:11 blacked out, that's intentional; it's concealing, redacting private information that you should not have, and so that's intentional.

BY MR. POHL:

Q. JK Electronic World, what does that name mean to you?

A. My co-defendant Hua Zhou.

MR. POHL: Can you take that down. And can you blow up right underneath that, the name right there.

Q. Hua Zhou?

A. Yes.

10:12 Q. You said he's your co-defendant; is that right?

A. Correct.

Q. What did you ask Hua Zhou to do with respect to this Bank of America account?

A. To receive T-5 funding.

Q. Okay.

MR. POHL: You can take that down. Thank you, Ms. McIntyre.

And could you go to page 3, please. I'm sorry. Right there. Thank you. Could you blow up that box with the names. Yes. Thank you.

BY MR. POHL:

Q. All right. In addition to Hua Zhou, there's another name on this document, Mr. Zhang.

A. Yes. Rong Li, L-I.

10:13 Q. Who is Rong Li?

A. Rong Li is one of the bankers with this bank.

Q. And what did Rong Li do for you?

A. Rong Li was the one that helped him to set up the account.

Q. And in addition to setting up the account, did Rong Li do anything else for you?

A. For the things that I am not very sure or clear about, then Rong Li also give me some clarification. He also mentioned that for this kind, there are many flack. For the J account, for the J account.

10:14 Q. So Rong Li works for Bank of America, correct?

A. Correct.

Q. But Rong Li told you things about these accounts?

MR. QUEENAN: Your Honor, objection. Leading the witness but also relevance.

THE COURT: I'm going to overrule and give you a

little latitude.
A. About the business account?
Q. What did you talk to Rong Li about?
A. When this account was opened, I was not present.
Q. I understand. But after this account was opened, you continued to talk to Rong Li, correct?
A. Later on, yes, I have talked to him afterwards.
Q. And what things did you talk to Rong Li about?
A. I don't recall exactly what he said to me.
10:16 Q. Not said. What did Rong Li do for you?
A. Rong Li helped my co-defendant to open several more accounts.
Q. And did Rong Li ever tell you anything about those accounts?
A. I do not recall.
Q. Okay.
MR. POHL: All right. You can take that down, Ms. McIntyre. Thank you.
Actually could you put back up page 1.
10:16 BY MR. POHL:
Q. JK Electronic World, was this a real company?
A. It's a shell company, no.
Q. All right. And after you set it up and your co-defendant set it up, did it receive T-5 money?
A. Yes.

Q. Okay.

MR. POHL: Can you go to page 5, Ms. McIntyre. Right there.

BY MR. POHL:

Q. All right. This page says that as of April 1st, 2022, the account balance of JK Electronic World's account was zero.

A. Yeah, okay.

Q. Why was it zero?

A. At that time the account was closed.

10:18 Q. Okay. Why was it closed?

A. I believe that either the bank closed it or the account was closed.

Q. Right. Do you know why it was closed?

A. Maybe. I don't recall clearly. But I think maybe the T-5 money went to the TD Bank.

Q. All right. Let me ask you this: There are accounts -- how many bank accounts did you have that received T-5 money?

A. Over 20 accounts.

Q. And why did you have so many accounts?

10:19 A. Because sometimes we closed some of the accounts.

Q. Well, sometimes you close some of the accounts. Sometimes other people did, right?

A. Sometimes the accounts were closed by the bank themselves.

Q. Right. And do you know why they were closed by the bank?

A. So to maintain the relationship with the client, sometimes

maybe the bank close the account if they think that there's something unusual about it.
Q. Do you know who had the money from this account after it was -- the balance went to zero?
INTERPRETER LIU: Sorry. Interpreter does not understand the question. Could you rephrase.
BY MR. POHL:
Q. There was money in this account, correct?
A. Yes, I believe so.
10:21 Q. Okay. And where did that money go?
A. If it was T-5 money after deduction of the commission, then it will be sent out.
Q. Right. But at this point there's no money in this account. Do you know where -- who got the money from this account?
MR. POHL: Could you put back page 1. Blow up the name.
A. What are you asking in your questions?
Q. I'm asking if there was money in this account and now the
10:22 account is down to zero, do you remember where the money went?
A. Basically we would transfer the money out to Cambodia from this account.
Q. Okay. Do you remember whether you opened an account at Santander Bank?
INTERPRETER LIU: Santander.

MR. POHL: Santander Bank.

INTERPRETER LIU: Satanic --

MR. POHL: Santander Bank.

A. Yes. It was opened by Hua Zhou, Z-H-O-U.

Q. And do you remember what the name of the account that was opened at Santander Bank was?

A. Also under the name of JK.

Q. And do you remember, what was deposited in the Santander Bank account?

10:23 A. If I remember correctly, then from the money from this account -- from this bank, then after that account was closed from Bank of America, then we got the check, then we deposit it into the Santander Bank.

Q. Okay. So I just want to make sure that I understand you correctly. After the Bank of America account was closed, you opened another account, correct?

A. Correct.

Q. Okay. And what went into the Santander Bank account?

A. If I remember correctly, the total amount that was

10:25 transferred from -- after the closing of Bank of America there was approximately $160,000 that was transferred to the new account that was set up in the other bank.

Q. Okay. And those funds, that $162,000, what kind of funds were those?

A. I believe that most of the money of this amount came from

the T-5 activity.
Q. So the Bank of America closed. You put the money in the Santander, correct?
A. Correct.
Q. Okay. Did you try to access the money from the Santander Bank?
A. After the money was deposited into the Santander Bank that then Hua Zhou then did one wire transfer.
Q. Were you able to transfer it out?
10:26 A. It was stopped. Because it was just clear.
Q. You were stopped by the bank from transferring the money?
A. The counter manager, yes, stopped it.
Q. So after that -- after you were stopped, what did you do with the money in that account?
A. Then the account got closed.
Q. Yes. Where did that money -- was that money converted into a check?
A. Correct.
Q. And did you end up with that check?
10:27 A. I took the check, and I did not give it back to Hua Zhou.
MR. POHL: Could I have Exhibit 52. No. I'm sorry. Apologies. That's not it. You can take that down, Ms. McIntyre. Thank you.
Exhibit 27, please. Sorry.
BY MR. POHL:

Q. Okay. Do you see this?
A. Correct. Yes.
Q. Is this the check you're talking about?
A. Yes, it is.
Q. So you kept this money? You just kept this check?
A. Yes, correct.
Q. What did you do with the check?
A. Because at that time I could not trust Hua Zhou, so I asked J to help.
10:28 Q. And when we say J, we mean the person you now know was the FBI undercover agent?
A. Correct.
Q. And what is it that you asked J, the undercover agent, to do?
A. I asked J if he could deposit this check.
Q. Did you discuss opening an account to be able to deposit the check?
A. J had discussed with me to open a similar type of account as well under the same name.
10:29 Q. "Under the same name" meaning JK Electronic World?
A. Yes, I believe so.
Q. Did J do that for you; did he open a bank account?
A. Yes.
Q. Okay. Do you remember what bank?
A. I forget which bank.

Q. Okay. Once you knew that J had opened up an account for you, did you deposit this check right away?
A. No, I did not.
Q. Why not?
A. Because it was a brand-new account.
Q. What did you do instead?
A. Then I deposit a check of only $10,000.
MR. POHL: Okay. Now we can have Exhibit 52, Ms. McIntyre.
10:31 BY MR. POHL:
Q. All right. Is this the check you're talking about, Mr. Zhang?
A. Correct.
Q. Who deposited this check for you; do you remember?
A. Either Brian or J.
Q. Do you know how either Brian and J came to have the check?
A. Yes, I do know.
Q. How?
A. At that time Feng Chen was going to Flushing for the
10:32 kitchen cabinet pickup, and then I asked him if he could meet me in Flushing in New York and also asked him to bring a check -- Feng Chen bring a check.
In New York when we met we went for a meal. And I asked him if he could bring a check to Flushing --
INTERPRETER LIU: Okay. Sorry. Correction. It's not

to bring a check to Flushing.
A. -- to bring a check to Boston.
INTERPRETER LIU: Correction on the record, to bring a check to Boston.
Q. And what did Feng Chen say?
A. He agree. Yes, he agree to help me.
Q. All right. Do you know whether Feng Chen handed that check to somebody in Boston?
A. I don't know whether he personally hand the check or not, but either J or Brian took the check.
10:33
Q. Okay. And the $10,000 that's represented in this check, where does -- what does that money come from?
A. This is my own personal money and also something from the gambling money.
Q. Okay. And why did you want to deposit this $10,000 check into this new account first?
A. Because at that time I was not sure if J's new account could be used or not.
Q. When you say you're not sure if it could be used or not, what do you mean by that?
10:34
A. Because the name of the account is exactly the same.
Q. As the account that had been closed?
A. Correct.
Q. Okay. What happened when the $10,000 check got deposited?
A. Yes, it went through okay.

MR. POHL: Before we move on, Ms. McIntyre, can you blow up the remitter box, including the United River Trading. Thank you very much.

BY MR. POHL:

Q. Do you see this part of Exhibit 52, Mr. Zhang?

Do you recognize this business, United River Trading?

A. Yes, I do. I recognize it.

Q. In the summer of 2022, was that a real business?

A. The company has not been started at all, no.

10:35 Q. Okay.

MR. POHL: Can I have Exhibit 59, Ms. McIntyre. All right. And could we -- the certificate of business records, could we turn to page 3, please.

BY MR. POHL:

Q. Do you remember opening this or starting this or filing paperwork for this company in the Commonwealth of Massachusetts?

A. I don't recall.

Q. Okay. Well, do you see your name on this document?

10:36 A. Yes, I do.

Q. And you're listed as the president, correct?

A. Correct.

Q. Okay. Of United River Trading, correct?

A. Correct.

Q. There's an address under your name.

MR. POHL: Could we blow that up, Ms. McIntyre. Thank you.

BY MR. POHL:

Q. Do you see that address, 24 Tosca Drive, Stoughton?

A. Yes, I see that.

Q. Whose address was that?

A. I believe that this is the address of Feng Chen's warehouse.

Q. Who gave you that address?

10:37 A. At that time I asked Feng Chen if I could open this company by using his business address.

Q. And what did he say?

A. He consider it for a while, and then afterwards he gave me his business address.

Q. Okay. And that's how you got the address?

A. Yes, I believe so.

MR. POHL: Can you go all the way to the end of the document, Ms. McIntyre. All right. Can you blow that up. Thank you.

10:38 BY MR. POHL:

Q. All right. This is the last page of the document. And do you see that?

A. Yes, I see that.

Q. Signed by Jin Hua Zhang as president on this day, 14th day of September 2022?

A. Correct.
MR. POHL: Can you go back one or two pages.
BY MR. POHL:
Q. All right. And you also -- you signed it a second time; is that correct, Mr. Zhang?
A. Which day is this?
Q. 9th day of June 2021.
A. (No response.)
MR. POHL: Thank you. You can take that down.
10:40 BY MR. POHL:
Q. Mr. Zhang, once you had indicated that -- once you knew that the $10,000 check had been deposited into the account and you -- what did you do with the $162,000 check?
A. Okay. I recall that I requested a female co-defendant --
INTERPRETER LIU: Sorry. Correction. It's not a female. I misheard. Correction. Strike the word "female."
A. I remember that I asked a co-defendant to bring this check to Boston, and then I asked him to -- I personally put the check into a white envelope and then I asked him to bring that
10:41 white envelope to, personally to Boston.
Q. And when you said bring it personally to Boston, who did you ask that the check be delivered to?
A. I asked him to bring that envelope with the check to my friend Feng Chen.
Q. Okay. Why do that, Mr. Zhang? Why ask somebody to drive

a check from New York all the way out to Boston?
A. It was my wrongful decision at the time. And I could have deposited it in New York but then at that time I asked him to do that in Boston.
Q. And what was -- why was that $162,000 important to you?
A. Because this amount of money is my money.
Q. All right. Let me just ask a question about that before I move on. When you say it's your money, what do you mean it's your money?
10:43 A. Because I have used other sources of money, already remits the money to the Cambodia side, so the remaining amount, which is my own money, so this amount of money now is actually my money now because I used other sources of money to remit it to the Cambodia side.
Q. Okay. So you had already paid them back?
A. Correct.
Q. And this money was yours?
A. Yeah. You can say that, yes.
Q. All right.
10:44 MR. POHL: Judge, I'm about to move on to another topic. I don't know if you think this is a good time for a morning break or I can keep going to 11:00. I wasn't sure.
THE COURT: I see some head nods, but let me do it by vote. How many want the break now versus 15 minutes now?
So all in favor now raise your hand. One.

You feel so betrayed, huh?

We are going to tough it out for 15 minutes.

MR. POHL: That's fine. Thank you very much.

THE COURT: Thank you.

MR. POHL: Thank you very much.

BY MR. POHL:

Q. Mr. Zhang, we're going to move on to a new topic. During the period of 2021 and 2022, did you have more than one phone?

A. Yes. I have two cell phones.

10:45 MR. POHL: All right. And can we put up Exhibit number 37. Can you blow up the top two numbers, Ms. McIntyre. Thank you. Right there. That's great.

BY MR. POHL:

Q. All right. I'm going to ask you, Mr. Zhang, if you recognize these two telephone numbers: 646-420-3871; do you remember that telephone number?

A. I have no impression of it.

Q. What about 917-916-3567?

A. That's my cell phone number.

10:46 Q. Okay. All right. Thank you.

You said that during this period of time you often used multiple cell phones, correct?

A. Correct.

Q. All right. So was there a time in the fall of 2022 that you went to Southeast Asia a second time?

A. Yes, around July or August.
Q. Okay. And why did you go back to -- where did you go?
A. I went to a town in the Philippines and then I went to Thailand and then I went to Cambodia.
Q. All right. Do you remember what your purpose was for going to Thailand?
MR. QUEENAN: Objection, relevance.
THE COURT: Counsel.
MR. POHL: I think it's a second visit along the same lines as the first visit but -- and that, I think after a brief period of time Mr. Zhang comes back --
MR. QUEENAN: Your Honor, can we approach so the government is not testifying in front of the jury.
(At sidebar.)
THE COURT: It's basically the same thing but doesn't get you any closer to what you need to establish.
MR. POHL: With what we've already established. Yeah, he went -- he went back over there with Sun to Thailand, and he met other scammers and then he -- that were doing the same thing. He came back, and when he came back, he got arrested, and that's when we grabbed the phones.
MR. QUEENAN: Your Honor, is Feng Chen involved in this case?
MR. POHL: My colleague reminded me. There's a discussion about this in this WeChat that we're about to talk

about. So that's really the reason we're referring to it because it will -- otherwise, you would have to explain it during the WeChat.

MR. QUEENAN: And I recall this session about Cambodia. I don't know about Thailand and Philippines relevance.

THE COURT: I remember Cambodia as well. Maybe Thailand.

MR. POHL: Okay. It was all one trip with similar
10:49 type of activities.

THE COURT: I thought he had already come back from Cambodia?

MR. POHL: The first time he did and then he went back a second time, and at the end of the second time is when the arrests on the case happened.

THE COURT: What were you going to say?

MR. QUEENAN: I was going to say, Your Honor, that there is WeChat discussion or reference to Cambodia, and I understand that. But Feng Chen's involvement in this case ends
10:50 there. So any scammers after Feng Chen's involvement wouldn't even go to the relevance to Feng Chen. Certainly a case with Mr. Zhang, but not Feng Chen.

MR. POHL: Right. There's a reference in the chat that Zhang is going to the Philippines and in this Southeast Asia tour. So that's all I was trying to do, so that we can

discuss it with some sensible back story of when we do the WeChat.

THE COURT: What I'll allow you to do is just indicate that he traveled to another country, similar reasons, but we need to get to what this case is about, which is the connection with Chen. Does he know about any of this?

MR. QUEENAN: Thank you, Judge.

MR. POHL: Thank you.

MS. CLEARY: Thank you.

10:50 (End of sidebar.)

BY MR. POHL:

Q. Mr. Zhang, did you make a second trip to Southeast Asia in the fall of 2022?

A. Yes.

Q. And was it for a similar purpose as the trip you described previously to Cambodia?

A. Similar.

Q. And you had similar meetings?

A. Correct.

10:51 Q. And the purpose was for T-5?

A. Yes.

Q. Okay. When did you -- and after you were there for a few weeks, did you come back?

A. In September I came back.

Q. Okay. And do you remember what happened to you in October

of 2022?
A. I was arrested.
Q. Okay.
MR. POHL: Your Honor, if I could, at this time I would like to read a stipulation between the parties.
THE COURT: Okay. So ladies and gentlemen, let me just explain. Counsel is about to read to you an agreement by the parties about certain facts that you can accept to be true because it's by agreement of the parties. All right.
10:52 MR. QUEENAN: Your Honor, if we could have just one moment.
(Pause.)
MR. QUEENAN: Thank you. Thank you, Judge.
THE COURT: Counsel, you can proceed.
MR. POHL: Thank you, Your Honor.
Ladies and gentlemen of the jury, the United States through its attorneys and the United States Attorney's Office for the District of Massachusetts and Feng Chen, through counsel, hereby stipulate and agree as follows:
10:53 On October 6th, 2022, the Honorable Sanket J. Bulsara, the United States Magistrate Judge, United States District Court for the Eastern District of New York, issued an arrest warrant for Jin Hua Zhang.
On October 7th, 2022, the Honorable M. Page Kelley, United States Magistrate Judge, United States District Court,

District of Massachusetts, issued an arrest warrant for Zhang.

On October 13th, 2022, the Federal Bureau of Investigation arrested Zhang at 479 Burlington Avenue in Staten Island, New York, on those arrest warrants.

At approximately 6:03 a.m., the FBI knocked and announced the presence of the arresting agents. At approximately 6:04 a.m. Zhang opened the door. The FBI confirmed Zhang's identity by asking if he was, quote, Jin Hua Zhang, close quote, after which Zhang responding affirmatively.

10:54 Agents conducted a protective sweep of the residence. Upon completion of the protective sweep agents escorted Zhang back into the residence and directly to his bedroom to retrieve his clothing and identification documents.

Upon plain view observations of two phones on the nightstand located on the right side of the bed and agent first asked Zhang about the ownership of the phones. Zhang responded that they belonged to him. Agents then seized the phones pursuant to a search warrant authorizing the search and seizure of phones in Zhang's vicinity.

10:54 The devices seized were, A, one Apple iPhone 13, blue in color, with the model number associated numbers attached, referred to in the stipulation as Zhang phone number 1, and B, one Apple iPhone, 13 Promax, light blue in color, again, with various identifying numbers attached. That's referred to in this stipulation as Zhang phone 2.

A WeChat conversation for the WeChat user name, named Leo Chen, beginning July 13th, 2022, at 9:33 a.m. and ending on October 12th, 2022, at 9:54 p.m. was recovered from Zhang's phone 1 and documented in a premarked contested Exhibit WWW, which is a series of screenshots that fairly and accurately reflect the content of the communications, that they exist in native form in Zhang's phone 1.

THE COURT: Would you like to take a break now? All right. Why don't we take our morning break. We'll see you

10:56 back at 11:30.

THE CLERK: All rise for the jury. Jurors, please leave your binders and notebooks.

THE COURT: All right. Thank you, all. Take your morning break.

(Recess taken from 10:57 to 11:30 a.m.)

THE CLERK: All rise.

(The Honorable Court enters.)

THE CLERK: All rise for the jury.

Thank you. Please be seated.

11:35 We're back on the record in the Chen matter.

MR. POHL: May I, Your Honor?

THE COURT: Please. I insist.

MR. POHL: All right.

May I approach the witness? I know you said not to ask but --

THE COURT: Bad habit.

BY MR. POHL:

Q. I'm putting in front of you, Mr. Zhang, what's been marked as contested WWW. Do you recognize that?

A. I recognize.

Q. You recognize it. How do you recognize it?

A. I saw those notations.

Q. But whose chat is that?

A. I was chatting with Feng Chen.

11:36 Q. And this is the chat that existed on one of your phones that were seized from you when you were arrested?

A. Correct.

Q. And you've had an opportunity before your testimony to review this chat, correct?

A. Correct.

Q. And this chat is how it appeared on your phone, correct?

A. Correct.

Q. Thank you. You can keep that.

MR. POHL: We'll offer this, Your Honor.

11:37 MR. QUEENAN: Your Honor, objection for the record.

THE COURT: Thank you. Noted.

THE CLERK: 73.

(Government Exhibit 73 received in evidence.)

MR. POHL: And now that this is in evidence, Your Honor, there is an accompanying transcript that goes with the

exhibit. That's previously contested Exhibit GGG.

MR. QUEENAN: Your Honor, objection for the record.

THE COURT: To this line, right?

MR. QUEENAN: Yes, but also to the admission of formerly marked GGG, the accompanying transcript. So just for the record.

THE COURT: All right.

MR. POHL: So we would offer this as the accompanying transcript.

11:38 THE COURT: Received in evidence.

MR. POHL: Thank you.

THE COURT: Objection noted.

MR. POHL: So that's 71?

THE CLERK: That will be 74.

MR. POHL: Thank you.

(Government Exhibit 74 received in evidence.)

BY MR. POHL:

Q. All right. Mr. Zhang, what are we looking at here?

A. This is the chat between me and Feng Chen.

11:38 Q. And I'm going to direct your attention --

MR. POHL: First, Ms. McIntyre, to page 2 of this transcript. Page 2.

Oh, I'm sorry. Mr. Lara, I'd ask that the transcript be distributed at this time.

Ms. McIntyre, can you pull up Exhibit 74 for the

witness.

BY MR. POHL:

Q. I gave you a hard copy, but are you able to see it on the screen?

A. Yes.

MR. POHL: 73, Ms. McIntyre, pull up 73.

BY MR. POHL:

Q. All right. You could read that, but you also have a hard copy in front of you. So you can use whichever one is most comfortable for you.

11:40

All right. I would like to direct your attention, Mr. Zhang, midway down to the second page of this transcript, which begins at July 13th, 2022 at 9:59 a.m.

All right. Chen, there's a four second audio call. "I still have your check. Just let me know when, okay?"

Zhang, "Wait."

Chen, "[okay emoji]"

Zhang, "I'll deposit another one for $30,000. Wait until it clears. It will be safer."

11:41

Chen, "[okay emoji]."

Do you know --

MR. POHL: I'm sorry, Mr. Chan. Please finish.

Q. Do you know what Chen -- excuse me -- what check is being referred to in this conversation?

A. You are talking about the $10,000 check or the $160,000

check?
Q. Well, you said to Chen, "I'll deposit another one for $30,000. Wait until it clears. It'll be safer."
So when you said it will be safer, what are you worried about?
A. Because this account was too new.
Q. Right. So when you said, "I'll deposit another one for $30,000" --
A. I did mention that, but I forget whether I actually
11:43 deposit that check or not.
Q. Right. But the important point is you had already deposited the $10,000 check, right?
A. Correct.
Q. And so you said wait until it clears. It will be safer. The safer -- the check that you're referring to there is which check?
A. I was referring to the $10,000 --
INTERPRETER CHAN: No, actually -- correction. It's my fault. Witness said I was referring to the $160,000 check.
11:44 MR. POHL: Okay. Thank you.
BY MR. POHL:
Q. And when you say it will be safer, why is it safer to wait for the check before you deposit the $162,000 check?
A. This is, you know, newly opened bank account.
Q. And why is the fact that it's a new bank account

concerning to you?
A. Because this account is so new I don't want to, you know, flush all the new big amount checks into this account in a short moment.
Q. All right. This check is a T-5 check?
A. Yes. Most of the money in this $160,000 check were related to T-5 money.
Q. Okay. And what were you afraid was going to happen if you deposit this check into this new account?
11:45 A. Well, I just worry that the deposit will not be accepted.
MR. POHL: All right. Let's move ahead, Ms. McIntyre, to page 7.
BY MR. POHL:
Q. In the middle of page 7 on July 19th, 2022, there's a call from Zhang to Chen.
"Ah, Leo, Leo, uh, over there, both pieces [of checks] have cleared, all right? Let's see...tomorrow, probably tomorrow, tomorrow or the day after tomorrow, give the $160,000 check to, to that, that Chinese person. Okay? The
11:46 two pieces that I deposited before have both cleared."
And then Chen responds "[okay emoji]".
All right, the Chinese person that you're referring to in that call, who are you talking about?
A. Brian.
Q. Thank you. All right. Let's go to the bottom of that

page, again, on page 7.

August 1st, 2022 at 2:34 a.m. Do you see that?

MR. POHL: And Ms. McIntyre, if I could ask you to pull up page 8 of what's now been introduced as Exhibit 73, previously WWW.

BY MR. POHL:

Q. All right. Do you see that at the top of the page, Mr. Zhang?

A. Yes. Correct.

11:48 Q. There's an image at the top left. Do you see that?

A. Yeah, I saw that in the English piece.

Q. Yep. And then there's a link, correct?

A. Correct.

Q. And that link reads www.bostonherald.com/2022/07/30/boston-chinatown-restaurant-served-up-multimillion-dollar-money-laundering-operation-feds.

MR. QUEENAN: Your Honor, the defendant requests the Court's instruction.

THE COURT: Okay. Thank you.

11:50 Members of the jury, you're about to hear testimony and see evidence that the defendant through a WeChat message sent Jin Hua Zhang a link to a Boston Herald article related to a separate criminal case. This evidence is admitted only for a limited purpose. You may consider this evidence only for the purpose of deciding whether the defendant had the state of

mind, knowledge or intent necessary to commit the crimes charged in the indictment.

Further, the case referenced in the Boston Herald article is unrelated to this case. The government and the defendant agree that no one mentioned in this trial, Feng Chen, Jin Hua Zhang, Licheng Huang or any of the other subjects had any connection to or involvement in that separate case.

And do we need it interpreted -- this for the benefit of your client?

11:51 MR. QUEENAN: Thank you, Your Honor.

MR. POHL: Thank you. Ms. McIntyre, can I ask you to turn on Exhibit 73, the chat, to the next page.

BY MR. POHL:

Q. And this reads, "According to the Justice Department in Boston, eight people were indicted for their alleged roles in elaborate money laundering and money transmitting conspiracies that laundered tens of millions of dollars' worth of drug trafficking proceeds as well as a trade-based scheme that used stolen and/or fraudulent gift cards to purchase and ship thousands of Apple products internationally."

11:53 And there are a number of defendants listed. Judge Kelley's stipulation covers those defendants.

The screenshot of the remainder says, "The investigation, dubbed Operation Good Fortune, was part of an organized crime drug enforcement task force's operation that

identifies, disrupts and..."
Q. All right. Mr. Zhang, Mr. Chen sent you that newspaper article, correct?
A. Correct.
Q. At 2:34 in the morning?
A. Correct.
Q. If you could turn the page of the transcript to page 8. When he sent it to you, you responded, "I can't read it or understand it."
11:54 At which point there was a 16-second phone call, correct?
A. Correct.
Q. And Chen called you?
A. Correct.
Q. And did you answer the call?
A. Yes, I should have picked up the call.
Q. And do you remember where you were when you got the call?
A. Inside a nightclub.
Q. Okay. When -- Chen then said, "Where are you?"
11:55 And you said, "In Flushing."
Chen said, "Only hearing music."
And you sent a laughing emoji.
Chen then says, "When will you come here with your family? It's opening for business tomorrow?"
You then said, "Can't make it in time. I'm flying on

the third of the month."

Where were you flying to?

A. The Philippines.

Q. This was for the second Asia trip?

A. Correct.

Q. All right. Chen then said, "The money laundering arrests from the Fuzhou shop."

Do you know what the Fuzhou -- I apologize if I'm mispropronouncing it -- but that Fuzhou shop is?

11:57 A. I know.

Q. What is it?

A. China Gourmet, it's in Boston Chinatown.

Q. Did you understand what he meant by -- when he said "Fuzhou shop"?

A. At that time I think I was on drug. I was a little bit high on drug. I did not pay full attention.

Q. And after he sent that to you, he sent you the article a second time, right?

A. Are you referring to the one that's on the bottom of

11:58 WeChat record?

Q. Yes.

A. Yes.

Q. That's the same Boston Herald article?

A. Well, I couldn't understand the English, but I was knowing that it was referring to what he just said in Chinese.

Q. Right. All right. He sent the article twice, correct? The article is in your chat twice. And this is at, according to the transcript, 2:37 a.m., from about four minutes after he sent it the first time.
A. I wasn't sure about the exact time of the second one.
Q. Okay. It doesn't matter. He sent it to you twice, correct?
A. This was like a remark from the article, that there was a remark on the article.
11:59 Q. Yep. All right. And after he sent -- this last question, Mr. Chen and then I see that you need to switch.
After he sent the article a second time, Chen said something, correct? "Ok, be careful with everything."
A. He says, you know, everything must be careful.
Q. And do you know -- when he said be careful with everything or everything must be careful, do you know what he was -- from your participation in this conversation, what was your understanding of what Mr. Chen said?
A. I wasn't too clear about it, but according to what my
12:01 subsequent response is to him, it appear I understood -- I understand what he meant.
Q. What did he mean?
A. According to the record, I think he might be referring to the Chinese custom that there, when a friend, he's going to take a long trip, he would caution him to be careful.

Q. Okay. So the transcript goes on. You talked to him about the trip again, right?

"If we were to go, we will be above the common people. Those people are already at the boss level...won't be working for others; already winning at the starting line"?

A. Correct.

Q. And Chen said, "You will also be at the big boss level in the future"?

MR. QUEENAN: Your Honor, the government skipped a portion of this transcript. We ask for the rule of completeness that it be read in its entirety.

THE COURT: Okay. Just direct us where. Just above?

MR. QUEENAN: After the, "Ok, be careful" --

MR. POHL: Mr. Queenan, I have got it. Thank you.

BY MR. POHL:

Q. "Be careful with everything."

Zhang then says, "Opening tomorrow?"

Chen, "Yes. I've been working at the restaurant over the past two days."

THE COURT: What page?

MR. POHL: Page 8, at the bottom of page 8, Your Honor.

THE COURT: Okay. But that's not what was being shown on the screen. I'm just trying to make sure -- all right. So would you start now.

BY MR. POHL:
Q. Sure. "Opening tomorrow," question mark.
Chen, "Yes. I've been working at the restaurant over the past two days."
Zhang, "If we were to go, we will above the common people. These people are already at the boss level...won't be working for others; already winning at the starting line."
Chen, "You will also be at the big boss level in the future." And then there was a kung fu emoji.
12:03 "I still have to work hard as a brick mover."
Chen, "So lit."
"Hahaha, we are at the same level," said Zhang.
"Why aren't you asleep yet," said Zhang.
"Just came back from the restaurant."
"When will it open?"
"It opens tomorrow."
Zhang, "I'm going to the Philippines on the third of the month."
Chen, "For how long?"
12:04 Zhang, "About two months. I'll invite you to invest if there are good investment projects over there."
Chen, "Sure. Bring your wife and family here when you come back then."
Chen, "[okay emoji]."
Chen, "Li Zao: I'll invite you to invest if there

are good investment projects over there."

Zhang, "The good project from last time was delayed."

Chen, "It's not a problem."

Chat continues at 2:48 a.m.

Chen, "Just let me know when the timing is right."

Zhang, "I won't forget about you."

Chen, "Thank you, Boss! Thank you, Boss!"

Chen -- Zhang, excuse me, "Be patient."

Chen, "Of course I will."

12:05 Zhang, "You guys won't lose money from that Boston project. It's just taking longer."

Chen, "It's not a problem."

Zhang, "Hahaha, wait for my return...to make glory together."

Chen, "Love you to death."

Mr. Zhang, what are you and Feng Chen discussing in that part of the transcript?

A. My purpose of going to the Philippines is to see if there's any projects, good projects.

12:06 Q. What do you mean by "good projects"?

A. Online casino. Over there the online casinos are legitimate, legal.

Q. What did that have to do with Feng Chen?

A. I will be looking for investor if there are any suitable investor over there.

Q. Had you discussed investing with Feng Chen?
A. You mean the Philippines?
Q. Yes, in what you're discussing in this part of the chat.
A. Not about the Philippines.
Q. What are you discussing in the chat?
A. It related to a Chinese project.
Q. What kind of Chinese project?
A. It is like underground -- like a collateral, people invest in China using collateral.
12:08 Q. Did you discuss with Feng Chen investing in this project in China?

MR. QUEENAN: Objection, relevance.

THE COURT: Sustained, Counsel.

MR. POHL: May we approach?

THE COURT: We can.

(At sidebar.)

MR. POHL: The fact that these two men have business transactions starting in the chat and continuing on later in the chat help explain why Feng Chen would aid Zhang in these 12:09 money pickup transactions in Boston. Mr. Queenan opened with he didn't get paid, how can he be here? And this is the why.

Zhang and Chen have an ongoing series of business projects with each other and are talking in the chat about past discussions of business opportunities and future business opportunities.

THE COURT: Legal or illegal?

MR. POHL: I don't actually think it matters.

THE COURT: Do you know?

MR. POHL: I mean, I think it's likely to be illegal.

THE COURT: But no evidence that it is?

MR. POHL: But it doesn't --

MR. QUEENAN: He's never talked to this witness about this.

MR. POHL: That's absolutely not true, Judge. And 12:10 the -- but again, it doesn't matter. It doesn't matter if it is or it isn't. The point is, the discussion -- the point of the chat is that they obviously have an ongoing business relationship, and one of the things that's going to come later in the chat is that Zhang helped Chen acquire a sauce for his restaurant in China and had a transaction with him over that. And so the point is, it just explains why Chen would do the things that he's doing, that it's not that he's not getting paid for the actual money laundering.

THE COURT: Why not ask him how many business 12:10 interactions or dealings do you have with each other? There's a way to get to it without going through each one of them.

MR. POHL: That's fine. I just wanted you to know why. I hope I've now established the relevance. I'm happy to speed it along.

THE COURT: Let me hear counsel.

MR. QUEENAN: That's the first I've heard for motive. If that's what he's saying then, okay. But I mean, I don't know how many -- to say they're illegal, we're going down things that aren't charged. We're talking about transactions that are sauce, buying sauce in China, I don't know.

THE COURT: They're different. They're friends. They love each other, whatever. That's what he wants to build up. But he doesn't necessarily establish that he's aware that these are illegal activities, and I assume if you don't know the 12:11 answer that they're illegal, it's not going to come off as if they're illegal.

MR. POHL: No. I think it is -- there are a number of -- there's a long list of, sort of in a few pages, there's almost like a settling of accounts between the two of them. They are talking about money that Zhang owes Chen and money that Chen owes Zhang, and I think that makes sense if you understand from the transcript that they're engaged in a series of financial transactions with each other. And that's all we're trying to establish.

12:12 MR. QUEENAN: Your Honor, just for the record, the government has not discussed this with this witness, and I think the government is going to try to elicit and find out if there is anything new that they can discover and drop in front of the jury at the last moment. These transactions are not relevant. I just want to make that clear.

MR. POHL: That's not accurate. We've talked to this witness many times, as you know, Mr. Queenan.

MR. QUEENAN: It's 302.

MR. POHL: No, it isn't 302.

THE COURT: You're making Ms. Walsh's job impossible, and she has permission to interrupt.

MR. POHL: Okay. Well, the chat has been the subject of numerous discussions and countless starting in April and so --

12:13 THE COURT: And the focus being the --

MR. POHL: The Herald article, which is big. You know, the rest of it I think will tie back to some of the money that Mr. Chen delivered for Zhang and their ongoing business relationship, which would explain why Chen would do what Mr. Queenan has said is otherwise inexplicable. Because why would somebody go to all the trouble of doing all this and not getting anything out of it. This is what he's getting out of it.

THE COURT: Okay.

12:13 (End of sidebar.)

BY MR. POHL:

Q. Let me just leave it as this, Mr. Zhang.

You and Chen discussed business opportunities with each other in this part of the chat, correct?

A. Correct.

Q. Okay.

MR. POHL: Can I go back, Ms. McIntyre, to page 9 for a second. Before we move on -- 9 of the transcript. Thank you.

BY MR. POHL:

Q. Just at the top. I just want to go over one more time before we move on, Mr. Zhang. If -- the part of the transcript here, "If we were to go, we will be above the common people." Do you remember what you were -- what did you mean when you said that to Feng Chen?

12:14

A. If Qing Hua Sun and I went to the Philippines together, then the other side will perceive us on a higher level. They will give us more respect from then on.

Q. So were you inviting him to go?

A. Who do you mean?

Q. Feng Chen.

A. I mean, I only meant Qing Hua Sun.

Q. Sun, right. So when you were talking to Feng Chen, you said that you and Qing Hua Sun when you will go, you will be above the common people, correct?

12:15

MR. QUEENAN: Your Honor, objection. Leading the witness.

THE COURT: Sustained.

BY MR. POHL:

Q. When you said these people are already at the boss level,

won't be working for others, already winning at the start line, what did you mean by that?
A. I was referring to Qing Hua Sun's friend.
Q. All right. So page 10, 11, these are the discussions about continuing with business discussions with you and Feng Chen, correct?
"I'll invite you to invest if there are good investment projects over there."
"Don't worry. I won't forget about you."
12:17 A. Correct.
Q. Chen says, "Thank you, Boss!"
A. He didn't say that. He just send me that emoji.
Q. Like an emoji?
A. Yes.
Q. You then said, "Be patient."
Chen said, "Of course I will."
A. Yes, that's correct.
Q. "You guys won't lose money from that Boston project. It's just taking longer."
12:18 A. Correct.
Q. And Chen says, "It's not a problem."
Do you know what you're referring to, the Boston project?
A. Okay. It is the project relating to my friend's boyfriend's friend project.

MR. QUEENAN: Your Honor, objection to the relevance of this.

THE COURT: I'm going to overrule here and allow him to ask the question, but I'm certainly open to further objections.

MR. POHL: Thank you, Judge.

INTERPRETER LIU: The witness has not finished answering the question, okay. Please.

A. The project relating to my friend's boyfriend's friend is a high return project. Yes, related to rental.

Q. Relating to?

A. Rental.

Q. Thank you. And you had discussed that with Feng Chen?

A. We have cooperated on that before.

Q. Okay. We're going to move ahead now, Mr. Zhang, to page -- the bottom of page 13 of the transcript. The very bottom, Zhang -- this is on August 6th, 2022 at 9:56 p.m.

"Can you bring that" --

A. Yes, I see.

Q. -- "bank check to the restaurant on Monday?"

Chen, "It's in my car."

Zhang, "Ok. I'll ask the non-Asian to pick it up on Monday."

A. That was said by me.

Q. Right. I'm sorry, Zhang said.

12:21
12:22

Who was the non-Asian?
A. J.
Q. Okay. So you said, "I'll have the non-Asian pick it up on Monday," that's having J come and pick it up on Monday?
A. Correct.
Q. And Chen sends an okay emoji, correct?
A. Correct.
Q. And then on August 10th, 2022, at 8:31 in the morning, the chat has a call from Zhang to you -- I'm sorry -- from Zhang to Chen.

"Leo, Leo, that...that non-Asian will go down there today. You can give him the check later. When you get a chance, send me the address of that hot pot restaurant, that hot pot restaurant."

Chen, "OK."

Then at 8:52 a.m., Chen, "Approximately what time will he be too tired?"

Zhang, "He should be on his way; driving there now. Let me see."

Chen, "...coming over?"

Zhang, "At 3:30...if the non-Asian doesn't get there by that time...I told him to go at four o'clock.

"The address, send me the address. He'll be there at 3:30 in the afternoon.

"I will tell him to go and eat there first. The

bill, the bill, cover his food bill for me."

Chen, "If he is coming, you have to tell him to come later. I now, uh...I will not open the restaurant until five o'clock, will not open for business until five o'clock. The staff is preparing food so they come in at noon; but the restaurant doesn't open until five o'clock."

Zhang said, "Then there's no need, no need for him to eat. Because the business is not open. We can do it next time. No problem."

12:24 Chen, "Okay, okay. If he comes later, a bit later, at five o'clock, then the business is open, and he can have something to eat. Because, uh...at 3:30, the waiters are still cleaning the place and it is impossible to eat there. All right?"

Zhang, "For 3:30...should he start to drive from New York now? Or what? Send me the address."

And Chen responded, "47 Billings Road, Quincy, Mass."

When Chen sent you the address, 47 Billings Road in Quincy, Mass., what did you do with that information?

12:25 A. Then I transferred that address to J.

Q. Okay. And what had you asked J to do?

A. I asked J to go over there and also bring the check over.

Q. All right. Exhibit 27 --

INTERPRETER LIU: Correction. Hold on. Correction.

A. I asked J to go over there to the restaurant and to pick

up the check and also to have a meal there.

MR. POHL: 27.

Q. When we say the check, we're talking about this check?

A. Correct.

Q. All right. And once J got that check, you had asked J to deposit that?

A. Correct.

MR. POHL: All right. Back, Ms. McIntyre, to the transcript at page 16. Thank you. Page 16.

12:27 BY MR. POHL:

Q. All right. August 10th at 3:40 p.m. Chen sent you a message. "The stuff was given to him." And you then responded, "OK." What does that mean?

A. I mean that that check he has already picked up.

Q. J picked up the check?

A. Correct.

Q. The next day there's a conversation between you and Chen, "The non-Asian is over there," and that's J?

A. Correct.

12:28 Q. And you said to Chen, "Take care of the food bill for me." And then there's a word in the transcript, "caymus".

Q. What does that mean?

A. That means that's the name of the red wine.

Q. Okay. "Get some food for him."

"Boss."

"Boss."

"Boss."

Top of page 17.

Chen, "It's done. He left. I told him that you left a message about it."

You then sent, "Thank you, Boss."

MR. POHL: Can we go to page 19, please. All right.

Q. Mr. Zhang, I'm going to read a portion of this transcript.

Zhang, "Can you give $50,000 cash to Jia Yu for now? I took $10,000" --

12:30

INTERPRETER LIU: Excuse me for one second. Is it possible that you say it in English one or two lines and then I interpret. It's easier to do it this way.

BY MR. POHL:

Q. Okay. "Can you give $50,000 cash to Jia Yu for now. I took $10,000 plus $5,000 from you."

Chen, question mark.

He replied, "I took $10,000 plus $5,000 from you."

Didn't you give $10,000 in cash, and then you gave $5,000 to this what is called person; what is this person called?

12:30

A. Eba, the person is called Eba.

Q. "Yi-Dong, how much did the wardrobe order cost? How much do I need to pay you back?"

MR. QUEENAN: Your Honor, objection to relevance.

MR. POHL: It's the same point that we made at the sidebar before. I think it continues on into the next page, Your Honor.

THE COURT: Okay.

MR. POHL: Thank you.

THE COURT: I'm going to sustain the objection. Let's tighten this up. What are the transactions? We're not going to go through everything.

MR. POHL: All right. Let's skip to August 25, 2022.

12:31 INTERPRETER LIU: Can you roll up the part? It's not showing up on the screen.

MR. POHL: Top of page 22.

Q. All right. There's a text from Chen, correct?

"As of 8/23, Jacky owes Leo 15,250. Leo owes Jacky" --

INTERPRETER LIU: Please hold. The witness is not able to find that page. It's not corresponding.

MR. POHL: Page 22, it's right at the top.

INTERPRETER LIU: The Chinese is not corresponding to

12:32 the English, that's why. Please hold.

THE COURT: Oh, are these two different screens running differently or are they aligned with the transcript?

MR. POHL: I'm not asking him to read it from the WeChat. It's in evidence. I'm just reading it, Your Honor.

BY MR. POHL:

Q. So Mr. Zhang --

THE COURT: So that we understand what's going on because I sort of found myself trying to see if they line up. So have they been preloaded to line up together or are you moving two different things?

MR. POHL: Judge, I think the chat was only -- no. So I think we can just go right with the transcript for now, Judge. Thank you.

THE COURT: Okay. Good.

12:33 MR. POHL: Thank you. All right.

BY MR. POHL:

Q. Chen, "As of 8/23, Jacky owes Leo $15,520."

THE COURT: Okay. Just a second, Counsel. I thought you said we were just going to go with the transcript? Because we're seeing both still.

MR. POHL: Okay. Can you take that down, Ms. McIntyre. Thank you.

THE COURT: I mean, in all fairness, if you're putting something before the witness, he understands one, so he's naturally going to look at that one. 12:33

MR. POHL: I understand. Thank you. This in evidence.

BY MR. POHL:

Q. So I'm going to read it to you, Mr. Zhang. Okay?

MR. QUEENAN: Your Honor, if we're just reading the

transcript, we'll stipulate to its contents. And I'm sure it can be referenced later in the trial.

MR. POHL: It's already in evidence. I'm just asking him what -- but I need to read it to him so he knows what I am asking him about.

THE COURT: But you are going to ask a question?

MR. POHL: Right after this, yes.

BY MR. POHL:

Q. So Mr. Zhang, this -- Chen says, "As of 8/23 Jacky owes Leo $15,250."

12:34

Mr. Zhang, you don't need to look at the chat. Just look at me.

The transcript says, "As of 8/23 Jacky owes Leo $15,250," correct? "Leo owes Jacky" --

INTERPRETER LIU: I haven't finished yet. Please give me time.

A. Correct.

Q. All right. Who is Jacky?

A. That's me.

12:35

Q. Who is Leo?

A. Feng Chen.

Q. The text continues, "Leo owes Jacky RMB 314059.00," correct?

A. Correct.

Q. All right. "Plus five pieces."

Okay.

Chen, "That should be correct!", correct?

A. Yes, correct.

Q. All right. And what are you --

MR. QUEENAN: I haven't heard a question about this passage.

THE COURT: Is there a question about this?

MR. POHL: Yes, yes, yes.

BY MR. POHL:

12:36 Q. My question, Mr. Zhang, is this: What are you and Chen exchanging information about in this passage?

A. I want to know exactly how much I owed him because so that I can know exactly how much to send him because I owe him money.

Q. Okay. You owed him money?

A. Correct.

Q. Did Chen owe you money?

A. Yes, he owed me in Renminbi.

Q. Okay. What did he owe you in RMB for?

12:37 A. He owe me the money in Renminbi for the seasoning of the food in his restaurant.

Q. Okay. So let me ask you a question about that.

MR. QUEENAN: I object to the relevance.

THE COURT: I hope we get to it. So Counsel, tell us --

BY MR. POHL:
Q. What did Mr. Chen ask you to do for his restaurant?
A. Because he has to -- Chen has to order seasoning from China for his restaurant business, so he asked me to advance the money first in Renminbi to pay the China side and then after a couple of days then he will pay me back for the money in Renminbi that he owed me.
Q. I see. So he -- all right. Thank you.
Let's move ahead to September 1st, 2022.
12:38 And as we're pulling that part of the transcript up, why did he ask you for RMB?
A. I think he thinks that I know more people in Mainland China.
MR. QUEENAN: Your Honor, objection for relevance. The case is not about the seasoning at Mr. Chen's restaurant.
THE COURT: How much longer?
MR. POHL: I mean, I think we're going to finish direct today.
MR. QUEENAN: Your Honor, I think there's a delay 12:39 going on here. I think we're ready for cross-examination pretty soon.
THE COURT: Okay. When he's finished, I'll let you go. But Counsel, let's focus. I don't want the jury to get all confused by a variety of things and so --
MR. POHL: I understand.

THE COURT: Let's get there. Thank you.

MR. POHL: Ms. McIntyre, can you pull up page 31 of the transcript.

Just one second, Your Honor. Excuse me.

I'm sorry. Could I have just one moment, Judge? Excuse me one second.

(Pause.)

MR. POHL: Thank you.

BY MR. POHL:

12:41 Q. Can we go to the very last page of the transcripts -- second to last.

And this is a screenshot from inside the chat. And the screenshot says, "How much do you need?"

Chen, "I don't have anything on me at the moment. I can arrange it for tomorrow?"

Phone emoji. There's been an 18-second call and a ten-second audio.

And on July 6th Chen sends an okay emoji.

July 7th, "The merchandise will be delivered to you

12:43 on Saturday." Five pieces -- "I already paid for it. Five pieces already given to him."

All right. Do you know what that chat -- that portion of the chat refers to? What are the five pieces you're referring to?

A. I wanted to borrow some money from Feng Chen.

Q. How much money did you ask to borrow from Feng Chen?
A. I forget how much I asked him for, but eventually he lend me $50,000.
Q. $50,000, okay?
A. Correct.
Q. Is $50,000 five pieces?
A. Yes. In Chinese we call five pieces.
Q. All right. At July 7th at 2:57 p.m. Chen says, "Five pieces are also given to him."

12:44 What happened on that day?

MS. CLEARY: Your Honor, I noticed the juror is raising their hand trying to get Your Honor's attention.

THE COURT: Oh, okay. Mr. Lara, would you -- thank you.

Attorney Pohl, you can step back.

MR. POHL: I'm sorry. Thank you, Your Honor.

(The Court and Clerk confer.)

THE COURT: So to just point out to counsel, you may have noticed it as well as I have, the position of the 12:45 individuals is different.

MR. POHL: I see, yes. The speaker list had switched. Thank you. Thank you.

BY MR. POHL:
Q. All right. Five pieces, when Chen said the five pieces were delivered, what happened?

A. He gave it to Brian.
Q. Okay.
MR. POHL: Can I have one moment?
(Pause.)
MR. POHL: Thank you, Your Honor.
THE COURT: Okay. Thank you.
MR. QUEENAN: Your Honor, may I approach?
THE COURT: Cross-examination.

CROSS-EXAMINATION

12:47 BY MR. QUEENAN:
Q. Good afternoon.
A. Good afternoon.
Q. Mr. Zhang, my name is Patrick Queenan. I represent Leo Feng Chen. You and I, we have never met before, have we?
A. Never.
Q. We have never spoken before?
A. No.
Q. I want to ask you about Feng Chen. Are you aware that the government has charged Leo with two crimes in this case and 12:47 alleged that he was involved in seven transactions by delivering cash or checks on your behalf?
A. Yes, I know.
Q. I want this to be clear: You never informed Leo that money involved in those seven transactions came from drug money or scam money, correct?

A. I have not.
Q. Meaning I'm correct, you never told him this came from drugs or scam money, correct?
A. Correct.
Q. You never told Leo that you were involved in drug sales or involved with drug money, correct?
A. He didn't ask; I didn't say.
Q. And you never told Leo that you were involved with T-5 scam money or romance scams or investment scams, correct?
12:50 A. I have not.
Q. And we heard a lot on direct examination about things that you did, but Leo wasn't involved in those things, like Cambodia, correct?
A. He was not.
Q. And Leo wasn't involved in drugs or drug money, correct?
A. Can you repeat the question again, please.
Q. Sure. Leo wasn't involved in drug activity, correct?
A. He was not.
Q. Leo wasn't involved in T-5, correct?
12:51 A. He was not.
Q. You did not pay Leo to deliver money or checks on your behalf, correct?
A. Correct, I have not.
Q. You asked him for a favor, correct?
A. Correct.

Q. Leo did not work for you, correct?
A. Correct.
Q. Mr. Zhang, at that time Leo was your friend, correct?
A. Correct.
Q. Some friend. You used Leo, your friend, so that you could make money, correct?
A. Yes.
Q. Mr. Zhang, do you see the screen in front of you?
MR. QUEENAN: For the record, we're looking at page 37 of Exhibit 74.
12:53
A. Okay.
Q. I want to make sure this is clear: On July 7th or around that time you asked Leo to loan you money, correct?
A. Yes. Yes, correct. To lend me money, correct.
Q. And Leo agreed, and he loaned you $50,000, correct?
A. Correct.
Q. And that was the $50,000 that Leo gave to Brian on July 7th, 2022, correct?
A. According to the screenshot, yes.
12:54
Q. And that's not drug money or scam money; that was Leo's money, correct?
A. Correct.
Q. Are you aware that the government is alleging that that $50,000 is scam money or drug money?
A. I don't know that.

Q. You told the government that that was a $50,000 loan from Leo, didn't you?
A. Yes, correct.
Q. During direct examination you had mentioned in response to the government's questioning something about a money pool. Do you recall that? I might say this wrong but is "Biao Hui" money pool?
A. Yeah, Biao Hui we call it in Chinese.
Q. Can you briefly explain that to the jury?
12:56 A. In this money club there are approximately about 80 to 100 members in the club. Basically for every month every member contribute about $1,000 into the club. So if any particular individual wants to take money from the pool of money, then that person has to place a bid. That person -- that individual has to use $1,000 to place a bid -- no, no, no. So if everybody contribute $1,000 per month, and then if the bid is -- if the person that place the bid $200 sent to every other -- all the members then would give that particular individual $800. So for the people who have already take the money -- so people who have already taken the money from the money pool, so then they still have that $1,000.
Q. Let me ask some questions. These money pools, are these common in the Chinese culture in communities?
A. Yes.
Q. And are they used in the community to help raise money so

that they can help people buy houses?
A. Correct.
Q. And also to have investment so they can start a business, correct?
A. Yes, some people, yes, do it like that, yes, correct.
Q. And you know that Mr. Chen and his family, they donate to one of these money pools here locally in this community?
A. I have heard about the fact that he has done something like that.
12:59 Okay. I don't really know what you mean by "donating" because I've heard that he has done something, you know, relating to a money pool, a money club, but I don't know what you mean by "donating."
Q. Okay. I may be using the wrong terms.
THE COURT: Counsel, I just want to point out the time to you. I can be a little flexible if the jury can if you need to a find a good sort of place to break for the day. Is there some flexibility in your time?
(Jurors nod.)
01:00 THE COURT: Okay.
MR. QUEENAN: Could I have one moment, Your Honor?
THE COURT: Sure.
(Counsel confer.)
MR. QUEENAN: Your Honor, I think we could try to get it in.

THE COURT: Okay.
BY MR. QUEENAN:
Q. Mr. Zhang, I know we talked a lot about some of the criminal things that you've done, but I want to ask you about some of the other forms of money that you work with in your business.
A. Okay.
Q. So you converted or exchanged money from legitimate business and clean sources, correct?
01:01 A. In the year 2021, you mean? In the year 2021?
Q. Correct.
A. Yes, that's the time when I opened my business called Western Union, correct.
Q. And you converted money for regular businesses, like nail salons and restaurants, correct?
A. No.
Q. How about converting cash to Chinese currency for foreign exchange students; you did that, correct?
A. Yes, I have done something like that for foreign student.
01:02 They would give me Renminbi, and then I give them U.S. dollar.
Q. And you've helped people who want to send money back home to China, correct?
A. To transfer what? To transfer what?
Q. To send money to China.
A. Yes.

Q. And do you remember that meeting you had with the FBI undercovers in Brooklyn, New York?
A. I remember that such a meeting existed, but I don't recall all the details relating to the meeting with the FBI person, FBI agent.
Q. Do you recall telling the FBI that some of your money was from Jewish clients and that it was clean money?
A. Yes, I did.
Q. On February 7th Mr. Chen was at the hotel room, but he eventually left, correct?
01:04
A. You mean relating to the incident, relating to the $100,000 transaction?
Q. Correct. The Encore Casino?
A. After Linda left, I don't recall whether Feng Chen and I had a meal or not. I don't recall clearly.
Q. Okay. Eventually Mr. Chen left, correct?
A. Correct.
Q. And you stayed at the casino, correct?
A. Yes. Yes, until -- yeah, until at night.
01:05
Q. And the FBI agent J, he was at the casino that day with you, correct?
A. I don't have such a recollection very clearly. I remember J was there once, and he was in the club and I was outside. I was outside gambling.
Q. And Leo came back to the casino that day, correct?

A. Probably, yes.
Q. Do you recall introducing Leo to J and introducing J as a real estate investor?
A. I do not recall clearly about that.
Q. Do you recall introducing Leo to J?
A. Yes. Yes, I think so. Yes. Yes, I think the two of them met, yes.
Q. Do you recall discussing that J owned properties in the Seaport and that Leo and him should do business together with
01:07 Leo's cabinet business?
A. I don't have such a recollection.
Q. Thank you. The China Gourmet, the restaurant that's referenced in the Boston Herald article, you're familiar with that restaurant, correct?
A. I kind of aware of it, but I'm not familiar with it.
Q. You don't recall going to that restaurant with Leo when you visited Boston?
A. I personally have been there in this restaurant, but I don't recall clearly about whether --
01:08 Q. I'm not going to ask you anything clearly, but just that you recall going to that restaurant with Leo, correct?
A. I don't have such a deep recollection about this.
Q. And that restaurant serves cuisine from your region in China, correct?
A. Yes, correct.

MR. QUEENAN: Just one moment, Your Honor.
THE COURT: Sure.
(Pause.)
BY MR. QUEENAN:
Q. I want to ask you just a few questions about the Union River Trading Company you created. You said you asked Leo if you could use and list his address for your place of business, correct?
A. Correct.
01:10 Q. You never told Leo that you were going to use that business for anything illegal, correct?
A. I have not.
Q. And you opened the bank account for that business in New York, correct?
A. Correct.
Q. And Leo had nothing to do with that, correct?
A. He did not know.
Q. And you had the bank send your debit card and other correspondence from that account to you in New York, correct?
01:11 A. Yes, because it was opened in New York. Yes.
MR. QUEENAN: Your Honor, could I have one moment?
THE COURT: Yes.
(Pause.)
BY MR. QUEENAN:
Q. Mr. Zhang, you've known Leo for about 12 years; is that

correct?
A. Until today, yes.
Q. And as you got to know him, you wanted him to be your friend, correct?
A. Correct.
Q. Leo is kindhearted, isn't he?
A. Yes.
Q. He is honest, isn't he?
MR. POHL: Objection.
01:12 THE COURT: Overruled.
BY MR. QUEENAN:
Q. He is hardworking, isn't he?
THE COURT: Do you need a response?
MR. QUEENAN: I'm sorry.
BY MR. QUEENAN:
Q. He is honest, isn't he?
A. I think so, yes.
Q. He is hardworking, isn't he?
A. Correct.
01:12 Q. He is devoted to his family, isn't he?
MR. POHL: Objection, Your Honor.
THE COURT: Overruled. To the extent that he knows.
A. Yes. According to me, yes.
Q. He is a good man, isn't he?
A. Yes.

Q. He wasn't involved in any of your criminal activity, was he?

MR. POHL: Objection. That's a legal, not a factual question, Judge.

THE COURT: Overruled. You can answer.

A. He helped me, though.

Q. In these seven transactions, correct?

A. Yes.

Q. He was your friend, correct?

01:14 A. Correct.

Q. Mr. Zhang, you used Leo, your friend, so that you could make money, correct?

MR. POHL: Objection. It's been asked and answered, Your Honor. Objection.

THE COURT: I think he's wrapping up. Overruled.

A. This was not my intention.

MR. QUEENAN: Nothing further, Your Honor.

MR. POHL: Three on redirect, Judge.

THE COURT: Okay.

01:14 MR. POHL: Thanks.

THE COURT: You can hang in for that so we don't have to bring the witness back.

REDIRECT EXAMINATION

BY MR. POHL:

Q. Mr. Zhang, on direct examination you testified that you

borrowed $50,000 from Feng Chen?
A. Correct.
Q. Why did you need to borrow $50,000?
A. At that time I need to purchase some crypto, Tether.
Q. Why did you need to purchase crypto or Tether?
A. Because I need to send some money, some remitting something.
Q. To where?
A. To Cambodia.
01:15 Q. Okay. So you needed to borrow $50,000 to buy Tether, correct?
A. Correct.
Q. And that's the $50,000 from July 7th, correct?
A. Yeah, according to the timeline shown on the screenshot.
Q. Okay. And you needed that to send back to where?
A. It should be something I need to send back to Cambodia.
Q. Okay. All right. Mr. Queenan asked you questions about money pools. My question is, in order to buy a home, why would somebody need to use -- why would somebody want to use a money pool instead of a bank?
01:17
A. Well, I mean, they might have to borrow some money from bank. Well, that down payment -- they still need mortgage, but they need to make up the cash payment for the down payment.
Q. Right. But why use -- why not use -- why not go to a bank?

A. Your question is why didn't they go to the bank to borrow money?
Q. Yes. Or why didn't they -- why not take the money to the bank?
A. Because they were not -- you know, they were not -- they could not deposit too much cash.
Q. Why not?
A. One of the reasons is, you know, reporting tax problem.
Q. Okay.
01:18 A. Secondly, you know, the amount is usually greater.
Q. Greater than what?
A. Because when they borrow money from the money club, they normally bigger amount of money to borrow from the money club.
Some people participate in one money club and some people at the same time participate in three or four different money clubs.
Q. But that's why you use the money club and not go to the bank, right?
A. Well, I mean, they may use a bank, but you know, the money club is still the source where they can, you know, get the down payment.
01:20
Q. Okay. All right. Last, Mr. Zhang, Mr. Queenan asked you some questions about converting money for students. Do you remember that?
A. Okay.

Q. What were the -- what were the dollar amounts for those type of student money conversions?
A. Well, they're basically normally under $100,000.
Q. Okay. And Western Union, same?
A. What was your question about Western Union?
Q. The amount of money that was -- that you exchanged through your Western Union, what were the dollar amounts associated with that?
A. You mean per transaction or overall?
01:21 Q. Per transaction.
A. Well, at the maximum is $7,500.
Q. Okay. Thank you very much.
THE COURT: Counsel.
MR. QUEENAN: Nothing further, Your Honor.
THE COURT: All right. Everyone remain where you are. I'm going to release the jury.
All right. So we have a weekend coming up and so you still can't do any of that online searching, Google, AI. You can't discuss the case. You'll have time.
01:21 We were hoping to get the case to you sort of early midweek, you know, in that time frame, Tuesday, Wednesday, in there. So we've got a little bit more to do. I have got to work with the lawyers and make sure that my instructions that I give to you are going to be in order. So that's part of what we're going to do today. We will have witnesses on Monday

anticipated. And so hang tight. Don't talk about it. Get some rest. You know what to expect. And pretty much Monday will be a full day. Okay. Thank you. That's our prediction.

THE CLERK: All rise for the jury. Jurors, please bring your notebooks and binders.

(The jury is not present.)

THE COURT: Everyone else can have a seat in the back, if you'd like. I need to take a break so that I can get something to eat. I do have -- I think it's a 2:15. That 01:23 should be brief. And we don't -- we can start today. I don't think we're going to conclude today because I certainly will give you another version.

So my thought is even if that means -- let's just say hypothetically we wrap up evidence on Monday, but it's at the end of the day, and we don't have time to sort of work on the instructions, that we can still go into Tuesday morning to do it just so that you have it all before any closing arguments. And so that's why I said what I said with the jury as far as Tuesday, Wednesday is going.

01:24 We're all set with Mr. Zhang. Thank you very much. I appreciate it.

But why don't we take 30 minutes. Is that enough? But today I'm really trying to -- because I just realized where I need to be this afternoon is almost on th Connecticut border.

MR. POHL: Okay.

MR. QUEENAN: Your Honor, do you want to do this first thing Monday morning before the jury is here?

THE COURT: I think we're going to need more time than that. So I at least want to hear you. I realize you filed something. I haven't gotten a chance to really read it, but I'll at least hear you, and I'll work on it over the weekend. You'll have another version.

MR. QUEENAN: And I can let the Court know that I think we've distilled it down to really more or less that one 01:24 issue.

THE COURT: Okay. So if we -- I don't think it will be too long, if that's the -- if that's the case -- well, how long would you think? I hate asking.

MS. CLEARY: Your Honor, it sounds like the case on Monday will not go past lunch. And so if Your Honor would like to do this on Monday afternoon instead and excuse the jury earlier that day, that is fine with the government.

MR. POHL: And that would give us time -- to be perfectly candid with you, I saw Mr. Queenan filed something. 01:25 I also haven't had a chance to look at it. That would make your drive less stressful. It would give us a chance to conference, and I think we could do that.

THE COURT: All right. So if you want to take what was shared with you -- I can share it electronically with you. The only thing is, I had a lot of formatting issues. I had to

retype some of it. So you want to make sure I retyped it correctly because all of those footnotes and lines, the margins were different, so a lot of time was spent on that.

But if you want to work from the electronic version that Mr. Lara will send to you, feel free to share that back, and I'll continue to work from there. But yeah, if there's something you want to say today and now, you can, but otherwise, we'll take it Monday afternoon.

MR. QUEENAN: Monday is great, Your Honor.

01:26 THE COURT: I think they're suggesting not.

MS. CLEARY: No, we did not.

THE CLERK: The digital version, they have it.

THE COURT: So the version that they submit, we can mark as the court exhibit, because that will be the one we work off of when we're together.

THE CLERK: So after?

THE COURT: Yes. So whatever they're going to send to you by sometime over the weekend.

MR. QUEENAN: You're talking about the instructions?

01:26 THE COURT: Yes, yes. So you confer and send back, and I'll work from that. So you can do similar what you did before, sort of indicating what the defense wants and what the government wants, but give me some time to work on that on Sunday.

MS. CLEARY: Okay. Thank you, Your Honor.

THE COURT: All right. And then we'll hammer it out on Monday afternoon and close on Tuesday.

MR. POHL: All right.

THE COURT: Makes sense?

MR. QUEENAN: Thank you, Judge.

MS. CLEARY: Thank you.

MR. QUEENAN: And Your Honor, you've budgeted a half an hour, maybe, 20, 30 minutes for us to make our Rule 29 arguments?

01:27 THE COURT: Yes. So that will be on --

MR. QUEENAN: Monday.

THE COURT: -- on Monday. You'll have plenty of time.

MR. QUEENAN: Yes. Thank you, Judge.

(Adjourned at 1:29 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 10th day of August, 2025.

/s/ Linda Walsh

Linda Walsh, RPR, CRR

Official Court Reporter