UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>FENG CHEN,<br>Defendant. | Criminal Action<br>No. 1:22-cr-10279-AK-3<br>Pages 2-1 to 2-80 |

BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE

JURY TRIAL - Day 2
EXCERPT TESTIMONY OF PETER LONG

August 5, 2025
11:10 a.m.

John J. Moakley United States Courthouse
Courtroom No. 8
One Courthouse Way
Boston, Massachusetts 02210

Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
By: AUSA Christopher J. Pohl
AUSA Meghan Chambers Cleary
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3196
christopher.pohl@usdoj.gov
meghan.cleary@usdoj.gov

On Behalf of the Defendant:

SHEEHAN PHINNEY BASS & GREEN, PA
By: Patrick J. Queenan, Esq.
1000 Elm Street, 17th Floor
Manchester, New Hampshire 03101
603-627-8335
pqueenan@sheehan.com

SHEEHAN PHINNEY BASS & GREEN
By: David M. Losier, Esq.
28 State Street, 22nd Floor
Boston, Massachusetts 02109
617-897-5604
dlosier@sheehan.com

Proceedings reported and produced
by computer-aided stenography.

# INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER LONG | | | | |
| By Mr. Pohl | 2-4 | | 2-78 | |
| By Mr. Losier | | 2-60 | | |


## E X H I B I T S


| | DESCRIPTION | RECEIVED |
|---|---|---|
| GOVERNMENT EXHIBITS | | |
| 1 | Photo of Licheng Huang........................ | 2-14 |
| 2 for ID | FBI Undercover- Demonstrative................. | 2-24 |
| 3 for ID | Individual Photos - Demonstrative............. | 2-24 |
| 4 | Photo of Jin Hua Zhang........................ | 2-25 |
| 5 | Image of January 10 location.................. | 2-26 |
| 6 | January 10, 2022 Recordings (parts 6-1 through 6-6)........................................... | 2-28 |
| 7 | Transcript of January 10, 2022 Recording....... | 2-28 |

P R O C E E D I N G S

* * * * *

(EXCERPT BEGINS.)

PETER LONG, having been duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. POHL:

Q. Good morning.

A. Good morning.

11:10 Q. Can you please introduce yourself to the jury.

A. My name is Peter Long. I'm a special agent with the FBI.

Q. Special Agent Long, how long have you worked for the FBI?

A. Since September of 2010.

Q. Can you describe for the jury what training you received upon joining the FBI?

A. I received initial training in Quantico, Virginia, for the initial training, and since becoming a special agent I've also attended various other investigative trainings.

Q. When you graduated from the FBI Academy at Quantico, what
11:10 geographic part of the United States were you assigned to go to?

A. I was assigned to the Los Angeles office.

Q. And what kind of work did you do upon graduating at Quantico for your first several years as an FBI special agent?

A. I was assigned as a primary case agent to work national

security matters.
Q. Okay. As you sort of progressed through that time as a case agent working on national security matters, was there ever a time in which you received any additional specialized training or certification as an FBI agent?
A. Yes. I received numerous trainings, but specifically, I was also a certified undercover agent or we're referenced as UCA within the FBI.
Q. Right. How did you first sort of become approached in 11:11 your job at the FBI to be considered as an undercover agent?
A. Can you repeat the question?
THE COURT: Just one second.
(Technical difficulty.)
THE COURT: Counsel, do you know where you left off?
MR. POHL: I do remember. Thank you. But I think I'm just going to maybe go back one more question.
BY MR. POHL:
Q. You started your work at the LA office as a case agent. You mentioned a moment ago that you then received training as a 11:15 specialized undercover agent, and my question, I think, Special Agent Long, where I left off was, was there something -- you know, how was it first, sort of, brought to your attention that you should consider applying to being an undercover agent?
A. Normally there are a lot of factors or prerequisites to become a certified undercover special agent. First and

foremost, the participation and familiarity with the various case matters to include national security and criminal investigations.

Number two is participation in various operations, covert operations. There are also -- there's assessment testings to go under to be selected for the school. Then once selected for the school, then you're required to pass the certification in order to be certified.

Q. So let's talk about that. After you go through that, it sounds like a vigorous application process, what do you do, you know, sort of generally at the undercover school?

A. So I'm unable to go into the details due to the classified nature of the school itself. I can say that it's -- the certification course is two weeks long. So after the two-week course, you're either deemed to pass or fail the school. Upon passing, you're certified as an undercover.

Q. What was the sort of pass rate for the people that entered the undercover program?

A. It varies. So each year only about 20 are selected. Normally for the school the passing rate is approximately 50 percent plus or minus.

Q. In addition to -- well, when you sort of became a certified undercover agent, what kinds of work did you begin to -- well, what kinds of work did you do sort of after you completed that program?

A. I participated in various violations to include national security as well as criminal enterprise operations and cases.
Q. When you say criminal enterprises, like what kinds of criminal enterprises -- leave the national security thing to one side for a second.
What kind of other criminal enterprises did you investigate as an undercover agent?
A. Drugs, money laundering, health care.
Q. Thank you. Special Agent Long, do you speak a language other than English?
11:18
A. I do.
Q. What is that?
A. Mandarin Chinese.
Q. In the summer of 2021, were you contacted by another division of the FBI?
A. Yes.
Q. And who reached out to you?
A. Boston office, specifically case agent Benjamin Wallace.
Q. And when Special Agent Wallace reached out to you, do you remember what was your -- what was the request that Special Agent Wallace made to you at that time?
11:18
A. He was requesting a certified undercover agent, more specifically a certified undercover agent who's familiar with the Chinese culture, customs, as well as an ability to speak Mandarin Chinese.

Q. And what did you learn about the nature of the investigation that Special Agent Wallace was conducting?
A. Initially I was given just a high overview of the case involving money laundering operations, more specifically involving Chinese actors or Chinese subjects participating in money laundering operations.
Q. Okay. And did you -- in the course of these sort of initial discussions, did you have occasion to speak to any of the targets of the investigation here in Boston?
11:19 A. After the initial introduction of the case and after arriving to the Boston field office from Los Angeles, I was introduced to one of the subjects.
Q. Okay. And maybe I asked you a bad question.
You met that Boston subject in person eventually, correct?
A. Correct.
Q. Before you met that individual in person, did you speak to that person on the phone?
A. I did.
11:20 Q. All right. And when you spoke to this individual on the phone, sort of, what was the conversation that you had with this person about who you represented to be and what your goal was?
A. In the initial conversation, I introduced myself as the head of organization from the Los Angeles area, and the

conversation involved -- specifically, the subject had specified that he was looking for someone who can engage in money laundering operations to convert U.S. dollars into Chinese currency RMB.
Q. You indicated that you've worked on money laundering cases in addition to this one during your time as an undercover agent. Have you had that fact pattern come across your desk before this particular investigation?
A. Yes.
11:21 Q. All right. Why -- why would -- based on your training and your experience in these investigations, why would individuals want to take money in the United States, U.S. dollars, and convert them into Chinese currency?
MR. LOSIER: Objection, Your Honor.
THE COURT: Overruled. This is based upon your training and experience, what have you learned.
A. Based on my experience, investigative experience, the reason to convert the currency into Chinese currency is threefold. One is to launder illegal proceeds. Two is to
11:22 engage in illegal underground money transmitting or transfer. Three is for transferring money for purposes of tax evasion.
Q. And so the Boston target, unidentified to you at this time, had expressed an interest in doing that kind of work, right? Correct?
A. Correct.

Q. And how had the Boston target, if you know, been identified to the Boston agents?
A. I was told that he was identified through the introduction of a government cooperating witness or we reference as confidential human source.
Q. So Boston had a source, correct?
A. Correct.
Q. That individual made contact with someone in Boston who wanted to take U.S. currency and convert it into Chinese currency, correct?
11:23
A. That's correct.
Q. Boston needed a Mandarin-speaking agent to further this investigation?
A. That is correct.
Q. That's how you came in?
A. Correct.
Q. All right. So as the -- you then spoke to this individual, correct?
A. I did.
11:23
Q. All right. And what was it that you -- I think you mentioned a moment ago that you represented yourself in a particular way. What did you do or what did you -- who did you say that you were when you spoke to this person on the phone?
MR. LOSIER: Your Honor, I just want to object for the record.

THE COURT: Thank you. Noted.
MR. LOSIER: And also object on Petroziello grounds.
THE COURT: Thank you. Your objection is noted.
MR. POHL: Thank you.
BY MR. POHL:
Q. Agent, do you remember the question?
A. Could you repeat the question.
Q. Sure. You had a conversation with this individual in June of 2021; is that right?
11:24 A. That's correct.
Q. All right. And at that time you -- how many people were on that conversation in June of 2021?
A. Two to include myself.
Q. All right. And -- well, you, the target -- and was the cooperating witness also on the call?
A. That's right.
Q. And what did you hold -- how did -- what did you hold yourself out to be and what did you ask of this target on the call?
11:24 A. I introduced myself as head of an unnamed criminal organization over in Los Angeles, and I did not go into the specifics, rather that I am someone who's in charge of various money laundering operations.
Q. And what service did you offer this person?
A. I offered -- specifically, I offered -- my counteroffer to

the initial request is that I am unable to convert U.S. dollars to RMB as the subject had requested.

Q. And RMB -- if we've already said this before, I apologize. RMB is an abbreviation for what?

A. For Renminbi. It's the official currency of the People's Republic of China.

Q. Very good. So you -- on this call with the target in Boston, you said, I can't do cash for RMB, but you then said you had a counterproposal to make. What was the

11:25 counterproposal?

A. The counterproposal is that I'm able to convert U.S. currency to digital or cryptocurrency currency.

Q. Aside from the role that you're playing, is the FBI able to convert U.S. dollars to RMB in the course of its investigations?

A. No.

Q. Why is that?

A. FBI is not authorized and is not able to open accounts overseas, specifically in the People's Republic of China, and

11:26 the FBI as of this day cannot engage in the transferring or opening accounts involving in the People's Republic of China currency, specifically RMB.

Q. But what about -- you mentioned that you are able to do cryptocurrency currency. Why is that?

A. Because you do not need to cross border over to open

accounts in People's Republic of China to conduct transferring of the currency or conversion of a currency to cryptocurrency.

Q. Okay. Now, the individual on this phone call as you're sort of making this pitch, what does this individual tell you?

A. He's -- he accepted the counterproposal.

Q. Okay. And because he accepted the counterproposal, did you sort of take steps with the agents of Boston to sort of set up a further in-person meeting with this person?

A. We did.

11:27 MR. POHL: All right. Ms. McIntyre, Mr. Lara, for the witness only, could I have Exhibit A through --

THE COURT: Just a second while we work on the headset.

(Technical difficulty.)

THE COURT: It's okay now? All right. Very good. Witness only.

BY MR. POHL:

Q. Agent Long, do you have an image in front of you?

A. I do.

11:28 Q. Do you recognize this person?

A. I do.

Q. Who is this person?

A. It's an individual by the surname of Huang, who was introduced to me as Little Huang.

MR. POHL: And -- well, I would offer A-3.

MR. LOSIER: No objection.

THE COURT: Received in evidence.

THE CLERK: What was the name marking identifier?

MR. POHL: A-3.

THE COURT: A as in apple?

MR. POHL: Yes.

THE CLERK: A-3 is going in as 1, Exhibit 1.

(Government Exhibit 1 received in evidence.)

MR. POHL: And --

11:28 THE COURT: Just so you know, ladies and gentlemen, so A-3 was what it was premarked as, but it's going to be Exhibit 1 in evidence.

MR. POHL: Great. Thank you. And thank you, Mr. Lara.

All right. So I think the jurors now have this photograph up, correct? Great.

BY MR. POHL:

Q. All right. Special Agent Long, as the -- this was the person that you spoke to on the phone in June of 2021, correct?

11:29 A. Correct.

Q. And you and the agents in Boston set up another meeting with this person in sort of -- to further discuss your -- his interest in engaging in money laundering, correct?

A. Correct.

Q. All right. Do you remember when that was?

A. I don't remember the specific dates.
Q. If I suggested in July of 2021, does that sound right to you?
A. Yes.
Q. Maybe about a month or so, a little longer, after the phone call?
A. Correct.
Q. All right. So at this point in time, after you had the call with Licheng Huang and you discovered and confirmed his
11:30 interest in this scheme, could you just explain to the jury what the sort of -- at least the beginnings of the undercover plan that you were beginning to put into -- put in place, like, who were the individuals that were going to be sort of attempting to talk to and work with Licheng Huang?
A. So the objectives post phone call of the meeting was threefold. One is to introduce -- to identify the parties in person. That includes for me to introduce the other undercover agents or groups. Two is to identify further -- further identify the objectives of the subject and the operation
11:30 protocols the subject has. And third is to identify or possibly identify network that's associated with the subject.
Q. So those are the goals. And how many people did you sort of -- you and the Boston agents sort of settle on to sort of develop the evidence necessary to see if you could gather evidence to meet those goals?

THE COURT: Just a second. Okay.
INTERPRETER LIU: Can you repeat the question, please?
MR. POHL: Sure.
BY MR. POHL:
Q. After you set the goals of your investigation, how many people did you need to further that investigation?
A. Well, there's no specific number, but the overview is we need myself, the cooperating witness or the CHS and also the Boston undercover team.
11:32 Q. Okay. So I'm going to just walk over to the board for a second. There's three people here, right? There's you, correct?
A. That's correct.
Q. And your role in this sort of undercover operation is as a West Coast financial criminal, correct?
A. That's correct.
Q. All right. When you set up the meeting with Licheng Huang in July of 2021, who else came with you to that meeting?
A. The other person that arrived with me was the CHS and also
11:32 its -- the subject Huang as well as the Boston undercover agent.
Q. Okay. So I think we have your role. When you're discussing with Licheng Huang sort of your operation, how do you introduce the other people that are part of your team as agents and to Huang as part of your business? Who are these people?

A. So as stated earlier, since my initial introduction is I'm the boss of the Los Angeles operation, that I operate out of Los Angeles, the other teams, the other members are my local contacts, the Boston teams who are -- who will be responsible for all the logistics of the operation.
Q. All right. And so there's another undercover agent, correct?
A. That's correct.
Q. And he -- you, in your conversations with Licheng Huang,
11:33 went by the name of what?
A. The undercover agent?
Q. Yes. Well, let me -- I'm sorry. Your undercover -- the name that you used with respect to Licheng Huang and the conversations that you're going to have with undercovers in this case was Jeff, right?
A. That's correct.
Q. And you had another partner here that you introduced as someone who was based in Boston, correct?
A. That's correct.
11:34 Q. And that individual was known as J?
A. That is correct.
Q. All right. And what is J's relationship to you when you introduced him to Licheng Huang?
A. I introduced J as my Boston partner or someone who works under me as an employee/partner, also as the go-to person, the

person who is engaged in cryptocurrency, more specifically, digital wallets.
Q. All right. And how did you introduce, sort of, as you said, the cooperating witness who went by the name of Brian, how did you introduce him to Licheng Huang?
A. How did I introduce --
Q. Well, I should say, Licheng -- the cooperating witness actually introduced Licheng Huang to you, correct?
A. That's correct.
11:35 Q. All right. And did you describe to Licheng Huang what role Brian, the cooperating witness, played in your operation?
A. Yes.
Q. What was that?
A. I stated that Brian was also an employee who had in the past been employed by my organization, by myself, to conduct various money laundering operations.
Q. Okay. Thank you.
So in July of 2021, you all had a meeting: You, Brian, the cooperating witness who works for you, J, your sort of local partner in crime in business here in Boston, correct?
11:35
A. That's correct.
Q. All right. And where did that meeting occur; do you remember?
A. It was in Rhode Island, Newport, Rhode Island.
Q. Okay. And what did you sort of discuss with Licheng Huang

at that meeting?

MR. LOSIER: Your Honor, I'm going to object for the record and object under Petroziello.

THE COURT: Okay. Thank you.

MR. LOSIER: Your Honor, may we have a standing objection?

THE COURT: That's fine. Thank you. Objection is noted.

BY MR. POHL:

11:36 Q. So you, your other undercover agent, the cooperating witness, Licheng Huang, and others arrive at Newport, Rhode Island, correct?

A. (No verbal response.)

Q. All right. What do you discuss with Licheng Huang in the course of that meeting?

A. We discussed his needs and our ability to facilitate his needs. These include --

Q. What were his needs?

A. His needs were to convert -- to engage in money laundering

11:37 operations to include converting specific marijuana money into cryptocurrency.

Q. Okay. And what were, you know, sort of -- what were you trying to sort of test or probe or figure out from Licheng Huang during the course of that meeting? I mean, did you discuss anything about sort of the volume of business or how

frequently he would do it?
A. We did.
Q. All right. And what can you tell the jury about that?
A. Our objective is to identify the skill of the operation or his objectives. During that meeting we had discussed, one, his acceptance of the cryptocurrency as the conversion; and two, his intent on how to convert the money or the currency and the source of the funds.
Q. All right. So you indicated that he expressed that the source of the funds was drug money, correct?
A. Correct, marijuana.
Q. And who in that meeting was sort of -- whose job was it to make sure that Licheng Huang understood how to receive cryptocurrency in exchange for the cash to be laundered?
A. That would be the Boston -- who I introduced as my Boston partner and my Boston employee, which in this case referred to the Boston undercover team.
Q. Okay. And did -- in the course of that meeting, did you and your team successfully sort of confirm that Licheng Huang was able to receive cryptocurrency in order to launder drug money?
A. We did.
Q. All right. How did you do that?
A. Not myself but the Boston undercover team, specifically Boston undercover agent J, has demonstrated -- provided an

example by converting or sending $100 to a predesignated digital wallet, and he then showed the app to the subject to confirm the sending and the receiving of the currency to crypto.
Q. And do you know from the meeting who -- did Licheng Huang direct where that cryptocurrency was to be sent to?
A. Yes.
Q. All right. Where did Licheng Huang direct the cryptocurrency that you were sort of using as a test to be sent to?
A. In his words, it's the digital wallet of his boss.
Q. Okay. At that moment is it fair to say that neither you nor the Boston agents had identified who that boss was?
A. That's correct.
Q. In fact, that was one of the goals of the meeting, right?
A. That's correct.
Q. So after that meeting in July of 2021, did you sort of explain to Licheng Huang that, sort of, the day-to-day operations of this money laundering enterprise were to take -- were to be handled by your local counterparts?
A. I did.
Q. All right. And so would it be fair to say that at this point of time you sort of stepped back to LA and the Boston-based team had contact with Licheng Huang thereafter?
A. That's correct.

Q. All right. And while you weren't personally involved in these meetings, you're aware that there were at least two cash conversions in August of 2021 that involved Licheng Huang, correct?
A. I was made aware.
Q. Okay. Sort of later on in the fall, Special Agent Long, did you have an occasion to sort of become in contact with or to get into contact with the person that was subsequently identified as Licheng Huang's boss?
11:41 A. I did.
Q. All right. How did that happen?
A. Initially the unidentified boss was revealed to me at the first meeting. Upon conversion of the $100 aforementioned currency, Huang had got on the phone and informed us that he was on the phone with his boss. Post meeting, I've had phone conversation with the individual who has identified himself to be Huang's boss. Subsequently, we also had the in-person meeting.
Q. Okay. All right. So you spoke -- while you were together
11:42 in July of 2021, Licheng Huang spoke to his boss, correct?
A. That's correct.
Q. Later in the fall you yourself spoke to his boss?
A. That's correct.
Q. All right. And do you know why Licheng Huang's boss wanted to speak to you in the latter end of 2021?

A. Yes.
Q. What was that -- why was that?
A. The reason is that he wanted to discuss the scale of the operation, but then at the meeting, more specifically, if I understand your question correctly, is he wanted a direct one-on-one engagement without involving Huang.
Q. Did Huang's boss suggest a meeting to further discuss these, you know, hopefully future developments?
A. He did.
11:43 Q. All right. And did that meeting get set?
A. Yes.
Q. All right. And was that meeting on January 10th of 2022?
A. Yes.
Q. All right.
MR. POHL: Mr. Lara, can I have for the witness Exhibit A-2, Ms. McIntyre.
THE COURT: Before we go on to labeling any other exhibits, these two you want to offer, right?
MR. POHL: Yes. I'm happy to take this down. Thank you, Judge.
11:44
THE COURT: We're going to make that Exhibits 2 and 3. Does that work, Mr. Lara, these boards? They need to be introduced.
THE CLERK: If they're evidence, they need to be introduced.

THE COURT: Okay. So what is next, 2 and 3?

THE CLERK: 2 and 3.

THE COURT: That was what was discussed, correct?

MS. CLEARY: I believe, Your Honor, we intended to mark them for identification and use them as demonstratives but not as substantive exhibits.

THE COURT: Okay. So is there any marking for them, any labeling?

MS. CLEARY: Not presently. We can mark them however the Court would like.

THE COURT: All right. Mr. Lara, it's just for ID.

THE CLERK: They'll be marked as 2 and 3 but not admitted.

(Government Exhibits 2 and 3 marked for identification.)

THE COURT: All right. You may continue, Attorney Pohl.

MR. POHL: Thank you very much, Your Honor.

This is for the witness, correct?

THE CLERK: If that screen has no exhibit, it's just for the witness.

MR. POHL: Thank you.

BY MR. POHL:

Q. Do you see an image in front of you?

A. I do.

Q. All right. Who is that?

A. That was introduced to me as Huang's boss, surname Zhang. He also introduced himself to me as Xiao Hua, little Hua.
Q. What do those phrases mean?
A. I'm sorry?
Q. Is that a nickname, the other name that you mentioned?
A. Yes. Xiao Hua in literal translation is little Hua.
Q. And this person in A-2 is who to Licheng Huang?
A. The individual in the picture is Jin Hua Zhang.
Q. And is that Licheng Huang's boss?
11:46 A. Yes.
MR. POHL: We'd offer this.
MR. LOSIER: No objection, Your Honor.
THE COURT: Received in evidence.
THE CLERK: 4.
(Government Exhibit 4 received in evidence.)
BY MR. POHL:
Q. All right. Where did Licheng Huang's boss, Zhang, where did you plan to meet while you were -- where did you plan to meet?
11:46 A. In Brooklyn, New York.
Q. All right. Do you remember where in Brooklyn, New York?
A. It was in a hotel.
Q. All right.
MR. POHL: Can I have Exhibit H, Ms. McIntyre, for the witness.

Q. Do you recognize that?
A. I do.
Q. Is that the hotel in Brooklyn where you met with Jin Hua Zhang?
A. It is.
MR. POHL: We'd offer this.
MR. LOSIER: No objection.
THE COURT: Received in evidence.
THE CLERK: Exhibit number 5.
11:47 (Government Exhibit 5 received in evidence.)
BY MR. POHL:
Q. From the undercover team side, who was present at the meeting in Brooklyn?
A. It was myself, the CHS, or the cooperating witness, subject Xiong, who later asked me to refer to him as Jessie, his partner, as well as the Boston undercover team.
Q. Okay. So Zhang brought somebody else to the meeting, correct?
A. He did.
11:47 MR. POHL: All right. For the witness, and then I think we're done for this witness, Mr. Lara. Can I have H for the witness.
THE CLERK: H was just up.
MR. POHL: I'm sorry. A-4 for the witness. My apologies.

THE CLERK: A-4 was?

MS. MCINTYRE: A-4 I think was the picture of --

MR. POHL: Sun.

MS. MCINTYRE: Ye.

THE CLERK: A-4 was already admitted.

MS. CLEARY: I believe A-2 and A-3 --

MS. MCINTYRE: No, that was A-2 and A-3.

THE CLERK: The witness's is only up.

MR. POHL: All right. Thank you, Mr. Lara.

11:48 BY MR. POHL:

Q. Who is that, Special Agent Long?

A. That's Sun, who introduced himself to me as Ben.

Q. And he's the individual who came with Jin Hua Zhang to the meeting in Brooklyn?

A. That's correct.

Q. Special Agent Long, the meeting that you had in Brooklyn, how long was it, approximately?

A. Approximately three hours.

Q. Was it recorded?

11:49 A. Yes.

Q. All right. And you have reviewed the recording of that meeting, correct?

A. That's correct.

Q. That's listed on the list as D-1 through 6. Do you recognize your own voice on that recording?

A. I do.
Q. Do you recognize the voices of the other members of the sort of undercover team, the agent in Boston and the cooperating witness from Boston?
A. I do.
MR. POHL: Your Honor, we'd move D into evidence and G, which is the accompanying transcript.
MR. LOSIER: Your Honor, we object for the record and object under Petroziello.
11:50 THE COURT: Okay. Thank you. Objection is noted.
THE CLERK: D would go in as 6.
MR. LOSIER: Your Honor, we would ask that they be provisionally admitted under Petroziello.
THE COURT: Yes, understood.
THE CLERK: 6 as D and 7 as G.
MR. POHL: Thank you.
(Government Exhibits 6 and 7 received in evidence.)
MR. POHL: All right. Thank you.
BY MR. POHL:
11:50 Q. Now, that this has been admitted, Special Agent Long, just one more time. I want to make sure everyone saw it. This person is who?
A. This is Sun.
Q. And Sun is the partner of -- or the person who accompanied Zhang to the dinner in Brooklyn, correct?

A. Correct.
Q. All right. So the dinner was three hours long, right?
A. The meeting --
Q. I'm sorry. The meeting was three hours long?
A. That's the three hours to include -- the operation was three hours long. I included at the time preparation, the preambles, and the post meeting. I don't know the exact length of the actual meeting.
Q. And I wasn't -- let me put it this way, it wasn't quick, right?
A. That's correct.
MR. POHL: Okay. So Jurors, I'm going to ask you to pull out your transcript binders, and if you could flip to the January 10th, 2022 tab. So, again, for the record --
MR. LOSIER: Has this been admitted provisionally?
MR. POHL: Yes.
MR. LOSIER: The transcript?
MR. POHL: Yes.
THE CLERK: Yes, provisionally 6 as D and 7 is G.
MR. POHL: Thank you.
BY MR. POHL:
Q. So Special Agent Long, the whole transcript is 55 pages long. We're not going to read all 55 pages.
THE JUROR: I don't have it. It's in here. It's just not labeled as a tab.

THE CLERK: Can you guys close your binders for one second.

MS. MCINTYRE: It might be in G.

MR. POHL: It might be in G. If it's not listed by date, it's listed as G.

THE COURT: Just a second. Direct your comments to the Court, not to the jury.

What is the issue?

(Court and Clerk Confer.)

THE COURT: All right. So my understanding, the problem is that the binders they've been provided have tabs that list a date, and within those tabs there are exhibits by letters. And so we need to be clearer on what we're asking them to open up to. So why don't we start with that. What date?

MR. POHL: The date is January 10th, 2022.

THE CLERK: Some also have no dates as well.

THE COURT: Okay. Does everyone have dates? No.

THE JUROR: There's not tabs with all the dates, but we can find it eventually if you give us a minute and if we look to our neighbor.

THE COURT: Okay. Does everyone have -- so I guess what will appear before you is Exhibit G. Does everyone have that in front of them? Okay. Is that right, Counsel, as to where we should be?

MR. POHL: It is, Your Honor.

THE COURT: All right.

MR. POHL: Thank you. All right. Thank you, everyone.

BY MR. POHL:

Q. Special Agent Long, we're not going to read this entire transcript, but there are certain portions of the transcript that I wanted to go over with you.

Is it fair to say that during the course of this meeting that there was a discussion about the various kinds of sources of the funds that Jin Hua Zhang was laundering?

11:54

A. Correct.

Q. All right. And both laundering and sort of hoping to expand into and to launder more of; would that be fair?

A. That's correct.

Q. All right. So --

MR. POHL: So, Your Honor, with your permission, we're going to read the first seven and a half pages of this transcript in at this time, pausing occasionally to let Special Agent Long comment on particular questions.

11:55

THE COURT: Okay. So starting at page 1?

MR. POHL: Page 1, first line.

THE COURT: All right.

MR. POHL: All right. Thank you.

Zhang, "We are here today" --

THE COURT: One second.

MR. LOSIER: The interpreter is asking for a copy of the transcript.

INTERPRETER LIU: We don't have a copy. Thank you.

THE COURT: Okay.

MR. POHL: Thank you, Judge.

Zhang, "We are here today, uh, we came up here. We want to know if your wire transfer is okay or what."

Undercover agent 1, that's you, is that right, Special Agent Long?

11:56 A. That's correct.

Q. Thank you.

"Yeah, so, that's what I want to talk to you about. Uh, actually..."

CW-1, that's Brian, the cooperating witness who you've introduced as somebody who worked for you, correct?

A. That's correct.

Q. All right.

"Here is a cup here for you."

Sun, "Thank you, thank you!"

11:56 UC-1, "Do me a favor, hang that jacket in the closet."

CW-1, "Okay, okay, okay. I will do it right now."

Zhang, "So I have customers ready."

UC-1, "Yeah, so, that's what I want to talk to you about. So if you want to go forward, you want to go with wire

transfer?"

Zhang, "Yeah, I do more with wire than unintelligible."

UC-1, "I think that will be, the only, the only thing, like we talked about before is, we've got to guarantee the volume, right? So originally when Li, Xiao Li hit up to Brian..."

CW-1, "Xiao Huang."

And then Zhang and both of you say, "Xiao Huang, Xiao Huang, Xiao Huang."

11:57 "Uh, the only thing we discussed was that he guaranteed, he patted on his chest and guaranteed the volume. That is, the volume had to be large. We have not seen that."

Let me just pause for one second right there.

Fair to say that in the conversations that you had had with Licheng Huang that there was a representation by Huang about how much business he could deliver, correct?

A. That's correct.

Q. And the first couple of meetings in Boston were smaller quantities than what were promised, how's that?

11:57 A. That's correct.

Q. All right.

Zhang, "That is okay, we are okay, I mean, not convenient, you know, if I pick up, I give you the cash in Boston, you know, it's not convenient for me. I'm here, you know, how much do you think is, uh, the amount you are looking

for, to give you, on my side?"

From you, undercover agent 1, "From your side? What, what can you do?

Zhang, "Uh."

Undercover agent 1, "Well, wire transfer is actually easy, so I don't know, as long as we don't have to spend a lot of manpower to do pickups and stuff, wire transfer is the preferred way. The only thing I talked to you about is, you know, the wire transfer, we have different tiers. So, you know, everything is about mitigating risks. So, I have sub-accounts, each, each client has his own accounts."

Zhang, "Yes, so you know if something happens."

And "OV" just stands for you and Zhang talk over each other; is that right?

A. That's correct.

Q. All right.

UC-1, "So it has to be, has to be LLC, has to be, usually we have multi-tier LLCs or single layer LLCs, right? If you really want to get complex, there is escrow through the LLC, but with limited liabilities, we can do a 1099 through an LLC. But it all depends. It's all about risk mitigation. It all depends what I am charging the client, points or whatever. Where the money came from is very important."

Let me just ask you two questions about those two last sentences. It all depends what I am charging the client,

points or whatever, what are we talking about there?

A. The points is a reference to the earning or, in layman's terms, commission that we charge for the amount of money that's being transferred.

Q. Okay. And your next sentence, "Where the money comes from is very important," what are you talking about there?

A. So there will be a video later on that we were talking about the actual -- the illegal operation where the money is coming from. I don't know if I'm jumping ahead, but I

11:59 specified to him that certain -- there are different tiers of illegal activity. Certain are deemed more high risk, which we would charge higher commission or higher points. The lower criminally, the less risky criminal money would be charged with a lower points or lower commission.

Q. All right. "Basically" -- going back to the transcript to Zhang, "Basically, we can move, what we can move is cash, deposit cash. We can do it based on night drop. We have a, we did, unintelligible, before, you know? We can open an account through night drop to deposit cash into the bank account,

12:00 rather than from other places. Another place is..."

And UC-1, "You do, you do, you do just basically, just a wire transfer, Western Union, that's all?"

Zhang, "No, not Western Union. But we used the way that Western Union does. Deposit money with night drop, not like, uh, bring the cash to the account, to the counter. If

you bring a lot of cash to the counter to deposit, then you know, you can be shut down quickly."

Do you know what he's talking about there, Special Agent Long?

MR. LOSIER: Objection, Your Honor.

THE COURT: Sustained. Rephrase, please.

MR. POHL: Thank you.

BY MR. POHL:

Q. Well, let me -- the sentence in the transcript was, "If you bring a lot of cash to the counter to deposit, then, you know, you can be shut down quickly."

12:01

Based on your training and experience in money laundering investigations, when you hear the phrase "when you bring a lot of cash to the counter to deposit you can be shut down quickly," does that mean anything to you?

A. Yes. Based on my investigation and based on more elaboration from Zhang himself in later meetings, this is referenced to the seizing or the freezing of the accounts by either the bank or by law enforcement.

12:02

Q. "But, I do the night drop, you know, they will deposit the money, they will make the account last a little bit longer. The second night is, uh, I get some wire from other, other county or personal, people who are Jewish, though, uh..."

"People are what?"

Zhang, "Jewish people. I don't know where those

money, they say they guarantee the money is clean."

CW-1, "Jewish people."

UC-1, "Yeah, I know."

Zhang, "We, we actually can't guarantee the money is clean, but it is a very big account."

UC-1, "Here is the thing, this, this money, we are all business people, we all understand, but, what I mean is that we are only dealing with large accounts because most of our business is in Latin America. For the business in Latin America, we charge, use cash."

12:03 When you say "Latin America," Special Agent Long, based on the conversations that you had in the course of this investigation, what does that term mean?

A. Based on the course of this investigation and based on the course of previous investigations, the reference to Latin America is referencing to drug money.

Q. Okay. "For the business in Latin America, we charge, use cash. If they are doing powder, then we normally do seven percent."

12:03 Powder, what does that refer to?

A. Cocaine.

Q. "But the money is secure, we use multi-layer LLCs. After it comes in, we will remain clean if it is being investigated. This way, the client is protected and so are we."

Zhang, "You mean, from what you said, do you mean

that unclean money can come in? Is that what you mean?"

UC-1, "This, we don't, uh, we all know..."

Zhang, "No problem, no problem. We are all here, we are talking. Because what we do, and what you are saying..."

UC-1, "Oh, people would say, 'Oh, we're a mom-and-pop shop doing, doing..."

Zhang, "We don't say that. We also have this, this kind of money you mentioned, uh, we also have other money, but it is all coming as cash."

12:04 UC-1, "Of course it is all cash. It's all cash from Latin America."

Zhang, "Because, what we have, what we get, how should I say, what we do in New York, is basically like you said, one type is Latin American. The second time is leaf, that's marijuana."

So I mean, it might be an obvious point, at that point he's talking about a second type of drug that he has -- that is the proceeds of the bulk cash, correct?

A. That's correct.

12:04 Q. All right.

UC-1, "Normally, I know that in, in Los Angeles, it is either marijuana or, or..."

Zhang, "Marijuana in Los Angeles, actually, the marijuana paper is originally from foreigners' white paper, you know?"

UC-1, "Right."

"The paper comes to New York to purchase goods to exchange. The money needs to be paid to the farmers. So the most original source of the money is from the hands of the foreigners. It is the type of white money. Since you mentioned this, I guess you all know where the stuff comes from. It is the stuff the foreigners sell. Ultimately, the money they earn must go back to Latin America."

UC-1, "Right, right, right. So what you transfer now is..."

12:05

Zhang, "What we transfer now is not. What we transfer now is two types: One is cash, we deposit what we get, because the point we get here can't reach the seven percent you mentioned. New York, every state, every place, the prices are actually different."

UC-1, "Different. Money from China, and money all over to be withdrawn in China, the prices are different."

Zhang, "However, you, if you can accept that kind of money, okay, then I want to ask, if you can accept that kind of money."

12:06

And before I move on, "If you can accept that kind of money" means if you're going to accept cash from drug sales, he wants to ask about a second kind of funding stream, correct?

MR. LOSIER: Objection, Your Honor. Move to strike.

THE COURT: Sustained, and it will be stricken.

MR. POHL: All right.

THE COURT: Disregard the question, ladies and gentlemen.

MR. POHL: I'm just going to go back to the transcript then, Your Honor.

THE COURT: Thank you.

BY MR. POHL:

Q. "However, you, if you can accept that kind of money, okay, then I want to ask, if you can accept that kind of money."

12:06 UC-1, "So, so, what, what Jessie is saying that, I mean, we are all friends here, let's just talk openly. So, right now, there is potential. If I am understanding it correctly, there is volume. He has asked the volume to...the volume that will reduce."

"Okay."

"...Latin, Latin clients."

"Yeah."

UC-1, "Let's just fucking...let's just say, right? So, it all depends, but he is saying that if we are willing to do it, he has access to those sorts. 12:07 I don't give a shit, money is money."

Zhang, "[chuckles]."

And you say, "It's fucking, it's all about the points."

And the other undercover, UC-2, said, "Yeah."

UC-1, "All I care about is two things: Points and volume. But tapper back, what's most important to us is that we got to keep professional and, unintelligible, consistency. If you make a promise, you have got to deliver. If I set up, if we set up the LLC, if the frequency is set, the frequency is set. What we can't deal with is incremental breaking promises. We all have the partners we have to answer to."

UC-2, "Right."

UC-1, "So everything is customized. So, we do this, you know, if we handle this money, the account is for you alone. The account is yours."

Zhang, "So we own account."

UC-1, "You own the account. This money, this company, is all set up just for you."

Zhang, "Our company account is also linked to their company account, linked one-on-one. A specific account is for their team to run, only for their team to run. Not given a team A, then a team B, and then a team C. Team A is only linked to my account A."

"Specifically linked.

"Specifically linked," said Zhang.

"So if the account number happened, froze, then something must have happened within team A, has nothing to do with us. If I gave account A to team A, B, C to use simultaneously, then, if the account is frozen, then it would

be hard to explain?"

Special Agent Long, based on your sort of work in this investigation and your participation in this conversation, can you understand exactly what or can you interpret what is being discussed here by Zhang?

MR. LOSIER: Objection, Your Honor.

THE COURT: Sustained. Rephrase.

BY MR. POHL:

Q. Well, based on your experience, does that phrase -- well, 12:08 the breaking up between different accounts, does that have significance to you through your experience in the money laundering operations?

MR. LOSIER: Objection, Your Honor.

THE COURT: Let me just see if -- Counsel, why don't you rephrase so that it's clearer what's going on.

MR. POHL: Sure.

BY MR. POHL:

Q. You know what I'll do, Special Agent Long, I'm just going to jump back and start at the beginning of the paragraph again.

12:09 "Specifically linked. So if the account number happened, froze, then something must have happened within team A, has nothing to do with us. If I gave account A to team A, B, C to you simultaneously, then, if the account is frozen, then it would be hard to explain. That's why we only do one-by-one. The account owners, they have, if they want, we

can do it. If you can do it, we can, uh, we can link you directly to the account owner or to tell the team over there to directly transfer to your side. However, we must settle on the points first, right? The second is..."

UC-1, "Still need to go through you."

Zhang, "These things, at first, we won't transfer anything big, because at first, how should I say, we need to establish this relationship."

THE COURT: Just a second. Just a second, Attorney Pohl. We have some issues here with the interpreter, the microphone and the headset.

And, Counsel, before you begin, I think you said that you were going through page 7 --

MR. POHL: Yes.

THE COURT: -- is that right? So I'm going to allow you to do that and any questions that you have in relation to 7, but then we'll try to break after that.

MR. POHL: That's fine, Your Honor. You know what? I think -- I think what I'll do, then, Your Honor, is this: I'm going to read all the way to the end of the paragraph of the section of this particular thing, and we can pick up with questions after the break.

THE COURT: Okay. But if you need to ask some questions before we break while it's fresh in everyone's mind, I'm happy to accommodate that.

MR. POHL: Thank you very much. Thank you, Judge. All right.

BY MR. POHL:

Q. "Still need to go through you."

Zhang, "These things, at first, we won't transfer anything big, because at first, how should I say, we need to establish this, this relationship."

UC-1, "Sorry, will you, just for example, I understood about half. You speak Chinese too fast."

12:12 And multiple people laughed.

Zhang, "Oh, okay, okay.

UC-1, "I didn't quite understand. Sorry."

"It is sort of like this, what I mean is, our side can have two ways. One, our team overseas can transfer money directly to your accounts, but it is U.S., U.S."

UC-1, "So, you have other clients in the U.S. that you want to pump money into us. State side, not..."

Zhang, "Yes."

CW-1, "...it is not overseas."

12:12 Zhang, "No. International only."

UC-1, "International only, but they always go through you. Right?"

Zhang, "What I mean is -- what I meant was can they send the money directly to your account, without going through my account first?"

UC-1, "I mean, yeah, why not?"

Zhang, "It is okay, right?"

UC-1, "Yeah, but I need to know where the money is from. I can't, you know..."

Zhang, "I know, I have, they have, they have the same."

UC-1, "No, no, I am saying that I need to know what, what money I am getting. What kind of money."

Zhang, "Okay. But..."

12:13 UC-1, "I am only charging two percent, you are telling me..."

Zhang, "No, no, it is not two percent for this. You know. Two percent is the cash deposit."

UC-1, "Yeah, yeah."

"This kind of stuff is, what we're talking about is another thing. We call it T-5, you know?"

UC-1, "What's that?"

Zhang, "We call it T-5. T-4, T-5 money. Equivalent to, similar to scam money. You know?"

12:13 UC-1, "Scam money, okay. Internet scam or whatever."

Zhang, "Yeah. It is probably this kind. The model is to entice you to buy some financial products, then cut chives."

Let me pause there for a second. In the course of your experience in money laundering investigations, Special

Agent Long, and your familiarity with Mandarin, does that phrase mean anything to you, "to cut chives"?
A. Yes.
Q. What does that mean to you?
A. In the course of my investigation and from past experience and later on it will be elaborated more by the subjects themselves, cut chives is a Chinese slang referring to victims as crops. Cut chives specifically reference to the harvesting of victims once they reach certain thresholds of the money that's committed.

12:14

MR. POHL: Judge, is now a good time for a break?
THE COURT: Sure, if it is for you.
MR. POHL: It is. Thank you.
THE COURT: All right. Thank you.
So ladies and gentlemen, you've heard some testimony, opening statements. I'm going to take this first break, and it's going to be a little bit longer break. Remember my instructions, can't discuss it, can't do any research, but I will see you back at 2:00 o'clock. You can leave the binders there and notebooks.

12:15

THE CLERK: Yes.
THE COURT: All right. Leave everything there in your seat and no one will touch it.
THE CLERK: All rise for the jury.
(The jury is not present.)

THE COURT: Okay. You can step down. When we resume, you can just return immediately to the witness stand. See you back at 2:00 o'clock.

THE CLERK: We're in recess.

(Luncheon recess taken from 12:15 to 2:00 p.m.)

AFTERNOON SESSION

(The Jury is not present.)

THE CLERK: All rise.

THE COURT: That's okay.

THE CLERK: We're back on the record in the Chen matter.

THE COURT: Anything that we need to discuss before I bring the jury back in?

MS. CLEARY: We were discussing, Your Honor, the uncontested exhibits and the parties have had a chance to discuss those. And I think in order to avoid confusion with numbering going forward, our proposal is to move to admit, at least provisionally, under the defense objection under Petrozziello the exhibits that are on the uncontested list.

THE COURT: Okay.

MS. CLEARY: And so the first stack that we would move to admit would be 9 through 38. And so we'll keep the numbering that they already have.

THE COURT: Okay.

MS. CLEARY: And then we'll move to admit what's on the exhibit list as 1 through 8, including all subparts, and those will be renumbered to follow 38.

THE COURT: Okay. Picking up at 39?

MS. CLEARY: Yes. Sorry.

THE COURT: I think that will take us 39, then, to 47

or so.

MS. CLEARY: Yes.

THE COURT: All right. So just do that in front of the jury so that they see them going into evidence.

MS. CLEARY: Sure. You guys can make your objections.

(Recess taken from 2:01 to 2:10 p.m.)

THE CLERK: All rise for the jury.

Thank you. Please be seated.

We're back on the record in the Chen matter.

02:11 THE COURT: Thank you for your patience. We were trying to work out some of the audio challenges that we've been having.

Let me just inquire, is there any concerns or issues that anyone needs to bring to my attention from the jury?

(No response.)

THE COURT: All right. I assume that's no.

With that, Attorney Pohl, you can resume your questioning.

MR. POHL: Thank you, Your Honor.

02:11 BY MR. POHL:

Q. Good afternoon, Special Agent Long.

A. Good afternoon.

Q. So we left off at the lunch break at page 7 of the January 10th, 2022 transcript. I think there's a few more passages that I would like to go through with you, if I might.

THE COURT: Was that on the screen?

MR. POHL: We do now.

THE COURT: Okay.

BY MR. POHL:

Q. So I think we were about maybe a little farther than the three quarters of the way down the page, Special Agent Long, where you used the expression "cut chives," and you sort of began to discuss what that expression meant to you.

Can you explain again to the jury, what is your understanding of what that term meant.

02:12

A. Yes. The term "cut chives" in Chinese, and later on referenced by the subjects themselves, refers to a Chinese slang to describe harvesting, in this case comparing the victims to agricultural products. And cut chives specifically meant harvesting of the victims, meaning that when they reach certain thresholds of the investments they cut chives with the victims and withdraw all the money.

BY MR. POHL:

Q. Thank you. All right. Let me finish this passage from page 7 to 8, and then I'm going to move ahead to the transcript.

02:13

Zhang, "It is not, it is, uh, you know, crypto."

UC-1, "Crypto scam."

Zhang, "Yeah."

UC-1, "Okay, so, but they could direct deposit into

the account."

Zhang, "Right, they will, they will wire transfer into your account. Okay? When you receive it. You will at the same time..."

UC-1, "Crypto scam."

UC-2, "Yeah. I mean, is he saying we will get more points?"

UC-1, "Yeah, those, the two points or one and a half points are only for cash."

02:14 Zhang, "For different things. Yeah."

Let me just pause for a second right there.

Special Agent Long, there's discussion between you, the other undercover and Zhang about different points. What is your understanding of what is being talked about in that passage?

A. The points, again, is a reference to the commission rate which we will charge for facilitating the money laundering.

Q. And so when you said "are only for cash" and Zhang says "for different things," what is your understanding about what 02:14 that means?

A. In the context of this conversation, it's twofold. Meaning that the low points, the two and one-half points is only for the cash, different things meaning that it will be different points for the aforementioned T-5 scam.

Q. Thank you.

UC-1, "He is saying that he has access to clients who do crypto fraud, they call T-5, crypto fraud, they want to deposit. But then, we wouldn't be going through..."

UC-2, "When you say deposit, is it wired into the account?"

UC-1, "Wire transfer, wire transfer."

UC-2, "And then, what do they want back? Tether?"

UC-1, "What do they want in return, return?"

Zhang then says, "U, USDT."

02:15 Does that abbreviation, USDT, mean anything to you, Special Agent Long?

A. I'm not a crypto expert, but in this case the USDT is referring to one type of cryptocurrency.

Q. Thank you. All right. There's two other passages that I would like to read in this transcript before moving on. Special Agent Long and jurors, if we could ask you to turn to page 14. So I think you referenced in your testimony a moment ago, Special Agent Long, that there was discussion in the conversation about cutting chives or the scams. You then said

02:16 it went on to be discussed later in the transcript. Is this the particular passage that you were referring to?

A. Yes, this is one of them.

Q. All right.

UC-1 -- and I'm -- again, I'm at the very top of the first full sentence on page 14.

UC-1, "Sorry, I, I don't understand. What do they use?"

Zhang, "Uh, similar to Instagram or Facebook, they find you and start chatting with you, right?"

UC-1, "Okay."

Zhang, "They get to know you and introduce you to play, uh, cryptocurrency, right?"

UC-1, "Cryptocurrency? Okay, yeah."

Zhang, "You make some money, right? Then they tell you to invest more money, right?"

UC-1, "Oh, yeah, yeah, yeah."

Zhang, "Then they cut chives. Under normal circumstances, if the amount is not very large, when you go to the bank or report to the police, no case is filed. You know?"

Let me stop right there. What is your understanding, Special Agent Long, about that passage, "If the amount is not very large when you go to the bank or report to the police, no case is filed?"

A. It's just that, the different thresholds of the scam in this specific case is -- one, is to reassure the minimization of the risk, the small accounts, there won't be investigations to that. It's expectation that there are other accounts, both certain amount.

Q. Thank you.

UC-1, "Right, right, right."

Zhang, "Unless your amount is big, then it will be reported to the FBI or, unintelligible."

UC-1, "Right."

Zhang, "Normally, until now, we only had one incident, one client, right? She was cut 375K, almost 400K within two weeks."

UC-1, "375, 400K."

"So this... until now...some clients definitely reported it, I got scammed. Then the account was froze, but 02:19 our money was already transferred out. Right? So, there is no problem at all. However, I don't know if there will be problems with your account. Normally, when they lose the money, they realize that they are scammed, they will call the bank, I wired money to this account and this money is online fraud."

The top of the next page.

"Yeah, so, what he is saying is that they are dealing with all the, what they called, pig games."

You use that expression, but what does that term mean 02:19 to you?

A. I was alluding to the fact that the term in 2021 had to be popularized based on my exposure and investigation. It's referring to the pig butchering scam.

Q. Is a pig butchering scam the same type of scam as a cut the chives kind of scam?

A. It is exactly the same type.
Q. After this sort of extended discussion about the online scams, they do return at least one more time to discussions about drug trafficking; is that correct?
A. That's correct.
Q. Let me turn to page 16, and then this will be the last passage that I would like to read from this transcript for today.

Sort of two thirds of the way down the page you begin by saying, "Where is the cash money from?"

02:20

Zhang, "Just like you said, leaf and Latin America money. But, Latin America money, how should I say, they..."

UC-1, "But, Latin America, we make money from Latin America. Latin America depends on the nature of the money. You need to tell me if it is from high risk."

Zhang, "Oh, no, by the time it comes to us actually, all of these things are, when they reach our hands, they are already changed to cash. By the time it reaches the hands of us Chinese it has already..."

02:21

UC-1, "So, so, that was my original concern. It's about risk mitigation. Cause I know for them, he says their clients are all Latin America, Latin America too. So the problem is, what's that mean? Is it fucking powder or is it fucking fentanyl? I don't know what it is. But, but, uh..."

UC-2, "Are we discussing about something different

now?"

Fair to say UC-2 does not speak Mandarin, correct?

A. That's correct.

Q. And so the preceding passage was you and Zhang discussing --

A. That's correct.

Q. UC-1, "Yeah, so, this is aside from T-5, this is cash. So, I'm asking..."

UC-2, "Oh, yeah."

02:21 UC-1, "...what kind of money we are dealing with in cash."

UC-2, "Oh, okay."

UC-2, "But Jesse" -- and, again, Jesse is again who?

A. Jesse is referring to Zhang.

Q. -- "is saying, he is smart, cause he is saying that hey, it's also from Latin America, but, uh, it's fucking, whatever the money from Latin America, regardless it's marijuana or powder, it's already been, by the time it got converted to cash, it has already been filtered through. So the risk that

02:22 we inherit should be minimized."

UC-2, "Minimum."

Zhang, "Your layer has no risks."

UC-1, "He is guaranteeing...So you already, already, cleaned it."

UC-2, "But, but that cash, that, he is hard on two

points for that cash."

UC-1, "No, we haven't discussed the points. I want to see where that money is from."

UC-2, "Okay."

Zhang, "If this money, no matter it is from Latin America or leaf, by the time it is transferred from foreigners to us Chinese, the risk is already removed. You know? The most dangerous part in our line of work is when we receive paper from foreigners. This is the most dangerous part in our line of work because sometimes we need to go to another state to bring the money back. Normally, if they follow, they would start at the foreigners, they are already following during the handover, the most, we have been doing this a long time, I know that the farthest they have ever followed is to New York. When you arrive at the address, they rush over and take the money, but the person is fine. They just have DEA, the, uh, the Drug Enforcement Administration, you know, DEA."

UC-1, "Right, DEA, yeah."

Zhang, "Right. What we fear most is the encounter with DEA. The stuff is taken, we are left with nothing, confiscated. But the people, the worst is being taken in and filing a report, then return."

UC-1, "So you don't touch the merchandise, only touch money?"

Let me stop right there. "Merchandise" in the

context of this sentence means what, Special Agent?
A. In this case "merchandise" is referring to the drugs.
Q. Okay.
Zhang, "Right, we don't touch that stuff."
UC-1, "Don't touch the merchandise."
Zhang, "We never touch it."
UC-1, "When it gets to your hands, it is already money."
Zhang, "Right, right, right. They already..."
UC-1, "So they don't deal with the merchandise. So what he is saying is that whatever the Mexican or Latin American, they, whatever the merchandise has been converted already. So, by the time, so they inherit all the risk doing the transaction cause they pick up the cash from the Latin Americans."
UC-2, "I get it."
UC-1, "So once they get the cash..."
UC-2, "I mean, we are dealing with the same thing in Boston. Yeah."
UC-1, "Yeah. But it's a layered risk, but the risk is still there."
Zhang, "Basically when it reaches the hands of Chinese, right, it is already mostly eliminated."
UC-1, "Yeah, so, I know what he is saying. So, by the time they get the cash, it's already, it's already, cause

they don't touch the merchandise."
That meeting continues on for some time; is that right, Special Agent Long?
A. That's correct.
Q. Is it fair to say, those two topics, drug money and scam money, are discussed throughout?
A. That's correct.
Q. At the conclusion of that meeting, do you have any discussions with Zhang about sort of next steps for your collaboration?
A. At the conclusion of the meeting, we had decided to proceed forward.
Q. And proceed forward in this case means what?
A. We're ready to accept the money both in electronic transfer and also physical delivery whereupon receipt we will convert them into cryptocurrency and deliver them back to Zhang.
Q. Did you sort of -- at the conclusion of the meeting, you returned to LA?
A. That's correct.
Q. All right. Did you have any other meetings in connection with your work as an undercover in this case?
A. I have.
Q. And what were they?
A. I subsequently met with Zhang for two more occasions,

physical meetings in addition to phone calls.
Q. And those meetings took place in where?
A. Those meetings took place in Brooklyn, New York, and Flushing, New York.
Q. For the meetings that you've discussed, the July 2021 meeting on the boat, the meeting at the hotel on January 2022, the subsequent meetings that you had in Brooklyn, did you ever see or meet during those meetings the defendant Feng Chen?
A. No.
02:27 MR. POHL: Can I have one moment, Your Honor?
THE COURT: Yes.
MR. POHL: Thank you, sir.
THE COURT: Cross-examination.
MR. LOSIER: May I inquire, Your Honor?
THE COURT: Yes.

CROSS-EXAMINATION

BY MR. LOSIER:
Q. Good afternoon, Special Agent.
A. Good afternoon.
02:28 Q. On direct examination AUSA Pohl asked you a lot of questions about phone calls and meetings, correct?
A. That's correct.
Q. Phone calls with Mr. Licheng Huang?
A. One of them, yes.
Q. And phone calls with Mr. Zhang?

A. Physical meetings as well as phone calls, yes.
Q. And when I say Mr. Zhang, do you pronounce that differently?
A. In Chinese it would be pronounced Zhang depending on the dialect. In Mandarin Chinese it will be Zhang. In his stated dialog, I don't know.
Q. So when you use that pronunciation, that's the same as when AUSA Pohl and I say Zhang?
A. That's correct.
02:28 Q. Okay. AUSA Pohl also asked you about meetings with Mr. Huang and Mr. Zhang, correct?
A. That's correct.
Q. Mr. Chen, Feng Chen, wasn't on any of those phone calls, right?
A. No, he was not.
Q. He wasn't referred to on any of those phone calls, was he?
A. No.
Q. He wasn't at any of those meetings either, was he?
A. No.
02:29 Q. He wasn't even referred to at any of those meetings, was he?
A. No.
Q. And the transcript of the January 10th, 2022 meeting that you say took about three hours, I think you said; is that right?

A. The entire operation, yes.
Q. Not once was Mr. Chen referenced at all, correct?
A. No.
Q. I'm not, correct?
A. Oh, he was not referenced.
Q. Now, you talked a little bit about your background as an FBI special agent, correct?
A. Correct.
Q. And how you were selected to go into a special training to become an undercover agent; is that right?
A. That's correct.
Q. And after you accomplished that, went through the two-week training, you became certified as an undercover special agent, right?
A. Correct.
Q. And at some point in May or June of 2021, FBI Boston reached out to you to talk about helping with an investigation here in Boston; is that right?
A. Correct.
Q. And that was Special Agent Wallace who reached out to you?
A. That's correct.
Q. And he reached out to you because of your familiarity with Chinese culture; is that right?
A. He reached out to me because, one, I was a certified undercover. And two, is because my understanding of the

language, and my ethnicity and the culture -- understanding of the culture and customs.
Q. You testified about that on direct examination, right?
A. Correct.
Q. When you began your work in this investigation, it was important to your credibility as an undercover special agent to know Chinese customs and Chinese culture, correct?
A. In a broad perspective, yes.
Q. And it was also helpful to you that you spoke -- that you
02:31 speak Mandarin, correct?
A. That's correct. The -- only Mandarin, not the other -- there are many dialects, many customs depending on region if you're from China.
Q. When you say many dialects, are you referring to the fact that Mr. Zhang speaks a different dialect, a Fujian dialect?
A. Correct.
Q. You don't understand that dialect?
A. I do not.
Q. Now, as far as the Chinese community, are you familiar
02:32 with the customs and the culture of the Chinese immigrant community in America; is that right?
A. I have a broad understanding of the diverse community, yes.
Q. And you understand, then, that in the Chinese American community, immigrant community, it's common to use quantities

of cash or large quantities of cash to make transactions to buy things, correct?
A. In all diverse communities, from my experience, cash trade is prevalent, yes.
Q. In the Chinese American community specifically, correct?
A. In transactions in terms of restaurants and shops, yes.
Q. Even for large purchases of tens of thousands of dollars, it's common for Chinese immigrants to pay for those transactions in cash as well; is that right?
02:33 A. I have not seen a large cash transaction taking place in commerce, only in what I physically witness are cash transactions in day-to-day commerce such as grocery shopping, restaurant.
Q. And that's a little bit different from non-Chinese Americans who oftentimes use credit cards or debit cards for those types of purchase, correct?
A. Could you repeat the question.
Q. I said that's contrasted with non-Chinese immigrant Americans who oftentimes instead of cash will use credit cards
02:33 or debit cards for those transactions that you described?
A. Non-Chinese referring to Caucasian neighborhoods or other diverse communities?
Q. Let's first talk about Caucasian neighborhoods.
A. I can attest to the neighborhoods that I frequented or lived in, that is correct, but not in the other neighborhoods

that I frequented.
Q. So there are other non-Chinese immigrant communities that also transact regularly in cash as well; is that right?
A. That's correct.
Q. As part of your -- let me back up.
Once Special Agent Wallace reached out to you, you accepted his request to work on this investigation; is that right?
A. I agreed to review the case and operation and to assist.
02:34 Q. So after you reviewed the case, you agreed to assist; is that right?
A. That's correct.
Q. And when you agreed to assist, was one of your first tasks in your investigation to speak with the Boston confidential human source informant named Brian?
A. Yes.
Q. And when you spoke with Brian, the informant, was he at the time being supervised by J, the undercover that you referred to as your partner?
02:35 A. Not that I'm aware of.
Q. So do you know whether your partner J, who you referred to on direct examination, communicated with Brian before you did?
A. Not that I'm aware of.
Q. So you were the first contact with Brian regarding this investigation?

A. I did not ask if I was the first. I just was -- when I arrived in Boston, I was introduced to Brian.
Q. And Brian told you about his meeting with Licheng Huang and Licheng Huang's desire to launder drug money?
A. Brian told me that Licheng Huang was looking for someone to launder money.
Q. And he told you it was marijuana money; isn't that right?
A. I don't recall the specific conversation I had with Brian.
Q. At some point you spoke directly with Licheng Huang?
02:36 A. I did.
Q. And immediately Licheng made clear to you that his boss wanted to launder marijuana proceeds; is that right?
A. My memory is that it was made specifically clear to me at the physical meeting that it was marijuana money that he wanted to launder.
Q. And that was fairly early on in your involvement in the investigation?
A. Yes.
Q. And, again, your conversations with Mr. Licheng Huang
02:36 never involved Mr. Chen, correct?
A. That's correct.
Q. Licheng Huang never referenced by name or implication Mr. Chen, correct?
A. Correct.
Q. Now, I think you testified about a June 2020 call that you

had with Licheng Huang. Did you testify about that?
A. Yes.
Q. And in that call, was it you that raised the possibility of using cryptocurrency, to convert the cash to cryptocurrency?
A. That's correct.
Q. So it wasn't Licheng Huang asking you about cryptocurrency. It was you suggesting to Licheng Huang that you could convert cash to cryptocurrency for his boss?
A. I informed Huang that I cannot facilitate transfer of RMB
02:37 in Chinese currency, that the alternative is cryptocurrency.
Q. In that initial call in June, Licheng Huang talked about his boss, right?
A. He mentioned he had a boss.
Q. And you later learned that that was Mr. Zhang, correct?
A. That's correct.
Q. You talked about a July 28th, 2021 meeting in Newport, Rhode Island. Do you remember that?
A. I do.
Q. And who was present at that meeting in Newport?
02:38 A. It was myself, the cooperating witness, CHS, Huang, as well as the Boston undercover team to include the special agent acting under the cover name J.
Q. When you say the cooperating human source, is that what you said, is that Brian?
A. Cooperating witness or confidential human source, that is

Brian, correct.
Q. And when you said the FBI Boston team, they weren't physically present for that meeting, they were observing it and recording it; is that right?
A. There are two teams. The case investigative team that are monitoring and conducting surveillance, but present were the secondary team which were the undercover team consists of various undercover employees, they were present at the meeting.
Q. And the purpose of that meeting was to establish trust with Licheng Huang, correct?
02:39
A. The purpose of the meeting is to want to bona fide of our organization having multiple members and to meet with Huang in person and identify his needs.
Q. And also to identify his boss and get closer to his boss, correct?
A. To identify his network, correct.
Q. Okay. And in this situation, another purpose was for you to introduce your undercover partner J to the investigation, right?
02:39
A. That's correct.
Q. Because ultimately you handed off Licheng Huang and eventually Mr. Zhang to J, and you went back to Los Angeles, correct?
A. That's correct.
Q. So that was the plan prior to that July meeting in

Newport, wasn't it?
A. Correct.
Q. And at that meeting in Newport, there was open and specific discussion about the proceeds of drug sales, right?
A. Could you repeat the question.
Q. At that meeting in Newport, Rhode Island in July, Licheng Huang talked about marijuana and drug sales and the cash proceeds that needed to be laundered, correct?
A. He mentioned the cash. The money is sourced from
02:40 marijuana sales to be converted, correct.
Q. Okay. And during that meeting, Mr. Huang made it clear to you that his boss preferred that any transactions like that, converting cash to crypto, he preferred they take place in New York, correct?
A. He made -- we're talking about two different things. One is the avenue to which to deliver the money and then the other one is the conversion. He discussed the method of delivering the money and then the converting it to the cryptocurrency.
Q. Then you discussed the delivery he wanted -- the delivery
02:41 of the money, the physical delivery Mr. Huang and his boss preferred that be in New York, correct?
A. Mr. Huang stated that to minimize his risk he preferred to do all deliveries in New York, correct.
Q. Okay. And you made clear that it was your preference to have those deliveries take place in Boston, correct?

A. I informed him, since my partner's in Boston, it's preferred that we do all deliveries in Boston.
Q. So a number of deliveries were set up in Boston at some point after that July meeting in Newport, correct?
A. It was outside my scope, but I was informed that deliveries were scheduled by the undercover team in Boston.
Q. And, again, before we move on from that meeting in Newport, Mr. Chen wasn't at that meeting?
A. No, he was not.
02:42 Q. And he wasn't referred to at that meeting?
A. No, he wasn't.
Q. Okay. Now, you were asked questions by AUSA Pohl about phone calls you had with Licheng Huang and then Mr. Zhang in the fall of 2021. Do you remember those questions?
A. Yes.
Q. And in those calls you spoke with Mr. Huang again, very specifically, about the money that he and his boss Mr. Zhang wanted converted that was cash from drug sales, correct?
A. I don't remember the specific phone conversation, but I do
02:43 remember the concept of that was discussed.
Q. Okay. And also, another concept that was discussed in phone calls in the fall of 2021 was your preference that the cash deliveries take place in New York, correct?
A. The cash was -- could you repeat that.
Q. I'm sorry. In the phone calls you had with Mr. Huang in

September of 2021, you also discussed with him where deliveries of cash would take place, correct?
A. I would have to look at the transcript again. I don't remember the specific conversation.
Q. Do you recall whether you had a conversation on September 21st of 2021?
A. I remember a conversation around that time period.
Q. Do you remember telling Licheng Huang that doing business in Boston is most convenient for you and your team?
02:44 A. Yes.
Q. Do you remember telling Licheng Huang that you were willing to accept one point if the delivery of cash took place in Boston, but if it took place in New York, then you would insist on 1.5 points? Do you remember that?
A. I would have to refer to the transcript, but that does sound logical.
Q. That's what you said, correct?
A. I would have to look at the transcript to confirm but --
Q. Is your memory exhausted on that point?
02:44 A. My memory to the context and details of that phone conversation, yes.
MR. LOSIER: May I approach, Your Honor?
THE COURT: You may.
BY MR. LOSIER:
Q. I put this document before you and ask you to take a look

at it. Just read it to yourself for now. I'm going to direct you to a particular section. I just want you to look at it. Do you recognize the document generally?
A. I do.
Q. What do you recognize it to be?
A. This is a summary of the -- not the verbatim but the summary translation of the phone call I had.
Q. And that would be a phone call on what date?
A. It would be October -- September 21st.
02:45 Q. 2021?
A. 2021.
Q. Okay. May I see that? And I'm going to direct your attention to a paragraph on page 3. Read it to yourself, and then I'll have follow-up questions whether that refreshes your recollection.
A. Okay.
Q. Does that refresh your recollection?
A. It does.
Q. Okay. I'm going to have a couple more questions about
02:46 that.
A. Of course.
Q. Special Agent, having now reviewed the transcript summary of a September 21 -- I'm sorry -- September 21, 2021, a phone call between yourself and Licheng Huang, is your memory refreshed as to whether you told him that you would essentially

give him a discount on cash deliveries on what percentage or commission you would charge for deliveries in Boston as opposed to New York?
A. Correct, I did.
Q. So you told him that?
A. I did. Based on the transcript, I did.
Q. And that's because you wanted to give Licheng Huang and his boss a financial incentive to have the cash deliveries be in Boston where your partner J was, correct?
02:47 A. That's correct.
Q. Now, when you got involved in this investigation, it was important for you to do research and learn about Mr. Zhang as well; is that right?
A. To do research, no.
Q. Look into him, investigate him, investigate who he is, where he lives, where he operates in New York; is that right?
A. No, not for me, not for the undercover agent.
Q. You didn't do any of that?
A. No.
02:48 Q. But that information was made available to you, correct, as part of your intelligence?
A. It's available. All the background information is available at request as long as it's pertinent to the operation itself.
Q. Okay. And you learned that Mr. Zhang owned nail salons in

New York?
A. I did not.
Q. You didn't learn that. The first time you've heard that is here today?
A. That's correct.
Q. And you're saying that you didn't know that Mister --
MR. POHL: Objection.
THE COURT: Overruled.
BY MR. LOSIER:
02:48 Q. You're saying it's your testimony you didn't know anything about Mr. Zhang operating a Western Union storefront in New York?
A. I did not know the details of his business or operations outside of what we were engaged in.
Q. You knew that Mr. Zhang and his friends, mostly Chinese immigrants, like to gamble? You knew that, right?
A. I did not know their life habits or patterns.
Q. That wasn't important for you to learn when you're an undercover in the investigation?
02:49 A. Not for the first meeting.
Q. Is that because you eventually were going to hand off this investigation to your partner J?
A. My role, again, is to act as the financier and the boss, but all logistic matters pertaining to the operation is to be handed to the Boston undercover team.

Q. Okay. I'm going to turn now to the January 10th, 2022 meeting in Brooklyn. Now, on direct examination AUSA Pohl asked you a lot of questions about drug money that was discussed, cocaine and marijuana; is that right?
A. Correct.
Q. And AUSA Pohl read portions of the transcript of the meeting that took place in Brooklyn that day; is that right?
A. That's correct.
Q. And there was free and open and detailed discussion about
02:50 marijuana cash proceeds, correct?
A. Correct.
Q. And there were detailed discussions about cocaine and proceeds from cocaine; is that right?
A. It was referenced, money from cocaine, Latin America.
Q. And there was also reference -- Mr. Zhang told you in that meeting about T-5, didn't he?
A. He did.
Q. And T-5 is a term that you heard for the first time at that meeting; is that right?
02:50 A. The term "T-5" was the first time I've heard it. The concept was not.
Q. The term "T-5" was when you first heard it, that term, at that meeting in Brooklyn from Mr. Zhang, correct?
A. That specific term, yes.
Q. He volunteered that to you, didn't he?

A. He did.
Q. Now, there was a lot of talk about the transcript from that meeting and most of the conversation was between you and Mr. Zhang, correct?
A. Correct.
Q. But there were two -- at least two other people at that meeting, correct?
A. That's correct.
Q. Your partner J was there, right?
02:51 A. He was.
Q. He's referenced as UC-2?
A. That's correct.
Q. And Mr. Sun --
A. That's correct.
Q. -- right? Is that Qing Hua Sun?
A. Qing Hua Sun.
Q. Qing Hua Sun?
A. Yes.
Q. And Qing Hua Sun is somebody that Mr. Zhang brought to 02:51 that meeting; is that right?
A. That's correct.
Q. And Qing Hua Sun and Mr. Zhang would oftentimes speak in Fujianese dialect at that meeting; is that right?
A. They spoke in a different dialect I didn't understand, which I believe to be Fujianese.

Q. Was anybody else at that meeting, other than yourself, J, Mr. Zhang, and Mr. Sun?
A. Yes.
Q. Is that Brian?
A. Yes.
Q. Brian doesn't appear on the transcript at all, does he, from what you read?
A. He did.
Q. And would you agree with me that the transcript that was
02:52 put before you today is a condensed, more abbreviated version of a larger transcript, correct?
A. This, based on the recording I've been listening to, is the entirety of the transcript verbatim translated by our linguist of the meeting.
Q. So did you listen to the entire meeting that took place at the Brooklyn hotel in January of 2022?
A. I listened to the audio files that was provided to me.
Q. And did you compare it as you were listening to a transcript?
02:53 A. I did.
Q. And it's clear based on your review of the audio files and the written transcript, there's no reference of Mr. Chen, correct?
A. That's correct.
Q. Isn't it true you've never met Mr. Chen?

A. That's correct.
Q. You've never spoken with him by text message, correct?
A. That's correct.
Q. You've never spoken with him on the telephone, correct?
A. Correct.
Q. You've never had any communication with Mr. Chen in any way at any time, correct?
A. That's correct.
MR. LOSIER: Your Honor, may I have a moment?
02:54 THE COURT: Sure.
(Pause.)
MR. LOSIER: No further questions, Your Honor.
THE COURT: Any redirect?
MR. POHL: Just one question.
THE COURT: You can do it from the table if you want.
MR. POHL: I wasn't sure how Your Honor would feel about that. I'll remember that for the next time. Thank you.
THE COURT: You said briefly, so that's why you could do it from there.
02:54 MR. POHL: I did.

REDIRECT EXAMINATION

BY MR. POHL:
Q. On cross-examination, Special Agent, there was a fair amount of discussion about the differences between having the meetings in New York versus Boston. I just want to -- remind

us again, how exactly did the FBI first begin to conduct this investigation?

A. The investigation, from what I was told, briefed by the case agent and from my conversation with the CHS or cooperating witness, is we answered or -- we answered an ad. There were people looking for parties to launder money, and we simply answered to that, to the call.

Q. And the person putting out the ad was from where?

A. From Boston.

02:55 Q. Thank you.

THE COURT: Any questions?

MR. LOSIER: No questions, Your Honor.

THE COURT: All right. You're all set. You may step down.

THE WITNESS: Thank you.

(END OF EXCERPT.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 13th day of May, 2026.

/s/ Linda Walsh

Linda Walsh, RPR, CRR

Official Court Reporter