UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, Plaintiff,

v.

JIN HUA ZHANG, Defendant.

Criminal Action No. 22-10279-AK

BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE

SENTENCING

April 1, 2026
3:32 p.m.

John J. Moakley United States Courthouse
Courtroom No. 8
One Courthouse Way
Boston, Massachusetts 02210

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts 02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
Christopher J. Pohl
Brian Alexander Fogerty
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3196
christopher.pohl@usdoj.gov

On Behalf of the Defendant:
Stephen P. Scaring
Stephen P. Scaring, P.C.
666 Old Country Road, Ste 501
Garden City, NY 11530
516-683-8500
sscaring@scaringlaw.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Angel Kelley, United States District Judge for the District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 8, Boston, Massachusetts, on April 1, 2026.)

(Interpreter duly sworn.)

(Case called to order.)

THE COURT: Good afternoon, everyone. Could you please state your appearances for the record, and let's start with counsel for the government.

03:32

MR. POHL: Thank you. Good afternoon, Your Honor. Christopher Pohl and Brian Fogerty for the United States.

THE COURT: Good afternoon.

MR. SCARING: Stephen Scaring for the defendant. The defendant is ready for sentencing.

THE COURT: Thank you, and good afternoon to you, sir. And Probation?

U.S. PROBATION: Good afternoon, Your Honor. Carolyn Patton for Probation.

03:32

THE COURT: Thank you very much. Counsel, is there anyone here that should be acknowledged?

MR. SCARING: Your Honor, the defendant's mother and his partner are in the courtroom.

THE COURT: All right. Thank you. I'm sure it means

a lot to him to have supporters here, and so I thank them for coming on his behalf. So today we're scheduled for -- is his last name Zhang or --

MR. SCARING: Zhang, Your Honor.

THE COURT: Zhang, all right, Jin Hue Zhang's sentencing hearing. On September 12, 2023, he pled guilty to two counts, one for money laundering conspiracy, under 18 U.S.C. Section 1956(h); and Count Two, conspiracy to possess with intent to distribute five kilograms or more of cocaine and 03:33 MDMA under 12 U.S.C. Section 841 and 846.

I have received and reviewed the Presentence Report, sentencing memos, including letters of support and detention records. Have I omitted anything, counsel, that you have submitted?

MR. POHL: No, Your Honor. Thank you.

MR. SCARING: Your Honor, we submitted a submission, I think you referred to it.

THE COURT: Let me just make sure. Yes. Officer Patton, was any information withheld from the Presentence 03:34 Report pursuant to Rule 32(d)(3)?

U.S. PROBATION: No, Your Honor.

THE COURT: Okay. Do the parties anticipate an evidentiary hearing?

MR. POHL: No, Your Honor.

THE COURT: No witnesses or victims?

MR. POHL: No, Your Honor.

THE COURT: All right. And counsel, were you anticipating calling any witnesses?

MR. SCARING: No, Your Honor.

THE COURT: Thank you. And counsel, have you had an opportunity to review all the materials submitted in connection with this sentencing with your client?

MR. SCARING: I have, Your Honor.

THE COURT: And Mr. Zhang, have you reviewed all the materials and discussed them with your attorney?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with the legal representation and counsel that you have received?

THE DEFENDANT: I'm satisfied.

THE COURT: I've reviewed the PSR and see that there are no objections. Anything that needs to be registered at this time? Hearing none?

MR. POHL: No.

MR. SCARING: No, not for the defendant, Your Honor.

THE COURT: So let me review. As an initial matter, Counts One and Two are grouped pursuant to 3D1.2(c). The offense level for the most serious count is determinative pursuant to 3.1.3(a), which is Count One. The base offense level of Count One is determined by calculating the offense level for the underlying offense here, wire fraud and

distribution of controlled substance under 2S1.1. The offense level of the most serious underlying offense is determinative. Let's begin with the base offense level of 30, and then as pursuant to 2D1.1, there is an increase by two because Mr. Zhang was convicted under 18 U.S.C. Section 1956.

It's further increased by two for the use of sophisticated means, and increase that by four for Mr. Zhang's role as the organizer or leader in the offense, resulting in an adjusted offense level of 38, and then minus three for timely 03:37 acceptance, resulting in a total offense level of 35, Criminal History Category is calculated as I.

And based on offense level of 35 and Criminal History Category I, possible penalties are custodial guideline range of 168 months to 210 months, supervised release of more than three years as to Count One and five years to life as to Count Two, a fine of $40,000 to $10 million, and a special assessment of $200.

Any objections to the statement as recommended under the guidelines?

03:37 MR. POHL: No, Your Honor.

MR. SCARING: No, Your Honor.

THE COURT: All right. Counsel, can I see you at sidebar.

(SIDEBAR DISCUSSION REMOVED.)

THE COURT: All right. And so there were no

objections to the calculation of the guidelines and the guideline range. So let me turn to the parties for your sentencing recommendation. First I'll start with the government.

03:41 MR. POHL: Thank you, Your Honor. I'll be happy to answer any questions that the court has, but I wanted to, one preliminary matter before I start, I wanted to -- our diligent forfeiture unit had flagged for me that we had filed a motion requesting a preliminary order of forfeiture in this case in April of 2025. It's docket number 498. And the dollar figures are mentioned in Mr. Zhang's plea agreement. I don't think that they're in dispute. They relate essentially to monies that were sort of found or seized in accounts that were tied to him or also to crypto currency accounts that were tied to him at the time of his arrest. And since that needs to be included in any final judgment, we would ask you to consider granting that motion.

THE COURT: So are you telling me that it differs in some way?

03:42 MR. POHL: No. I'm actually telling you it's exactly the same. All I need -- I don't believe there's any dispute. It was filed some time ago. I think in a perfect world maybe all three of us would have flagged it for Your Honor in our sentencing memorandum, but I think we would simply request that you grant the preliminary order of forfeiture that was filed as

part of the judgment for whatever sentence Your Honor gives today.

THE COURT: I am just comparing it to the plea agreement and what's been docketed as 498, and it does appear to be the same.

MR. SCARING: Yes, Your Honor. I have no objection.

THE COURT: All right. Very good. So that preliminary order is allowed, and it will be taken care of.

MR. POHL: Very good. Thank you very much, Your 03:43 Honor.

THE COURT: And we'll deal with the final order as well.

MR. POHL: Good. Thank you.

So, Your Honor, I'll just say a couple of things to set the table for our ultimate recommendation, which is for Your Honor to sentence Mr. Zhang to 84 months in prison. I would say two things.

One, you know, it's obvious from our exchange that we don't have a disagreement about the guidelines. The guidelines 03:43 in this case, with acceptance, are still quite substantial. I just, I think it's important for us to sort of start by talking about sort of the offense conduct that's here, which is something all the parties are familiar with and aware of, and we all know that Mr. Zhang is also charged with a matter in the Eastern District of New York.

Now, that investigation was contemporaneous with ours, and it certainly did have some overlap. There was a couple of common defendants ultimately that were charged in both indictments. The sort of criminal conduct that the Eastern District of New York agents and prosecutors uncovered was in some ways similar to what we ultimately charged here.

THE COURT: What is the amount involved in that case?

MR. POHL: So that's exactly -- you cut me to the quick. I don't know that the Presentence Report for Mr. Zhang 03:44 in the Eastern District of New York case has been completed. I don't have a final number for that. I don't know that I would be privy to it even if it had been done. And by the same token, I don't believe we've shared our Presentence Report with the prosecutors from the Eastern District of New York; nor have they asked us to.

My point in going through all this is just to make sure that Your Honor knows sort of we are -- it is a little bit of an unusual case in the sense that sort of our team of agents and prosecutors and a common defense counsel have been aware in 03:45 broad strokes that these two matters are proceeding, but my focus today is to talk about Mr. Zhang's offense conduct with respect to the case in the District of Massachusetts and the other matters that Mr. Zhang did that warranted our reduction below what the guidelines call for.

So I read Mr. Scaring's, what I thought was a

thoughtful sentencing memorandum. I would say that we're sort of -- there were only two words which I'll use in my argument where I sort of found myself sort of vigorously disagreeing with Mr. Scaring, but I don't think that we disagree in sort of broad strokes with the sort of procedural history of Mr. Zhang and the number of meetings that Mr. Zhang participated in and the fact that Mr. Zhang's information had substantial results in our case and I'm sure likely in the New York case as well.

I think where -- when I was reading Mr. Scaring's 03:46 memo, you know, his sort of history of Mr. Zhang is of a person who is smart. I agree that Mr. Zhang is smart. Mr. Zhang is probably one of the smartest people I've ever gotten to meet on the other side of the table in the course of my career as a prosecutor. Hardworking, nobody questions that, I don't anyway, and Mr. Scaring makes that point in his sentencing memorandum.

You know, Mr. Scaring's memo used the word "veer," that sort of by 2021, 2022 Mr. Zhang has sort of veered into criminal conduct. I don't think that that word really 03:47 describes what Mr. Zhang was doing at that time.

By the time that Mr. Zhang's criminal conduct was first detected by agents in New York, he was a substantial money launderer who had networks of customers of a number of different drug trafficking organizations that were using his services to launder bulk cash from largely marijuana but also

some cocaine trafficking as well.

Your Honor is familiar, I know, having sat through a number of the plea hearings and sentencings hearings in this case, Your Honor knows that really for several of the drug trafficking courier defendants, the only common denominator really is the fact that Mr. Zhang was the launderer for whatever drug group these particular couriers happened to work with when they showed up to exchange money for crypto currency.

And in addition to that aspect of Mr. Zhang's money laundering, which --and if we just did the drug trafficking bulk cash money alone, that would be close to $5 million, that would still be a substantial amount of money laundering in this case. But in addition to that, Mr. Zhang was able to sort of provide what turned out to be for him undercover agents the opportunity to launder really a large volume of money from these overseas networks of criminal groups based I think largely in Southeast Asia, in Mr. Zhang's case Cambodia, groups that are essentially internet farms that control customers in the United States to try to either trap or entice or trick individuals into sending money to accounts that are here in the United States. Maybe they think they're buying crypto currency. Maybe they think it's a warranty that has lapsed that they click on a link to think that they're going to renew. In some cases it was a romance scam of somebody who was believing that they were connecting with another person and it

turned out to be a case that their money was stolen.

Those funds in the period of essentially from January to October of 2022, Mr. Zhang laundered $20 million through the FBI undercover program in that time. And frankly, Your Honor, I think one of the things that we included in the Presentence Report was the month-by-month totals, and I'm almost positive we did that. We did. It's at paragraph 21 of the Presentence Report. And it goes from a couple hundred thousand dollars to a million to 3 million to 4 million to 5 million, and it got so fast so quickly that essentially the decision was made that this undercover operation had to be wrapped up, because it's one thing to sort of facilitate the drug trafficking pickups, but these were real sort of victims. It took agents a while to make sure that they understood exactly the scam that was happening, but these were money from people in America that were falling for these scams.

And the number of victims, they're very difficult to identify after the fact, and they're difficult to -- but the total amounts were not difficult to aggregate. And the staggering amount of money I think led all of us to conclude that we had to move forward and make arrests, including Mr. Zhang.

I just think it's worth taking a second and taking a step back and to just remember before we talk about all the other things we need to talk about with Mr. Zhang, this was an

extraordinarily sophisticated financial crime. And that's, either if you looked at the drug trafficking alone, it would be a substantial amount. If you look at the scam compound money alone, that would be an extraordinary amount. And on top of all those things, you have Mr. Zhang facilitated with relative ease several kilogram-size sales of drugs again to people that he thought were customers or connected to the undercover agents but who were in fact part of the undercover team that were investigating Mr. Zhang and his group.

03:52 So this is a very serious offense, and I think it's not often that you see 168 to 210 months in a Criminal History Category I. Usually it takes a substantial criminal history and a serious crime to get you up into that number. I think it's just worth noting that even with a Criminal History Category of I, Mr. Zhang's conduct here was substantial.

All right. Now, having said all of that, I agree -- so, you know, Mr. Zhang's criminal conduct might have started with a veer when COVID-19 happened, but by the time he was detected in Boston, he was well on his way to being a 03:53 substantial money launderer, and that's the person that agents in Boston really detected and worked to devise an undercover operation to infiltrate.

With respect to the information about after Mr. Zhang was arrested, I think the fact that Mr. Zhang met with agents and prosecutors quickly was notable. The fact that his

information was useful in securing guilty pleas and particularly in guilty pleas on the people that Mr. Zhang himself is sort of most familiar with, and we've noted those in our memorandum at page 4, but those include Licheng Huang, who was Mr. Zhang's sort of Boston-based partner here, the person that agents first detected, and they followed Mr. Huang's information to Zhang; Roger Luo, who worked for Mr. Zhang here in Boston as a money pickup person; Rongjian Li, who was a Bank of America employee who helped Zhang open bank accounts to accept these overseas scam monies; and Yanbing Chen, who I think Your Honor gave I think a very substantial sentence to at 57 months because he was somebody who was engaged both in drug trafficking and money laundering here and in New York, as well as Qing Hua Sun, someone who traveled with Mr. Zhang to the overseas compounds in Cambodia.

03:54

So Mr. Zhang's information helped secure I think guilty pleas in all of those cases. That is I think without question the definition of what the government views as substantial assistance.

03:55

The second word that Mr. Scaring used was "substantial and extraordinary. Extraordinary is in my view what would take a recommendation in this case from 168 months to a time-served sentence, which I know Mr. Scaring is asking for here. I think in the context of this case, that would be a misreading of Mr. Zhang's assistance. Providing information that leads to

guilty pleas, that is the sort of core function, one of the core reasons that we would give a substantial assistance motion. We have no difficulty recommending that here.

I think, though, the two areas where we might have been able to sort of push Mr. Zhang from substantial assistance into the realm of the extraordinary is, one is if we were able to do sort of more investigative work on the scam compounds. That's not Mr. Zhang's fault. It isn't that he failed to meet the government's request. It's just that Mr. Zhang -- those 03:56 are very difficult groups to investigate, and the fact that we don't -- I don't blame Mr. Zhang for the fact that we haven't been able to sort of penetrate those groups in the way that I might have liked, but I don't think that we can give Mr. Zhang credit for something that hasn't happened.

And I think the other way that Mr. Zhang's cooperation could have been I think extraordinary but wasn't was during the testimony in the Chen case. I think we did the best that we could in explaining our version in the memo. It's not that we think Mr. Zhang didn't testify truthfully in the Chen case, but 03:57 I think there were numerous instances where I think it was obvious to us, it was obvious to the jury, it might have been obvious to Your Honor, that Mr. Zhang did not really want to testify in that case. I'm not saying he didn't do it. I'm not saying he didn't sit for the proffers. But Mr. Chen and Mr. Zhang were longtime friends, close friends. It was obvious

that Mr. Zhang admired Mr. Chen. It was obvious that they sort of had similar trajectories in trying to establish a life for themselves here in the United States. But there were a number of times where Mr. Zhang gave more fulsome answers in proffers about the way in which you could know that Mr. Chen was committing a crime that were sort of backed off of or limited during the course of the trial.

I'm sure that that is a function of the fact that, A, he didn't want to be there; B, he was sitting there and

03:58 Mr. Chen was sitting right there. I think that was an extraordinary difficult and uncomfortable position for him to be in.

My point in saying that is not to suggest that he doesn't deserve substantial assistance credit for all the reasons we've already said. I think he does. But none of those people were people that Mr. Zhang really was close to or cared about. Chen, he cared about. And testifying in a way that would have made clear that he had fully accepted his own responsibility and explaining why Mr. Chen was also guilty,

03:59 that would have been a very difficult thing for anybody to do, and I think it was our view during the trial that Mr. Zhang struggled with that. And I think that's --

THE COURT: I agree with you on that, that he appeared to be in a very unfortunate position of testifying against someone that he considered a friend, and so that I recognize.

You used in your memo the term "combative." That's the part I'm not clear on. And maybe, you know, if he said things to you that he didn't say at trial, that didn't come through.

MR. POHL: That didn't come through. So I think that -- let me put it this way. I would use the word "combative" because I think there were a number of times when I tried to circle back with Mr. Zhang, and, you know, I just want to -- I think it's apparent, I'm sure it was apparent to Your Honor during the trial, but this is not a case in which we 04:00 didn't sit with Mr. Zhang enough or we unexpectedly called him at the last minute and he didn't know this was coming and everybody was doing the best they could but he just wasn't as prepared as we would have liked to have had him been. That wasn't the case at all. We spent a considerable amount of time with Mr. Zhang in the lead-up to the trial.

For all the reasons we said, Mr. Zhang was probably the most culpable. Mr. Chen was the least culpable. And the gap between them was substantial. We wouldn't have cooperated Mr. Zhang just to talk about Mr. Chen, all the things we said 04:01 in the memo.

So I think our view of the combative is, it's not that he shouted at me or anything like that. Mr. Zhang has never done that a single time in any of the meetings I've had with him, and he certainly didn't do it during the trial. I think where we found it to be combative was that I think there were a

number of occasions where we circled back to things that we knew, because we had just met with him or recently met with him, that we knew that Mr. Zhang knew we were going to ask and knew that the answers, the information that he provided was sort of much more restricted and limited in the direct.

And at a certain point you can only do that so many times before, A, any defense attorney and certainly the defense attorneys at the Chen trial would start to object; and B, there's only so many times you can do that before the jury thinks that you're improperly trying to coach your own witness.

So I don't know -- if that word isn't quite right, I think maybe the better way to say it is that I think we attempted to sort of on multiple times when we felt that Mr. Zhang was sort of limiting himself in his answers gave him an opportunity to expand on that, and he didn't take it, and I think he didn't take it because he really, during the course of the trial, wished that he wanted to be anywhere on planet Earth but that seat.

THE COURT: Let me ask you this question. If Mr. Zhang testified in a way which you had hoped and expected, what would your recommendation be?

MR. POHL: My recommendation would I think -- I still don't think I could have gone all the way down to time served, but I would have recognized that, I would have recognized that as the difference between substantial and extraordinary, and I

would have recommended a lower number.

And I know you're not saying this, and I know Mr. Scaring is not saying this, but I want to make sure that I say, mostly for Mr. Zhang's benefit, that is completely irrelevant. My recommendation would have nothing to do with the verdict, period. I would not have given Mr. Zhang time served because we won, and I'm not punishing Mr. Zhang because it was a not guilty. This would have been, even if Mr. Zhang did a perfect job in our view, it would have been a tough case. 04:03 I think it was a tough case. But I think the fact that we struggled so much with him during the trial was a function, not because he didn't know what we were going to ask and not because he didn't know what we had gone over, it's because he just had a very -- he had two problems. The biggest one was the fact that he really had a hard time testifying against this person. And the second thing, and this doesn't go to acceptance of responsibility, Mr. Zhang has pled guilty early. He's never really contested his own guilt or backed it up in any of the proffers that we've had, but there is an aspect in 04:04 talking to Mr. Zhang of pride and accomplishment.

I think Mr. Zhang knows how smart he is. I know how smart Mr. Zhang is. I think a part of Mr. Zhang recognizes it himself. I think Mr. Zhang, there was an aspect of his testimony where he essentially wanted the jury to know that he used to run a legitimate nail salon even if it turned out --

and a legitimate money remitting business even if it turned out that it completely confused the jury about the illegality of the conduct that he was engaged in with Mr. Chen at the time. And so I think those two things, those twin concerns were ultimately what led us to -- it was part of the reason why I think the trial resulted as it did.

But really, the verdict is not in any way a measure of Mr. Zhang's full cooperation. We could have, if we won that trial without calling Mr. Zhang, he would have gotten a particular sentence. If we won that number and Mr. Zhang gave I think full, complete, truthful, and fulsome testimony and we lost, that would have been -- I think we would have recommended a different number. It just happened to be the case that --

THE COURT: What's that number?

MR. POHL: The number for what I would have recommended under those circumstances?

THE COURT: Yeah.

MR. POHL: Well, I think, I guess I would say this. You should never ask a lawyer to do math on his feet, Your Honor, but I think 50 percent is the type of typical number that we give.

THE COURT: And that's where you are now?

MR. POHL: In a case like this, where his information led to pleas, all right, I think that's a fair -- also, particularly in light of the fact that the scam compound

information I think was itself valuable in this case. So, you know, another 10 to 15 percent off of that for extraordinary would have gotten him down into like 60 percent, maybe another year or two below what we recommended. I think that would have been -- that would have I think been a recognition that Mr. Zhang at that point had really done all that he could. So whether that's 60 months, something along those lines, that is I think what I would consider to be extraordinary, both substantial and extraordinary assistance.

04:07 THE COURT: Right now he's been in for how many?

MR. POHL: I think the Presentence Report, it's from the date of arrest to the present, so that's about 40 months.

MR. SCARING: I think it's just under 42 months, Your Honor.

THE COURT: Okay. Thank you.

MR. POHL: Thank you.

THE COURT: Okay. Did you say everything that you wanted to, counsel?

MR. POHL: I did. Thank you very much, Your Honor.

04:07 MR. SCARING: Thank you, Your Honor. I'm going to use the podium.

THE COURT: That's fine.

MR. SCARING: May it please the court, and thank you for this opportunity.

THE COURT: Before you start, can I just turn back to

AUSA Pohl. With regard -- so I understand with regards to forfeiture. Is there any request for restitution?

MR. POHL: Your Honor, I think the forfeiture order in the plea agreement and that you're asking for is I think not just the money that we've seized but it's up to $25 million, I think. As we identify -- so, no, the short answer is no.

THE COURT: Thank you.

MR. SCARING: Thank you, Your Honor.

First, in our submission, we tried to give the court 04:08 as much background as we could to understand who this guy is. And what we see is a hard worker, a person who has attempted through his life but-for this to do the right thing, to better himself, to get some kind of opportunity to be successful for his family, and then COVID hit.

As we said, he's not the only person who was affected by it, but it does show the impact that it had on him. He started drinking. He started using alcohol and drugs, and then of course he went where he went.

When he was charged, he talked to me about what his 04:09 opportunities were, and what he wanted to do was cooperate. I explained to him that cooperating under these circumstances could be dangerous, that he was dealing with some dangerous people here, that no matter how hard the government tries, the word will get out. I talked to him about how difficult it would be for him to convince the government that they should

enter into a cooperation agreement. I said that because of his role.

I also told him that it would be difficult to get both the Eastern District and Massachusetts to agree to that. I said, "Having all of that information, do you want to cooperate?" He accepted responsibility. He said, "It's on me. I have to do the best I can for my family. I will try to cooperate."

So we started the process. In the beginning, Mr. Pohl 04:10 was more excited about it than Mr. Weintraub, who was the assistant district attorney in Brooklyn. So we started what became a very lengthy process. The first session with all the agents from New York and the agents from this district, the prosecutors, went for hours. When I say "hours," I think about three hours. We did a second one, again, for about three hours. I remember a third one. That one I think Mr. Brooks who was my co-counsel was present. And I believe there was a fourth one. I don't recall if there was any more than that.

But these sessions were extensive, multiple questions, 04:11 information being given to the agents, to the government, to the U.S. attorneys. I had no idea how this information would have been used, but I do know that at the end of this process, both districts said they would enter into a cooperation agreement. I explained to the defendant that it was critically important if he was going to be a cooperator, at least my

client as a cooperator, that he tell the truth, that he doesn't exaggerate, that he doesn't try to impress the government by adding more information than he really knows and that he just tell the facts. And that's what he did for multiple years.

I had multiple conversations with the prosecutors over the years that he's been cooperating. I never heard a complaint about Mr. Zhang's cooperation. He's doing what we've asked him to do. He's providing information. That's what I heard, and I heard it from the beginning, and I heard it up 04:12 until after there was a verdict in this case, the one that was tried before Your Honor.

And with respect to Mr. Pohl, he told me flat out that his recommendation for Mr. Zhang's sentence was impacted by his testimony at the trial. I made my position -- I tried to argue that that was an inappropriate thing to do, but Mr. Pohl truly believed it.

But I want to talk about the letter that he sent to the court because I'm troubled by his -- first, I went back and read the transcript. I read it three times to see where it was 04:13 that the defendant, that Mr. Zhang was not being candid with him or was not being fair with him or was giving him any problems.

In the government's letter they never gave specifics like this question or that question, so there was nothing for me to pin to, but I looked at that testimony, and it was, to

me, clearly the kind of testimony that you're going to get from a person who has problems with the language, in other words, we need an interpreter. So you have the interpreter, the witness testifying. There are always issues in that regard.

Mr. Zhang never testified before, so he was nervous, but his testimony was really crystal clear both in direct and on cross-examination. Direct examination, he made it clear that Mr. Chen participated in multiple sessions with the -- I'm sorry -- participated with him by holding money or whatever the limited version of what he did was. And then on cross-examination he made it even clearer. He was never trying to go back from his testimony, never trying to minimize it. What he was trying to do was tell the truth.

We all know that there are cooperators who get on the witness stand and say what they think the government wants to say, but he said all he could say on direct and actually gave the government their case. And then on cross-examination, and I'd like to read this, this is from page 594, he was asked by Mr. Keenan, who was a very good lawyer -- except here Mr. Keenan made a little bit of an error. The question was, "He was involved in any of your" -- "He wasn't involved in any of your criminal activity, was he?" Mr. Pohl objected, but he didn't just object. He made a statement. He said, "That's a legal, not a factual, question, Judge." Your Honor overruled it, and then he answered that.

Now, he listened to what Mr. Pohl said. Mr. Pohl is an important person to him, and his answer was, "He helped me, though." And that's exactly what he did. Now, that's aiding and abetting. He doesn't know that. Then he goes on the next question by Mr. Keenan, I don't know why he asked this, but the question is, "In these seven transactions, correct?" And Mr. Zhang said, "Yes."

So that was Mr. Pohl's case, in essence. The question of whether or not he knew or didn't know, I mean, it was pretty 04:16 obvious that he knew what Mr. Zhang was up to. They were best of friends. I mean, best of friends know what's going on.

Now, he said we never discussed the criminality, but criminals who are involved in a conspiracy never discuss the criminality. I mean, indeed the court's charge on conspiracy is that conspirators don't typically get together in a room and talk about the criminal activity. And so what Mr. Pohl was left with was circumstantial evidence to prove that he was a knowing participant in this conspiracy.

Now, again, in my view you'd be naive not to believe 04:16 that. However, juries have a right to do whatever they want to do. And in this case, the jury evaluated the circumstances and decided that they would not convict him of this federal felony. This was never Mr. Pohl's intention, but it is a consequence. If cooperators believe that if there's not a conviction they're not going to get credit, that's a very dangerous thing to be on

the street. From Mr. Zhang's point of view, what does he know? He knows, he testified at the trial, he knows there was a verdict of not guilty, and he knows that the government is upset with him.

Now, again, obviously that's not what Mr. Pohl intended, nor would he ever do that. I have the highest regard for him. I'm talking about what the people on the street talk about. So I think he should not be penalized for that testimony.

04:18 THE COURT: The question is whether or not he should be rewarded as much as you believe that he should be by giving him time served, the 42 months.

MR. SCARING: Right. Well, let me talk about that, Judge. This was a single --

THE COURT: Even the number at 50 percent, the government's recommendation of 84 months is a substantial deviation from the low end of the guidelines.

MR. SCARING: Well, Judge, the probation report talks about the 65 people who had the same guidelines level. That's on page 23. And in that report they say the average sentence for the 65 defendants who had an offense level of 35 is 111 months. If we reduce that by 50 percent, then we get a much different number than is being recommended by the government. So if we reduce him at least that's a sentence of approximately 55 months. Now, Mr. Pohl said himself that under circumstances

where there was no difficulty in terms of his testimony, he would have recommended a year or two less.

I want to talk a little bit about why I think time served is appropriate here. First, I think we have to look at his conduct after he was arrested, aside from his cooperation, what he did at Wyatt. He showed that he's a responsible person. He showed that he is accepting responsibility. He went and took all of those courses. Indeed we got a letter from a warden. I never had that in my whole career, and I've 04:19 been doing this a long time. So we see that this is a positive person who is doing the right thing.

Now, what are the additional problems? Well, this was one incident investigated by the Eastern District and the District in Massachusetts. When this day is over today, he's not finished. He's going back to New York. He's going to testify in another case. In fact, I had received a telephone call from the government attorney in the Eastern District who said to me, "The trial that he's going to testify to could be delayed," and he said, "I will entertain" -- he didn't say he 04:20 would, but he said he will entertain a motion for bail pending the outcome of his investigation -- of his cooperation. And so this cooperation by the defendant --

THE COURT: In this case or in that case?

MR. SCARING: No. In that case.

THE COURT: Okay.

MR. SCARING: We couldn't do it in this case but in that case. But this investigation is ongoing, and it's ongoing for I don't know how long. But when he goes here, when he leaves Wyatt -- Wyatt is a pretty nice place to do time.

THE COURT: I just want to make sure that he would get full credit from the date of his arrest on this case.

MR. SCARING: Yes.

THE COURT: Okay. Is he likewise going to get credit for the New York case for that same time?

04:21 MR. SCARING: Yes.

THE COURT: Okay.

MR. SCARING: He's going to get --

U.S. PROBATION: No, Your Honor. It will be credited to one case.

THE COURT: That's what I was thinking.

MR. SCARING: What's that, I'm sorry?

THE COURT: He only receives that credit on one of the cases, not both of the cases.

MR. SCARING: Not on both, yes, Your Honor. I'm
04:21 sorry.

THE COURT: Okay. So the 42 months can be counted towards here, but it's almost zero months there. But we don't know what they're going to do. Was there any discussion about a concurrent sentence with the prosecutors in the Eastern District and here?

MR. SCARING: I don't recall.

MR. POHL: No. Our communications have been good both with each other and also with counsel. This is an obvious reason. They had a multi-defendant case. Ours was a multi-defendant case. When they were going to wrap up and who was going to do what at what time was just too difficult to coordinate, so no.

I'm quite sure that at the sentencing in New York Mr. Weintraub and Mr. Scaring will talk about the cooperation 04:22 that's been focused in New York, and I'm sure that the judge will take into consideration the sentence that is imposed here in whatever sentence gets fashioned down there.

MR. SCARING: I don't --

THE COURT: Are you counsel there?

MR. SCARING: I'm sorry?

THE COURT: Are you counsel in the Eastern District?

MR. SCARING: Yes, I am, Your Honor.

THE COURT: Okay. Go ahead.

MR. SCARING: I want to talk about, when he leaves 04:22 here, the only facility in New York, and I'm going to argue against this, is the M.D.C., which is a horrible place. It's been written up in many articles. There are lockdowns. There are all sorts of issues going on there. Now, I'm going to ask that the government in Brooklyn, in the Eastern District, place him in some other facility, except the facility that he will

normally go in would be the M.D.C.

And again, I want to talk about some of the fears that I have for him. In the Eastern District of New York, Mr. Zhang contributed to the indictment of Chen Zhi, who was the founder of Prince Holdings Group, one of Asia's largest criminal enterprises, and they seized $15 billion in crypto. Zhi is now incarcerated in China. There are a lot of people with that $15 billion that are not going to be happy that he had something to do with it. He wasn't the only person. He just contributed.

04:24 And the government here in their submission talks about his information for overseas compounds where internet farms manned through forced labor, et cetera -- I'm not giving the whole thing, but these are pretty bad people that we're talking about. Plus, he has of course upset a lot of people in the district here and in New York.

A person, let's assume a person is the average person who took a sentence of 111 months. That person with the recommendation by the government of 84 months would really only be doing maybe 29 months more than here, if my calculation is

04:25 correct. That person could go do his time and have no fear. This person cannot go do his time and have no fear.

About two weeks ago, I got a call from his fiance, and she said, "Agan just moved into my neighborhood. He knows that Jin is the person who fingered him. Am I in danger?" That's what she said. "Are my children in danger?"

We provided that information to the government, and they are not in danger, but I just want the court to understand that these fears are out there, and these fears are there for a long time. And that's one of the reasons that defendants get credit for cooperation. That's one of -- the credit is the incentive. There are risks and rewards.

THE COURT: And based on the government's recommendation, he's receiving 50 percent credit.

MR. SCARING: Well, he's receiving 50 percent credit. If he received 50 percent credit off the average sentence for a person --

THE COURT: 55 and a half months.

MR. SCARING: Yeah. Judge --

THE COURT: That might be a reasonable way to look at it, but you may continue.

MR. SCARING: Again, Your Honor, one of my concerns is, as I said, it's not over for him today. He goes back to New York. He continues to cooperate in New York. It would certainly be safer for him if he were not in a facility, since the government admits in their submission everybody knows that he cooperated, including, as they say in their letter, the organizations that he was affiliated with.

So, yes, I understand what Your Honor is talking about. My concern is, I'd like to see him -- he'll be back -- he's not getting out right away, but I would like to have an

opportunity to make a bail application to get him out before his cooperation continues or is finished in New York. Again, I don't know how long he's going to be cooperating there. I do know that the government said they would entertain -- they certainly didn't say they would grant it, and I do know that he is scheduled, according to the last conversation I had with Mr. Weintraub, that he is scheduled to testify in a case in the Eastern District.

If I may just take a short moment to -- Judge, we're 04:28 not trying to minimize this, but I am trying to just put my client's conduct in perspective with regard to the cooperation and what additional time he faces as a result of that. And, Your Honor, they would not have given him a cooperation agreement if it were not for the valuable information that he had. I had two districts that spent many hours talking to him who decided that it was important to the government to give him that opportunity, and he took it. Thank you, Your Honor. Unless Your Honor has any questions.

THE COURT: I do. The trial is expected to be in 04:29 October. You don't know what he'll get for a sentence in the Eastern District. You do have concerns about him being transferred to the detention facility there in Brooklyn.

MR. SCARING: Yes.

THE COURT: And if I were not in agreement with you about time served and I was inclined to give him additional

time, would it make sense to continue this sentencing so he remains in Wyatt? But I know that you have an interest in seeking bail for him in the Eastern District case, so, you know, ultimately you want him out on the street there. But I'm not convinced that I'm going with time served, and so with that, I'm just trying to figure out whether or not that assists you with the security concerns that you have.

MR. SCARING: That certainly would, Your Honor, because he knows what he's facing at Wyatt. Everybody knows what's going on there, and there have been no issues, safety issues at all.

04:30

THE COURT: Okay. Is there any question by the government in what I was just thinking out loud about?

MR. POHL: So your thought would be that we would -- I guess my thought, Your Honor, would be that you hear from Mr. Zhang today and we go through all of the stages of like a sentencing, really if for no other reason than it's all fresh in Your Honor's mind now. Not that we couldn't do it all again later. Then it would be your sort of inclination at this time to sort of continue the sentencing to a later date, the actual, your imposition of sentence to a later date, and during that time, the defendant would remain at Wyatt. I think I understand.

04:30

Let's put it this way. Nothing in my presentation should be seen as taking away from the real concerns that

Mr. Scaring has both about the facility in New York and about the fact that these are -- you know, he has genuine safety issues that we will have to address throughout the period of his cooperation while in custody and out.

THE COURT: Okay.

MR. POHL: So if that's Your Honor's inclination, I certainly can understand that, I can understand that.

THE COURT: Anything else you want to say on that? Because, like I said, I'm not sure I'm in agreement with your number, counsel.

04:32

MR. SCARING: No, Your Honor. Thank you for hearing me out.

THE COURT: Okay. Does your client wish to be heard?

MR. SCARING: Yes, Your Honor. Your Honor, he has asked me if he could speak to the court in English. He does speak English.

THE COURT: Whatever he would like. The interpreter is there for his assistance.

MR. SCARING: May he sit?

04:32

THE COURT: Whatever he's comfortable with.

THE DEFENDANT: Your Honor, thank you for allowing me to speak in court today. First, I want to apologize for the crime I commit. I'm sorry, I'm very sorry. I was so --

MR. SCARING: Just take your time.

THE COURT: Take your time.

THE DEFENDANT: I want to apologize to anyone affected by this case. I'm truly sorry.

MR. SCARING: Okay. Just take your time. Do you want to say anything else or that's it? Do you want to say anything else?

(Defendant conferring with counsel.)

THE DEFENDANT: I want to apologize to my family and friends for the pain and sufferings I caused them. I'm sorry. During the three and a half years in Wyatt, I have reflected on all the crime I committed and participated in programs in Wyatt. It has helped me understand why I made such poor decision and how to stay on the right path in the future moving forward away from any crime in the future. What I did before was wrong, completely wrong. There's no excuse for that. I am extremely regretful and ashamed of myself, and I have to live with it the rest of my life.

While incarcerated, I have learned how important I am to my family and how supportive they were, how difficult it was for them because of what I had done. I can only think, I can only imagine what I have put them through. I regret it from the bottom of my heart.

Today I'm respectfully asking the court for forgiveness for a second chance for my life, a chance that I can spend time with my kids and my aging parents, a chance to be a good father and good son and to become a useful person to

my society. Thank you, Your Honor.

THE COURT: Mr. Zhang, I have a question for you. You said that you've reflected, in your time at Wyatt, you've reflected on why you made poor decisions. What conclusion did you come to? I understand that you're sorry and you're sorry for what you put your family through, but help me understand what led you to that. And I do applaud you for all the work and effort that you've put into your time at Wyatt, all the courses that you've taken.

04:36 THE DEFENDANT: I reflect like on the illegal stuff I did before. I don't -- I think this is a bad thing to do. I don't have to do it. I can do nails. Why I committing crime? Why? You know, because what I did, a lot of people, they got hurt, financially, emotionally. It's not the right thing to do, you know. It's not the right thing to do. Thank you.

THE COURT: Thank you. Can I see counsel at sidebar?

(SIDEBAR DISCUSSION REMOVED.)

THE COURT: In consideration of what a reasonable sentence would be here, I must consider and have considered all 04:48 the factors under 18 U.S.C. Section 3553(a). That includes the nature and circumstances of the offense, Mr. Zhang's personal and criminal history and relevant characteristics, the kinds of sentences available, the kinds of sentence and the sentencing range established for the category of the offense committed by the defendant, any pertinent policy statement issued by the

Sentencing Commission, the need to avoid unwarranted sentence disparities among similarly situated defendants, and the need to provide restitution to any victims if that's applicable.

I've also considered the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.

04:49

Before I may impose a variance I must follow a two-step process. That's calculating the guidelines, as we've done, and consider the sentencing factors under 3553(a). The First Circuit has repeatedly held that I should give particular consideration to the nature and the circumstances of the offense and of the offender.

Mr. Zhang, I have reviewed the Presentence Report, submissions of counsel, letters provided on your behalf. What emerges is a life that did not necessarily begin with criminal intent. You emigrated to America from a working-class family in China with only a high school degree. You hustled by working as a restaurant busboy in multiple states, car salesman, kitchen cabinet repairman, cell phone repairman, and even certified nail technician. In just two years you managed to save up money to open your own nail salon. For the next ten

04:50

years you successfully ran that business. You lived a law-abiding life. You had no prior history of crime, nor drug or substance abuse. You started a family, and by many accounts you were living the American dream. That was until the COVID-19 pandemic.

Your business, like many, came to a halt while you had two children to care for and elderly parents to support. Like many, you were stuck at home with no ability to go out and make money the way you had before. You ended up online, starting 04:51 off with micro transactions and flipping video game currencies, but as you sunk deeper into the webs of the internet, you started to associate with the wrong people, money launderers. Money started to flow in probably more than you ever thought possible.

That background does not excuse your conduct. Many others in the country lost their savings and their livelihood without resorting to criminal acts that included scams on people, but it does help explain and it is something that I considered.

04:52 Turning to the offense itself, in determining an appropriate sentence, I took into account a number of aggravating factors. The conduct here is serious. This was a large criminal enterprise with over $25 million laundered in less than two years. Under your direct, your co-conspirators used social media to prey on and lure victims into investing in

fraudulent crypto currency, warranty and romance schemes. You also sold drugs, including cocaine and MDMA, across New York, New Jersey, and Massachusetts.

Even if there are no identifiable victims in this case, that does not mean your actions are victimless. You scammed millions of dollars of what could be people's retirement savings, education payments, or the day-to-day bills like rent, gas, and food. You need look no further than certain streets in this city to know the scourge of hard drugs and addiction, to know that drugs is not a victimless crime.

04:54

With that said, I've also weighed mitigating factors, including your actions since your arrest. We've discussed many of those here. It appears that while detained you have earnestly tried to restart your life. You've been taking educational and vocational courses on topics like ethics in small business and have expressed interest in substance abuse treatment. Your letters of support reflect a community of friends and family, young and old, who care for you, who want to see you do better and believe that you can do better.

04:54

Your determination led to success when you came to this country. Your greed led you to this courtroom today. Following your prison sentence, I hope that you will choose to live a law-abiding life for yourself, to set a good example for your two young children, and to be of help to your elderly parents as they age in peace. You asked for a second chance,

and I believe you deserve a second chance to make good on your words that you spoke today, to be better for your parents and for your children.

In considering all these factors, I have concluded that a sentence of 56 months of custody as to each count to be served concurrently and followed by three years of supervised release is sufficient but not greater than necessary to achieve the goals of sentencing.

No fine, nor restitution, is imposed. You're ordered to pay $200 mandatory special assessment. Forfeiture of the property listed in the plea agreement on page 4 is ordered. This represents a sentence that is below the sentencing guidelines.

Sir, would you please stand. Please stand.

Pursuant to the Sentencing Reform Act of 1984 and having considered the sentencing factors enumerated at 18 U.S.C. Section 3553(a), it is the judgment of the court that the defendant, Jin Hua Zhang, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 56 months. This includes the time in which Mr. Zhang has been held in custody since October 13, 2022.

Upon release from imprisonment, you shall be placed on supervised release for a term of three years. Within 72 hours of your release from the custody of the Bureau of Prisons, you shall report in person to the district in which you are

released. Forfeiture is ordered. Special assessment of $200 likewise.

As far as conditions of supervised release, while under the Probation Office's supervision, you shall comply with the mandatory and standard conditions as recited on pages 29 and 30.

As far as your special conditions, you shall participate in a substance use treatment program if deemed necessary by the Probation Department. You will be required to 04:58 contribute to the cost of evaluation, treatment, and programming and/or monitoring. You must provide the Probation Office access to any requested financial information which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

Are there any other conditions that are specifically requested?

MR. POHL: No, Your Honor. Thank you.

MR. SCARING: No, Your Honor.

THE COURT: Probation, is there anything I need to 04:59 review?

U.S. PROBATION: Your Honor, I would just ask, as for special condition number two, it adds the --

THE COURT: Testing.

U.S. PROBATION: -- not attempt to obstruct or tamper with the testing.

THE COURT: All right. Should you -- let me just state it. You must submit to substance use testing, not to exceed 104. You are prohibited from attempting to obstruct or tamper with any testing methods.

U.S. PROBATION: Thank you.

THE COURT: The sentence is imposed for all the reasons previously stated because the court believes that this sentence and all its components is reasonable and is a sentence that is sufficient but not greater than necessary to accomplish 05:00 the goals of sentencing consistent with 18 U.S.C. Section 3553 and the Supreme Court's guidance.

Under some circumstances the defendant has a right to appeal the sentence, and a defendant may waive the right as part of a plea agreement. I refer you to your plea agreement as to specifically those rights. Such waivers are generally enforceable, but if you believe the waiver itself is not valid, you can present that theory to the appellate court. Any notice of appeal must be filed within 14 days of entry of judgment. If you are unable to pay appeal costs, you may ask for 05:00 permission to appeal in forma pauperis, which means you can apply to have the court waive the filing fees. On appeal, you may also apply for court-appointed counsel.

This sentence is hereby imposed as stated.

Anything further from the government?

MR. POHL: No, Your Honor. Thank you very much.

THE COURT: Defendant?

MR. SCARING: No, Your Honor. Thank you.

U.S. PROBATION: No, Your Honor.

THE COURT: All right. So with that, Mr. Zhang, you are remanded to the custody of the Bureau of Prisons. Good luck to you, sir.

THE DEFENDANT: Thank you.

COURTROOM CLERK: All rise. This matter is adjourned.

(Adjourned, 5:01 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 9th day of June, 2026.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter